# EXHIBIT 1

# EXHIBIT 1

 # MGM MEMORANDUM

FROM: Frank I. Davis
TO: Karla Davidson
DATE: April 9, 1981

*80131-150-1-1*

SUBJECT: BUCKAROO BANZAI

Johnny B. Good  Inc.
f/s/o Earl Mac Rauch

Dear Karla:

Please prepare an agreement between MGM and Johnny B. Good Inc. ("JBG") (ID # ███-9582) relating to the writing services of Earl Mac Rauch in connection with a first draft screenplay and 2 sets of revisions, with an option for a third set of revisions based on the project entitled BUCKAROO BANZAI on the following terms:

(1) BUCKAROO BANZAI is an original story idea by  Rauch.  Rauch shall commence services on a first draft screenplay based on the idea on April 10, 1981, and shall write and deliver a first draft screenplay of not less than 110 nor more than 160 pages within a period of 16 weeks following commencement of services thereon.

(2) Following delivery of the first draft screenplay, MGM shall have a period of 3 weeks for reading and conferences following which  Rauch shall immediately commence services on the first set of revisions which revisions shall be delivered within a period of 4 weeks thereafter.

(3) Following delivery of the first set of revisions, MGM shall have a period of 3 weeks for reading and conferences following which  Rauch shall immediately commence services in connection with the second set of revisions, which shall be written and delivered within a period of 2 weeks following commencement of services thereon.

**CONTRACT OFFICE
FILE COPY**

- 2 -

To:  Karla Davidson
Re:  BUCKAROO BANZAI
     Earl Mac Rauch                    Date: April 9, 1981

     (4)  Following delivery of the second set of revisions,
MGM shall have a period of 4 weeks for reading and conferences
and within which it may exercise its option to have    Rauch
write a third set of revisions.  In the event the option
is exercised, the third set of revisions shall be written
and delivered within a period of 3 weeks thereafter.
MGM shall have the right to postpone the exercise of the
aforesaid option and      Rauch's writing services in
connection therewith, but in the event of postponement
Rauch's      services shall be subject to his availability.

     (5)  For      Rauch's writing services in connection
with the first draft screenplay and 2 sets of revisions,
JBG shall be entitled to receive the total sum of $75,000
which shall be payable:

          $ 18,750 - on commencement of writing services
                     on the first draft screenplay;

            18,750 - on delivery of the first draft
                     screenplay;

             9,375 - on commencement of services on the
                     first set of revisions;

             9,375 - on delivery of the first set of
                     revisions;

             9,375 - on commencement of services on the
                     second set of revisions;

             9,375 - on delivery of the second set of
                     revisions.

     For the third set of revisions, if option exercised,
JGB  shall be entitled to receive the total sum of $25,000
payable:

          $ 12,500 - on commencement of services on the
                     third set of revisions;

            12,500 - on delivery of the third set of
                     revisions.

- 3 -

To: Karla Davidson
Re: BUCKAROO BANZAI
     Earl Mac Rauch                      Date: April 9, 1981

    (6)   In the event Rauch receives sole or joint screenplay credit JBG shall be entitled to receive the total sum of $150,000 (inclusive of all amounts theretofore paid), payable upon determination of credits by the WGA.

    (7)   MGM shall reimburse JBG for WGA pension health and welfare payments and employer payroll taxes to the extent MGM would have had to pay same had it employed Rauch directly.

    (8)   Credit to be determined pursuant to the WGA.

Agent:  Mark Lichtman (Shapiro-Lichtman)

Subject only to the specific terms hereof, this deal memorandum shall be deemed to include all of MGM's standard terms applicable to deals of this nature.  The parties intend to enter into a formal agreement incorporating the terms hereof and such standard terms as promptly as possible and the parties shall negotiate in good faith with respect to such standard terms. However until such formal agreement is signed, this deal memorandum shall be deemed a binding agreement upon the parties.

IN WITNESS WHEREOF the parties have executed this agreement as of the day and year first hereinabove written.

JOHNNY B. GOOD INC.        METRO-GOLDWYN-MAYER FILM CO.

By _____      By _____
   Its _____             Vice-President
       PRESIDENT

I have read the foregoing and hereby agree to same.

_____
        EARL MAC RAUCH

FID:cr

# EXHIBIT 2

# EXHIBIT 2

AGREEMENT dated as of the 9th day of April, 1981 between METRO-
GOLDWYN-MAYER FILM CO., a Delaware corporation, (herein the
"Producer") and JOHNNY B. GOOD INC., a California corporation,
(herein the "Company"), relating to the services of EARL MAC RAUCH
(herein the "Writer").

1.   ENGAGEMENT                                     *80131-150-1*

   A.   Company hereby lends Writer to Producer, and Producer
        hereby borrows Writer from Company, to write and deliver
        to Producer a first-draft screenplay, of not less than
        one hundred ten (110) pages nor more than one hundred
        sixty (160) pages, and two (2) sets of revisions based
        upon an original story idea by Writer currently entitled
        "BUCKAROO BANZAI" (herein the "Property") for a pro-
        posed theatrical photoplay presently entitled "BUCKAROO
        BANZAI" (herein the "Photoplay").

   B.   In consideration of this agreement, Writer and Company
        grant to Producer an irrevocable option to have Writer
        write a third set of revisions.

   C.   Company hereby warrants, represents and agrees that it
        has a valid, binding and existing contract with Writer
        pursuant to which Writer is to render his services for
        Company for at least the full term of this agreement;
        that under the terms of the contract between Company and
        Writer, Company has a right to enter into this agreement
        with Producer and to grant Producer the services and
        rights herein granted to Producer; that Company is not
        subject to any obligation or disability which will or
        might prevent or interfere with the performance or
        observance by Company and Writer of all the covenants
        and conditions to be performed and preserved by Company
        and Writer hereunder; and that Company has not made nor
        will it make any grant or assignment which will or might
        conflict with or impair the complete enjoyment of the
        rights and privileges granted to Producer hereunder.
        Company has made, or will cause to be made when due, all
        payments and compensation which may be required to be
        made to Writer on account of the services rendered by
        Writer pursuant hereto.  Company agrees to indemnify and
        hold Producer harmless of and from any liability, cost,
        claim, damage and expense, including reasonable attorneys'
        fees, arising out of the breach by Company and/or Writer
        of any of the foregoing warranties and representations.

PHK:cs
4/29/81                         -1-

CONTRACT OFFIC
FILE COPY

Exhibit 2, Page 30

2.    <u>WRITING AND CONSULTATION PERIODS; TIME TO EXERCISE OPTIONS</u>

    A.    Writer shall commence writing the first-draft screenplay on April 10, 1981 and shall complete and deliver said first-draft screenplay to Producer within sixteen (16) weeks after commencement of services hereunder.

    B.    Following said delivery of the first-draft screenplay, Producer shall have three (3) weeks for reading and conferences.  Said period shall constitute the first consultation.  Upon the expiration of the first consultation period, Writer shall immediately commence writing the first set of revisions to the first-draft screenplay (herein the "first revisions"), incorporating therein such changes as Producer may require.  The first revisions shall be completed and delivered to Producer not later than four (4) weeks after commencement of Writer's services thereon.

    C.    Following said delivery of the first revisions, Producer shall have three (3) weeks for reading and conferences. Said period shall constitute the second consultation period.  Upon the expiration of the second consultation period, Writer shall immediately commence writing the second set of revisions (herein the "second revisions") incorporating therein such changes as Producer may require.  The second revisions shall be completed and delivered to Producer not later than two (2) weeks after commencement of Writer's services thereon.

    D.    Producer shall exercise, if at all, the option specified in subparagraph 1.B. above not later than four (4) weeks after delivery of the second revisions.  Said option period shall constitute the third consultation period. Notice of exercise of said option must be in writing; oral notice shall be ineffective.

    E.    In the event Producer exercises its option pursuant to subparagraph D. above, Writer shall commence services on the third set of revisions (herein the "third revisions") immediately upon Writer's and Company's receipt of Producer's written notice to exercise said option, incorporating therein such changes as Producer may require.  The third revisions shall be completed and delivered to Producer not later than three (3) weeks after commencement of Writer's services thereon.

PHK:cs
4/29/81                              -2-

3.  SUMMARY OF WRITING AND CONSULTATION PERIODS

Each item of work shall be completed and delivered by Writer within the applicable writing period specified in paragraph 2. above and summarized in this paragraph 3.  The first writing period shall commence on the date Writer commences services hereunder, as provided in subparagraph 2.A. above. The writing and consultation periods shall be as follows:

| | |
|---|---|
| First Writing Period: (Paragraph 2.A.: first-draft screenplay) | Not more than sixteen (16) weeks. |
| First Consultation Period: (Paragraph 2.B.) | Not more than three (3) weeks. |
| Second Writing Period: (Paragraph 2.B.: first revisions) | Not more than four (4) weeks. |
| Second Consultation Period: (Paragraph 2.C.) | Not more than three (3) weeks. |
| Third Writing Period: (Paragraph 2.C.: second revisions) | Not more than two (2) weeks. |
| Third Consultation Period: (Paragraph 2.D.) | Not more than four (4) weeks. |
| Fourth Writing Period: (Paragraphs 1.B. and 2.E: third revisions) | Not more than three (3) weeks. |

4.  POSTPONEMENT OF EXERCISE OF OPTION

Producer shall have the right to postpone its exercise of the option described in subparagraph 1.B., provided, however, in such event Writer's obligation to render services in connection with the third revisions would then be subject to Writer's other professional engagements.

5.  DELETED

6.  COMPENSATION

A.  Fixed Compensation:

Producer agrees to pay Company as set forth below:

Exhibit 2, Page 32

(i)  For the first-draft screenplay, first revisions and
     second revisions, the sum of SEVENTY-FIVE THOUSAND
     DOLLARS ($75,000) payable as follows:

     (a)  Eighteen Thousand Seven Hundred Fifty Dollars
          ($18,750) on commencement of services on the
          first-draft screenplay;

     (b)  Eighteen Thousand Seven Hundred Fifty Dollars
          ($18,750) on delivery of the first-draft
          screenplay;

     (c)  Nine Thousand Three Hundred Seventy-Five Dollars
          ($9,375) on commencement of services on the
          first revisions;

     (d)  Nine Thousand Three Hundred Seventy-Five Dollars
          ($9,375) on delivery of the first revisions;

     (e)  Nine Thousand Three Hundred Seventy-Five Dollars
          ($9,375) on commencement of services on the
          second revisions; and

     (f)  Nine Thousand Three Hundred Seventy-Five Dollars
          ($9,375) on delivery of the second revisions.

(ii) For the third revisions, provided that Producer
     exercises its option therefor, the sum of TWENTY-FIVE
     THOUSAND DOLLARS ($25,000) payable as follows:

     (a)  Twelve Thousand Five Hundred Dollars ($12,500)
          on commencement of services on the third revi-
          sions; and

     (b)  Twelve Thousand Five Hundred Dollars ($12,500)
          on delivery of the third revisions.

B.   <u>Contingent Compensation</u>:

In the event Producer produces the Photoplay and provided
Writer receives sole or joint screenplay credit, then
Company shall be entitled to the sum of ONE HUNDRED FIFTY
THOUSAND DOLLARS ($150,000) less all amounts paid to
Company pursuant to the provisions of subparagraph A.
above, payable promptly after determination of credit in
accordance with the provisions of the Basic Agreement.

PHK:cs
4/29/81                          -4-

7.   CREDIT

All writing credits for Writer shall be as determined by the Writers Guild of America.

8.   ADDRESSES

The parties' addresses for the purposes of this agreement are as follows:

> PRODUCER:                METRO-GOLDWYN-MAYER FILM CO.
>                          10202 W. Washington Boulevard
>                          Culver City, California  90230
>                          Attention:  Legal Department
>
> COMPANY:                 JOHNNY B. GOOD INC.
>                          c/o Shapiro-Lichtman, Inc.
>                          2049 Century Park East
>                          Suite 1320
>                          Los Angeles, California  90067
>                          Attention:  Mark Lichtman

9.   STANDARD TERMS

In addition to the terms stated above, the parties hereto shall be subject to the terms and conditions of the Standard Terms. Any word or phrase used in this principal agreement which is defined in the Standard Terms is used as so defined.  If there is any inconsistency between the terms of this principal agreement and the Standard Terms, the terms of this principal agreement shall prevail.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the date above mentioned.

METRO-GOLDWYN-MAYER FILM CO.

By _____
              Vice President

AGREED TO AND ACCEPTED BY:

JOHNNY B. GOOD INC.

By _____
Its
     PRESIDENT

PHK:cs
4/29/81                          -5-

Exhibit 2, Page 34

(Loanout)

## WRITER'S DEAL CONTRACT-STANDARD TERMS

1.   **DEFINITIONS:**

**Agreement:**   The principal agreement and these standard terms.

**Basic Agreement:**   Any then applicable collective bargaining agreement between the producer and Writers Guild of America, West, Inc.

**Changes:**   Any and all manner of changes in any item of work, including but not limited to new material, revision of existing material, and polishing.

**Default:**   Any failure, refusal or neglect of the writer (other than because of incapacity) to perform the writer's required services or to observe the writer's other obligations hereunder, whether then existing or prospective, including any declaration by the writer or by the writer's representative of the writer's intention not to perform; also any failure, refusal or neglect of the company, whether then existing or prospective, to perform any of its obligations or agreements hereunder.

**Delivery:**   Delivery of the respective manuscript to the Story Department of Metro-Goldwyn-Mayer Film Co., Culver City, California.   Delivery shall be deemed to occur two (2) business days after the writer's manuscipt has been received by said Story Department, such two (2) business days being allowed for transcribing and mimeographing, both of which shall be done by the Stenographic Department of Metro-Goldwyn-Mayer Film Co., Culver City, California.   Mimeographing, for the purposes of the foregoing, includes any other type of duplicating.

**Final Screenplay:**   This term is used in this agreement as the term "screen play" is defined in the Basic Agreement.

**First Draft Screenplay:**   This term is used in this agreement as defined in the Basic Agreement.

**Force Majeure:**   Any accident, fire, explosion, casualty, epidemic, act of God, strike, lockout, labor condition, unavailability of materials, transportation, power or other commodity, delay of common carrier, civil disturbance, riot, war or armed conflict (whether or not there has been an official declaration of war), the enactment of any law, the issuance of any executive or judicial order or decree, or other cause of the nature of force majeure beyond the control of the producer, whether similar or

lk: 12-21-65                    -1-

rjc (1-6-81)

Exhibit 2, Page 35

**(Loanout)**

dissimilar to any of the foregoing, which causes an inter-
ruption of or materially hampers or materially interferes
with the normal conduct of the producer's business of develop-
ing or producing motion pictures.

Incapacity:  Any illness or disability (physical or mental)
which incapacitates the writer from fully performing the
writer's required services; any inability of the writer to
perform for any reason which renders such inability ex-
cusable at law.

Item of Work:  Any of the various items which the writer is
engaged to write, either under the original loanout of
writer's services or by exercise by the producer of an
option to borrow the further services of the writer, such
as treatment, revised treatment, first draft screenplay, etc.

Law:  Any present or future statute or ordinance whether
municipal, county, state or federal; any executive, ad-
ministrative or judicial regulation, order, judgment or
decree; any rule or principle of common law or equity.

Person or Company:   Any individual, partnership, corpora-
tion or other business organization, or government or
governmental agency.

Photoplay:  A motion picture of any present or future kind,
with or without sound, on film, tape, wire or any other
substance, and produced or exhibited by or with any kind of
device or equipment, including television, whether now known
or hereafter discovered or invented.

Principal Agreement:   The agreement to which these standard
terms are annexed.

Termination for Cause:   Termination of this agreement by
reason of incapacity, force majeure or default.

Treatment:  This term used in this agreement as defined in
the Basic Agreement.

Work:   The material which the writer is engaged to write.

2.    TERM:  The term of this agreement shall commence with the com-
mencement of the first writing period and shall continue until
the completion of all of the writer's services hereunder (sub-
ject to such rights of earlier termination as are provided in

-2-

KD:ric (12-18-80)

these standard terms ). The producer shall have the right to postpone the commencement of the first writing period by a period equivalent to any period of incapacity, force majeure or default. The term shall consist of writing periods and consultation periods. Except as provided in paragraph 2, each writing period except the last shall be immediately followed by a consultation period and each consultation period shall be immediately followed by the next writing period.  There shall be a separate writing period for each item of work.  Subject to the maximum times stated in paragraph 2 of the principal agreement, and to such rights of earlier termination as provided in these Standard Terms, (i) the duration of each consultation period shall be designated by the producer, (ii) each writing period shall continue until the delivery of the respective item of work.  If any item of work is delivered within less than the full permissible period, or if the producer elects to take less than the full permissible time in any consultation period, the time remaining in such writing or consultation period may, at the producer's option, be added to any one or more of the remaining writing and consultation periods (meaning to say that unused writing time may be added to any writing or consultation period or both, and unused consultation time may be added to any writing or consultation period or both).

3.   <u>POSTPONEMENT OF FINAL CONSULTATION AND WRITING PERIODS</u>:  If the producer elects to postpone all or any part of the final consultation or writing period pursuant to paragraph 4 of the principal agreement, such postponement shall be ef- fectuated by notice to the company.  Upon the date designated in the notice, the term shall be deemed to be suspended until reinstated by notice from the producer to the company designating the date of reinstatement.  Such designated date shall be not later than six months following the commencement of the suspension, and the notice shall be served not later than two weeks prior to such date; provided however that if on the date of service of such notice the writer is elsewhere engaged, and the term of such engagement would conflict with the rein- stated term were it to start on the designated date, the company shall immediately so notify the producer, designating in the notice the company's best estimate of the date on which such other engagement of the writer will terminate.  The pro- ducer shall then notify the company of one of the following elections: (i) to cancel the notice and later designate another date (which however shall still be within the six month period above referred to); (ii) to terminate the writer's en- gagement; (iii) to postpone the designated date to the first business day (plus necessary travel time, if any) following the termination of the writer's other engagement, whether or not such date is within said six month period.  If the producer

-3-

KD:r²c (12-18-80)
PHK:cs 4/29/81

Exhibit 2, Page 37

**(Loanout)**

elects alternative (i) the procedure specified in this para-
graph shall be repeated.  If the producer elects alternative
(ii) the compensation payable with respect to the postponed
consultation or writing period or both (as the case may be)
shall be deemed to have accrued upon service of notice of such
election.  If the producer elects alternative (iii) the
company shall keep the producer informed of any changes in
the expected termination date of the writer's other engage-
ment and if such date is postponed the producer may again
elect alternative (i) or (ii) by appropriate notice to the
company.  If the producer fails to designate a reinstatement
date within said six month period (either in the first instance
or after having elected alternate (i), the writer's engagement
hereunder shall be deemed to have terminated at the expiration
of said six month period and the compensation payable with
respect to the postponed consultation or writing period or
both (as the case may be) shall be deemed to have accrued at
the expiration of said six month period.

4.    <u>SERVICES</u>:  During each respective writing period, the writer
shall write the respective applicable item of work, shall
consult as required with such persons as the producer may
designate with reference to such item of work, and shall in-
corporate in such item of work such changes as may have been
or as may be requested of the writer not only during the
preceding consultation period, if any, but also during such
writing period.  During each consultation period, the writer
shall consult as required with such persons as the producer
may designate with reference to the items of work previously
delivered and the changes, if any, desired to be made therein
during the next writing period.

The writer shall render the writer's services hereunder at
Metro-Goldwyn-Mayer Film Co. Culver City, California, or at
such other place or places as the producer may designate.
Article 21 of the Basic Agreement shall apply if the producer
requires the writer to perform services at any place other
than said studios.

The writer shall comply with the producer's reasonable rules
and regulations, and perform the writer's services and comply
with the writer's other obligations promptly, faithfully, con-
scientiously and to the full limit of the writer's ability
whenever required by the producer during the term, and in
accordance with the producer's instructions and directions in

-4-

MSL:nh 3-20-75
KD:rjc (1-6-81)

**(Loanout)**

all matters, including those involving artistic, literary or dramatic taste and judgment. Nothing herein shall be construed as providing for a five (5) day week or as requiring additional compensation for services rendered on week-ends or holidays or at times other than normal working hours.

The writer's work shall be turned in to the producer from time to time in convenient sections of pages, or from time to time as required by the producer, and in any event in such sections of pages as may key the accrual or payment of compensation pursuant to paragraph 6 of the principal agreement.

From time to time when requested by the producer, the writer or the company will give the producer the writer's best estimate of when any particular item of work will be completed.

5.   EXCLUSIVITY:  The writer's services during the term are exclusive, meaning to say that during the term the writer shall render services exclusively for the producer and shall not render services for the writer or the company, or any other person or company.

6.   COMPENSATION:  The producer's obligation to pay compensation or otherwise perform hereunder shall be conditioned upon the full performance by the company and the writer of their respective obligations under this agreement.

As to any compensation payable on a weekly basis:  No such compensation shall be payable for or during any period of incapacity, force majeure or default.  Pro-rating of any such compensation for any period of less than a full week shall be in accordance with the Basic Agreement.

No compensation shall be paid which shall not have accrued, except a payment (if any) required to be made upon the execution of this agreement or upon the exercise of an option.

The producer's obligations for the payment of compensation shall be subject to all present and future laws affecting such obligations.  No withholding, deduction, reduction or limitation of compensation required or authorized by law shall be deemed to be a breach of this agreement or relieve the company or the writer from their respective obligations hereunder.

-5-

HSN:rjc (7-1-80)

Exhibit 2, Page 39

(Loanout)
HSN:gl (6-14-79)

Taxes - Insurance:  Inasmuch as this is a lending agreement
and not an employment agreement, the producer will not with-
hold, report or pay so-called payroll taxes from the com-
pensation payable to the company (including Federal income
tax, Federal social security tax, and California unem-
ployment insurance tax).  Should the producer be subjected
to any expenses or liability by reason of such failure to
withhold, report or pay such taxes (including but not
limited to penalties, interest and reasonable attorneys
fees), the company agrees that the company and the writer
will indemnify and hold the producer harmless therefrom.
The company represents that it is a bona fide corporation,
in good standing, incorporated under the laws of the
State of  California        .

If the company or the writer should incur any charges with
the producer (or with Metro-Goldwyn-Mayer Film Co.) or if the
producer (or Metro-Goldwyn-Mayer Film Co.) should at the in-
stance or request of the company or the writer make any
expenditures for the account of the company or the writer,
the producer shall have the right (in addition to such
other rights as it may have hereunder or at law), to
reimburse itself (or Metro-Goldwyn-Mayer Film Co., as the case
may be) by corresponding deductions from the company's
compensation.  The foregoing shall not be construed as
permitting the company or the writer to incur charges with
the producer (or with Metro-Goldwyn-Mayer Film Co.).  If the
producer is Metro-Goldwyn-Mayer Film Co., the parenthetical
provisions of this paragraph shall be deemed to be deleted
as unnecessary.

If the company should claim that any deduction assertedly
made pursuant to this paragraph 6 is improper, such claim
shall be made in writing, and due consideration shall
promptly be given to the merits and adjustment of the claim.
If it is determined that the deduction was improper, in whole
or in part, payment of the wrongfully withheld amount shall
be promptly made, but the making of the deduction shall not
be deemed to have been a breach of this agreement.

If the producer should pay any compensation or other amounts
which, pursuant to any provision of this agreement, need not
have been paid, the producer may apply such payment against
any compensation or other amounts then or thereafter payable
hereunder, or such payment shall at the option of the pro-
ducer be repaid by the company on demand, or the producer may
recover such payment by other lawful means.

-6-

KD:rjc (1-6-81)
PHK:cs 4/29/81

(Loanout)

Company shall have the entire responsibility as the
employer of writer and warrants that it will indemnify
and hold producer harmless from and against any and
all of the obligations of an employer under any federal,
state or local laws, regulations or orders now or here-
after in force, including, but not limited to, those
relating to employer payroll taxes, unemployment com-
pensation or insurance, social security, workmen's
compensation, third party claims against producer
arising out of injury or death to writer, disability
benefits and tax withholding, and including the filing
of all returns and reports required of employers and
the payment of all taxes, assessments, contributions
and other sums required of them, and further warrants
that it will indemnify and hold producer harmless from
and against all obligations of an employer pursuant to
the Basic Agreement (defined in standard terms).

Taxes, Pension, Health & Welfare Reimbursement - If
requested by company, the producer shall reimburse
company for Employer Payroll Taxes, if any, which company
shall be required to pay with reference to writer's
compensation for his services in connection with the
photoplay.  Producer will reimburse company for its
payments actually made for pension, health and welfare
payments under the Basic Agreement.  All of the foregoing
reimbursements shall be made by producer to company
promptly upon submission of company's invoices accompanied
by vouchers and other documents evidencing the amount of
such payments made by company.  In no event shall the
aggregate amount of such reimbursements exceed the total
of all similar payments which producer would be required
to make had producer employed writer directly.



HSN:pj (9-18-79)       -6(a)-

(Loanout)

HSN:cr (1-27-78)

7.    OWNERSHIP OF WORK: The producer shall be the sole and
exclusive owner of the work, in whatever stage of
completion it may be from time to time, including but not
limited to the copyright thereof and all renewals and
extensions and rights of renewal and extension of copy-
right, and of sole and exclusive rights throughout the
world perpetually of production, recordation, public
performance, broadcasting, television and reproduction
by any method, whether such work consists of literary,
dramatic, musical, or other material and without obligation
to pay any fees, royalties or other amounts except those
expressly provided for in this agreement and in the
Basic Agreement.   The company hereby assigns all such
rights to the producer without condition, reservation
or limitation.   The company agrees that upon the producer's
request it will cause the writer to execute and deliver
to the producer with respect to any item or items of work,
whether completed or not, a certificate in substantially
the following form:

        "I hereby certify that I wrote the work identified
        as

        as an employee for hire of Metro-Goldwyn-Mayer Film Co,
        pursuant to a certain loanout agreement dated
                                between
                                and Metro-Goldwyn-Mayer
        Film Co.  in the performance of my services there-
        under and in the regular course of my employment.

        I acknowledge that Metro-Goldwyn-Mayer Film Co., is the
        owner of all rights in said work, and of the copyright
        thereof and of all renewals and extensions and rights
        of renewal and extension of such copyright, and has the
        right to make such changes therein and such uses thereof
        as it may determine.

        IN WITNESS WHEREOF, I have signed this certificate
        this              day of            197 ."

- 7 -

KD:rjc (1-6-81)

(Loanout)

All rights hereby vested in or granted to the producer do
so vest immediately upon the creation of the work, whether
or not the writer completes the writer's services, whether
or not this agreement is terminated, with or without cause,
before the expiration of its appointed term, and whether
or not the writer executes the certificate prescribed above.

The execution of such a certificate shall, at the option of
the producer, be a condition precedent to the accrual and
payment of any installment or installments of compensation
hereunder.

8.  WARRANTIES:  The company and the writer warrant that, except
as provided in the next sentence hereof, all work of the
writer hereunder is and shall be wholly original with the
writer, that no incident therein or part thereof is or shall
be taken or copied from or based upon any other source
(including but not limited to any photoplay or any other
literary, dramatic or musical work), that neither said work,
nor the use thereof in any form, adaptation or version, does
or will infringe any copyright, literary, dramatic, photo-
play or common law rights of any person, firm or corporation,
and further, with respect to any claim that writer's material,
or any part thereof, defamed or invaded the privacy of any
person, company and writer warrant and agree that writer did
not knowingly use the name or personality of such person
and/or that writer should have known, in the exercise of
reasonable prudence, that such person would or might claim
that his personality was used in such material.  The foregoing
warranties do not apply to any material which the producer may
instruct the writer to use as the basis of or to incorporate
in the writer's work, including the source material referred
to in paragraph 1 of the principal agreement (if the writer is
not the author or co-author thereof), but do apply to whatever
the writer may add to such material and to any changes in such
material made by the writer; nor do said warranties apply to
any changes which the producer may make through other persons
in any work done by the writer.

The company and the writer agree to indemnify the producer,
its successors, assigns, licensees, officers and employees,
and hold them harmless from and against any and all liability,
losses, damages, costs, expenses (including but not limited to
attorneys' fees), judgments and penalties arising out of,
resulting from, based upon or incurred because of the breach
of any warranty made by the company or the writer.

9.  REMEDIES:  Each party to this agreement agrees to perform
fully and completely each and all of such party's obligations
and agreements under this agreement.  The company undertakes
to cause the writer to perform all of the writer's obligations
hereunder.

- 8 -

HSN:lcd  5/25/77

Exhibit 2, Page 43

(Loanout)

Time is hereby declared to be of the essence of the per-
formance of this agreement by the company and writer.
Without limiting the definition of default in paragraph 1
of these standard terms, failure of the writer to deliver
any item of work within the time prescribed in the principal
agreement for the delivery of such item of work, for what-
ever cause or reason other than incapacity, shall consti-
tute a default and shall entitle the producer to exercise
any of its remedies for default provided for or referred to
in these standard terms.  Also, if such failure is caused
by incapacity, then (notwithstanding the provisions of the
next following subparagraph) the producer shall have the
right to terminate this agreement by notice in writing to
the company at any time during the continuance of such
failure.  Instead of terminating for such failure, whether
caused by incapacity or constituting a default, the pro-
ducer may, at its option, allow the writer additional time
to deliver such item of work.  No additional compensation
shall be payable to the company for or because of such
additional time, if any.

The producer shall have the right to extend the time to
exercise any option hereunder and/or the time to deliver
any item of work for the period of incapacity and/or force
majeure and/or default and the time for making any payments
shall similarly be extended.

The producer shall have the right to terminate this agree-
ment in the event (i) that the writer shall be prevented
from or materially hampered in performing this agreement
because of incapacity for a period or aggregate of periods
of two (2) weeks or more, (ii) that force majeure continues
for a period or aggregate of periods of four (4) weeks or
more, (iii) of default.  Such right may be exercised by notice
to the company at any time during the existence of the re-
spective contingency (but after the periods specified in
clauses i and ii should such clauses be applicable).

If any right of termination provided for in this paragraph 9
is exercised the producer shall be released from all further
obligations hereunder, other than to pay the company such
compensation as may previously have accrued and been unpaid
and (if the cause of termination is incapacity or force
majeure) other than its obligations under paragraph 11 of
these standard terms, but such termination shall not affect
any rights of the producer as set forth in paragraph 7 of
these standard terms nor release the company or the writer
from any warranties or agreements under paragraph 8 of these
standard terms nor constitute a waiver by the producer of
any other remedies, including its right to damages, in the
event of default.  Also, in the event of such termination, if
the company has been paid any compensation in advance (i.e.,
before it has accrued) the company shall be obligated to repay
such compensation to the producer on demand.

(Loanout)

In the event of such termination the company and the writer shall immediately thereafter deliver to the producer all work then completed or in process, in whatever stage of completion it may be.

All rights and remedies herein granted or referred to are cumulative; resort to one shall not preclude resort to another.  No waiver by either party of any breach of this agreement shall be deemed to be a waiver of any other, whether prior, concurrent or subsequent.

The company acknowledges that the services to be performed by the writer hereunder and the rights herein granted are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law, and that the writer's default or the company's default will cause the producer irreparable injury and damage. The company agrees that the producer shall be entitled to injunctive and other equitable relief to prevent default by the writer or the company.  In addition to such equitable relief, the producer shall be entitled to such other remedies against the company and the writer as may be available at law, including damages.

Nothing in this agreement shall be construed so as to require the commission of any act contrary to law.  If and whenever any provision of this agreement is illegal, such provision shall be deemed to be modified to the extent necessary to avoid the illegality.  This agreement is executed in and shall be governed by the laws of the State of California.

The producer may elect to terminate this agreement at any time without cause, but such termination without cause shall not release the producer from its obligations hereunder as to the company's compensation or from any obligations under paragraph 11 of these standard terms. Such compensation shall be deemed to have accrued upon the exercise of such right of termination without cause.

10.   <u>GUILD MEMBERSHIP</u>:  The company represents and warrants that the writer is, and throughout the term of the writer's engagement hereunder, the writer will remain a member in good standing of the Writers Guild of America, West, Inc.

-10-

(loanout)
  rev.

11.   CREDIT:   The provisions of article 8 and Schedule A of
      the Basic Agreement shall govern the matter of the credit,
      if any, to be accorded to the writer for his services
      hereunder.  However, as to credit not finally determined
      during the term of the Basic Agreement Exhibit "X" attached
      hereto shall govern.

      No casual or inadvertent failure by the producer to comply
      with its obligations under this paragraph 11 shall constitute
      a breach of this agreement.

      The producer shall have the perpetual right to use and
      authorize others to use the name, voice and likeness of the
      writer for advertising and publicity purposes in connection
      with any use or proposed use of the work, except as other-
      wise provided in the Basic Agreement.

12.   OMITTED.

13.   INSURANCE:  The producer shall have the right to obtain
      life, health, accident, cast or other insurance covering
      the writer, in the writer's or the producer's name, and
      at the producer's expense, for the producer's benefit,
      in any amount deemed necessary by the producer.  In the event
      producer is unable to obtain such insurance, producer shall
      be entitled to terminate this agreement and shall have no
      obligation to the company or writer hereunder.  The
      producer shall own such insurance and the cash values and
      proceeds thereof.  The company will cause the writer to
      assist in obtaining such insurance by submitting to the
      required examinations and by correctly preparing, signing and
      delivering  such applications and other documents as may
      reasonably be required, and will cause the writer also to
      the best of the writer's ability, to observe all terms and
      conditions of such insurance of which the producer notifies the
      company (except payment of premiums) necessary for continuing
      such insurance in effect.

- 11 -

HSN:cr (2-16-78)

Writers LO
Revised 5-8-73
BSh:mb

14.   <u>NOTICES</u>:   Notices to the company or to the writer here-
under may be oral or written, unless otherwise provided.
Written notices to the company or to the writer shall be
served at the address indicated immediately below the
company's signature to the principal agreement.  Notices
to the producer shall be in writing and shall be served
at Metro-Goldwyn-MayerFilm Co., 10202 Washington Boule-
vard, Culver City, California, Attention:  Legal Depart-
ment.  Either the company, the writer or the producer may
change its address for the service of written notices from
time to time, but only by written notice to that effect
specifying the new address.  Written notices may be served
by mail (including certified or registered mail), telegraph
or personal delivery.  All charges or postage must be pre-
paid.  If telegraphed, the date of delivery of the notice
to the telegraph office shall be deemed to be the date of
service.  If mailed, the first business day following the
date of mailing shall be deemed to be the date of service,
but if the place of mailing is such that more than one
day is normally required for delivery to the designated
address, then air mail shall be used.

15.   <u>ASSIGNMENT AND LENDING</u>:   This agreement is non-assignable
by the company.  The producer may assign this agreement
to any other person or company, provided that such person
or company assumes and agrees in writing to keep and per-
form all of the executory obligations of the producer
hereunder.

The company understands that the actual producer of the
photoplay may be a company other than the producer named
herein.  In such event, the writer's services shall be
rendered hereunder for the actual producer, but without
releasing the producer named herein from its obligations
hereunder.

16.   <u>PUBLICITY RESTRICTION ON COMPANY AND WRITER</u>:  Neither the
company nor the writer shall, by means of press agents or
publicity or advertising agents employed or paid by the
company or writer, or otherwise, circulate, publish or
otherwise disseminate any news stories, or articles, books
or other publicity or advertising containing the company's
and/or writer's name, relating directly or indirectly to

KD:rjc (1-6-81)                           **-12-**

Writers LO
Revised 5-8-73
BSh:mb

the services of writer hereunder, the subject matter of
this agreement, the photoplay, or the services to be
rendered by writer or others in connection with the photo-
play unless the same are first approved in writing by
the head of the publicity department of producer, which
approval such department head shall not be required to
give.  If producer is not Metro-Goldwyn-Mayer Film Co., then
nevertheless the reference to "producer" in this paragraph
16 shall mean Metro-Goldwyn-Mayer Film Co.

17.  <u>CAPTIONS</u>:   The captions used in this agreement are used
solely for convenience and are not part of nor shall they
be used for the construction of any provision hereof.

18.  <u>DISTRIBUTION</u>:   The following provisions shall apply if
the producer is not Metro-Goldwyn-Mayer Film Co. (in which
case said last mentioned company is referred to in this
paragraph 18 as the distributor).

The company understands that the distributor has a financial
interest in the performance of this agreement.  It is there-
fore agreed that this agreement is made expressly for the
benefit of the distributor as a third party beneficiary.
Without limiting the generality of the foregoing, distribu-
tor shall have the benefit of all the rights granted to
producer under this agreement and distributor shall have
the right to proceed directly against the writer in the event
writer is in default hereunder.

If the producer defaults in the performance of any obligations
hereunder for the payment of money, the company shall take no
action because of such default without first offering the
distributor the opportunity to cure the default.  Such op-
portunity shall be offered by appropriate written notice to
the distributor at its studios in Culver City, California,
Attention:  Legal Department.  The default shall be deemed
to be cured if payment is made within one week after service
of such notice.

If the producer defaults in the performance of any obligation
hereunder other than an obligation for the payment of money,
the company shall take no action because of such default
without first offering the distributor the opportunity to
take over performance of this agreement.  Such opportunity

-13-

KD:rjc(1-6-81)

Writers LO
Revised 5-8-73
BSh:mb

shall be offered by appropriate written notice to the distributor at its studios in Culver City, California, Attention: Legal Department. The distributor shall then have the right, by written notice to the company and producer within one week after service of such notice, to take over performance of all executory obligations under this agreement. Should the distributor make such election, the company and the writer shall proceed with the performance of this agreement, reserving any right to damages the company may have against the producer by reason of the latter's default.

If the distributor should elect to cure a default or to take over performance of this agreement as aforesaid, the producer shall, at the distributor's request, assign this agreement to the distributor.

19.  <u>TEAM OF WRITERS</u>:   The provisions of this paragraph 19 shall apply if the persons engaged as writers under the principal agreement are a team of writers.  The obligations of said persons under this agreement shall be joint and several, and all references in this agreement to the "writer" shall be deemed to refer to them jointly and severally.  Should any right of termination arise as a result of incapacity or default of one of the writers, the remedies of the producer may be exercised either as to the one writer affected or as to both or all of the writers, at the producer's election. Should the producer elect to exercise its remedies only as to the writer affected, the engagement of the other writer or writers shall continue and the company shall receive only a pro-rated share of the compensation provided for in the principal agreement (such pro-ration to be on the basis of an equal share as to each writer).

END OF STANDARD TERMS

-14-

LO RHD/lk/12-22-65

## AGREEMENT OF WRITER

In consideration of the execution by the parties thereto of the foregoing agreement whereby my services are to be furnished to the producer, I agree as follows, for the express benefit of the producer and the distributor of the photoplay.

1.  JOHNNY B. GOOD, INC.          has the right to enter into said agreement and to grant all rights therein granted, including but not limited to the rights for the use of my services, name, voice and likeness.

2.  I agree to perform said agreement in all respects in which it provides for performance by me, whether or not JOHNNY B. GOOD, INC.      performs its obligations under its employment contract with me, and whether or not my employment contract with remains in force or effect.

3.  I agree that I am bound by all of the pro-visions thereof relating to me.

4.  I will look solely to JOHNNY B. GOOD, INC. for payment of my compensation. I confirm my understand-ing that the producer has no responsibility or obligation for the payment of such compensation.

Dated:  9 - 9 - 81

_EARL MAC RAUCH   (Writer)_

APPROVED AND ACCEPTED:

METRO-GOLDWYN-MAYER FILM CO.

By: _____
        Vice President
             ( Producer )

-15-

PHK:cs 4/29/81

Exhibit 2, Page 50

FORM 356

# EXHIBIT "X"

A.  Screen credit for the screen play authorship of a feature-length photoplay will be worded "Screen Play By" or "Screen Play—".

B.  Except in unusual cases, screen credit for the screen play will not be shared by more than two (2) writers and in no case will the names of more than three (3) be used, provided, however, that two (2) established writing teams recognized and employed as such and of not more than two (2) members each may share screen credit for screen play.  The intention and spirit of the award of credits being to emphasize the prestige and importance of the screen play achievement, the one (1), two (2) or at most three (3) writers, or two (2) teams, chiefly responsible for the completed work will be the only screen writers to receive screen play credit.

C.  The only exception to the foregoing shall be:
    (1)  Musicals.
    (2)  Pictures on which one (1) writer (or a team) writes both the original story and screen play.  In this case the credit may be worded "By", "Original Story and Screen Play By", or "Original Screen Play By".

D.  The term "screen play" means the final script (as represented on the screen) with individual scenes, full dialogue and camera setups, together with such prior treatment, basic adaptation, continuity, scenario, dialogue, added dialogue or gagging as shall be used in and represent substantial contributions to the final script.  The term "photoplay" means a feature-length photoplay.

E.  No production executive will be entitled to share in the screen play authorship screen credit unless he does the screen play writing entirely without the collaboration of any other writer.

F.  When more than one (1) writer has substantially contributed to the screen play authorship of a photoplay, then all such writers will have the right to agree unanimously among themselves as to which one (1) or two (2) or in exceptional cases three (3) of them, or two (2) teams of the nature above mentioned, shall receive credit on the screen for the authorship of the screen play.  If at any time during the course of production all such writers so agree, then the Producer will not be obligated to issue the notices specified in Paragraphs J through P of this Exhibit.

G.  The Producer shall have the right to determine in which one of the following places the screen play credit shall appear on the screen:
    (1)  On the main title card of the photoplay.
    (2)  On a title card on which credits are given only for the screen play.
    (3)  On a title card on which credits are given for the original story.
    (4)  On a title card on which credits are given for the sources of the material upon which the screen play was based.

H.  A writer whose contribution is judged by the Producer to represent a substantial portion of the completed screen play shall for the purpose of this Exhibit "X" be considered a "substantial contributor".  As a substantial contributor he shall be entitled to participate in the procedure for determination of screen credits.

I.  The screen credits and also the work of writers making substantial contributions but not receiving screen credit may be publicized by the Producer.

J.  Before the screen credits for screen play authorship are finally determined, the Producer will send a written notice to each writer who is a substantial contributor.  This notice will state the Producer's choice of screen play credits on a tentative basis, together with the names of the other substantial contributors and their addresses last known to the Producer.

K.  The Producer will make reasonable efforts in good faith to communicate with such writers.  The notice specified in the foregoing Paragraph will be sent by telegraph to writers outside of the Los Angeles area or by telegram, messenger or special delivery mail to writers in such area.  No notice will be sent to writers outside of the United States or writers who have not filed a forwarding address with the Producer.  In case of remakes the Producer shall not be under any obligation to send any notice to any writer contributing to the screen play of the original production unless such writer received screen credit in connection with such original production.

L.  The Producer will keep the final determination of screen play credits open until a time specified in the notice by the Producer, but such time will not be earlier than six o'clock, p. m. of the next business day following dispatch of the notice above specified.  If by the time specified a written notice of objection to the tentative credits or written request to read the script has not been delivered to the Producer from any of the writers concerned, the tentative credits will become final.

M.  However, if a written protest or written request to read the script is received by the Producer from any writer concerned within the time specified in Paragraph L hereof, the Producer will withhold final determination of screen play credits until a time to be specified by the Producer, which time will be not earlier than forty-eight (48) hours after the expiration time specified for the first notice mentioned in the foregoing Paragraphs.

N.  Upon receipt of a written protest or request to read the script the Producer will make at least two (2) copies of the script available for reading at its studio.  The Producer will also notify by telegraph the writer or writers tentatively designated by the Producer to receive screen play credit, informing them of the new time set for final determination.

O.  If, within the time limit set for final determination of credits, exclusive of any writer or writers waiving claim to screen credit, all of the writers entitled to notice have unanimously designated to the Producer in writing the names of the one (1) or two (2) or in exceptional cases three (3), writers or two (2) teams to whom screen play credit shall be given, the Producer will accept such designation.  If such designation is not so communicated to the Producer by such writers within the time above mentioned, the Producer may make the tentative credits final or change them as the Producer sees fit within the requirements hereof as to wording and limitation of names.

# EXHIBIT "X"

EXHIBITS "A" and "B" to the Agreement dated as of April 9, 1981 between METRO-GOLDWYN-MAYER FILM CO. (herein the "Distributor") and JOHNNY B. GOOD INC. (herein the "participant") relating to the writing services of EARL MAC RAUCH in connection with the proposed photoplay presently entitled "BUCKAROO BANZAI".

1.   GROSS RECEIPTS:  The term "gross receipts" means all monies actually received and earned by Distributor in dollars in the United States or in other currencies freely remittable to the United States as film rentals or license fees for licenses to exhibit, distribute or televise the photoplay, except as follows:

(a)   Advance payments or security deposits shall not be included unless and until earned or forfeited.  Non-returnable guarantees are deemed advance payments and excluded from gross receipts until earned or forfeited.

(b)   Receipts from roadshow exhibitions, i.e. where Distributor has taken over the operation of the theatre (4-wall deals), shall be included only to the extent that the total of such receipts exceeds the total costs incurred, and for this purpose all such roadshow engagements shall be treated in the aggregate as a unit.  Should all such roadshow engagements treated in the aggregate as a unit show a loss, then such loss shall be deducted as an item of direct distribution expense.

EXHIBIT "A"

Rev. 8/24/76        (Net Profits)
SHS/sh 7/30/81

-1-

(c) Any amounts collected by Distributor as admission or sales taxes shall not be included in the gross receipts.

(d) Any refunds or rebates given by Distributor shall be deducted in computing the gross receipts.

(e) Revenue realized from trailers, music royalties, publications, advertising accessories, merchandising deals, phonograph records and albums, and scrapping of prints or other salvage shall not be included in the gross receipts.

(f) If any receipts from any exhibition of the photoplay are contributed by Distributor to a charitable organization, such receipts shall not be included in the gross receipts.

(g) Where a license to exhibit or distribute the photoplay in a particular country or territory is given to a subdistributor (other than a subsidiary or affiliate of Distributor), the actual amount paid to Distributor by such subdistributor as film rentals or as the license fee shall be the "gross receipts" hereunder with regard to such license, but only when the payment to Distributor has been actually received and earned by Distributor in dollars in the United States or in other currencies freely remittable to the United States.

The gross receipts shall also include all net sums actually received by Distributor from the satisfaction or settlement of any claims for infringement by others of the photoplay or of any claims against exhibitors or other licensees for breach of contract, or of any claims against exhibitors or others for mutilation or damaging of prints, after the deduction of all costs and expenses incurred by Distributor in connection with obtaining such monies. Costs and expenses in excess of monies received shall be deductible as items of direct distribution expenses.

EXHIBIT "A"
(Net Profits)

Rev. 8/24/76                    -2-
SHS/sh 7/30/81

2.  <u>IMPOUNDED MONIES</u>:  Distributor agrees that it will en-
deavor in good faith to expedite the transfer of all monies to
the United States, consistent with the economic or political con-
ditions and with such moratoria, embargoes or banking or currency
restrictions, as may from time to time exist in any particular
country or territory.  Monies remitted to Distributor in the
United States shall be accounted for hereunder in United States
dollars at the rate of exchange at which the respective remittance
is made to Distributor.  Distributor shall have the right to
make agreements regarding the sale or conversion of impounded
monies realized from the distribution of the photoplay on such
terms as it considers proper, provided that such agreements are
at least as favorable as those made at the same time with respect
to impounded monies in the same country or territory realized
from the distribution of Distributor's other photoplays.  All
costs, expenses, taxes or losses incurred in remitting, selling
or converting foreign monies shall be considered and treated as
direct expenses of distribution for the purposes of this agree-
ment.  "IMPOUNDED MONIES" are monies which cannot be remitted to
Distributor in the United States in unrestricted United States
funds because of moratorium; or because of agreement between
Distributor, or any organization or agency acting for Distributor,
or the United States Government or agency thereof, and any foreign
government or agency thereof or representative or organization
authorized by such foreign government or agency to make such
agreement; or because of embargo, currency restrictions and the
like; or which in Distributor's judgment it may be commercially
impracticable or unjustified to remit because of excessive taxes
or other adverse conditions.  In the event that Distributor
accumulates impounded monies in any particular foreign country

EXHIBIT "A"
(Net Profits)

Rev. 8/24/76                    -3-
SHS/sh 7/30/81

or territory from the distribution of the photoplay and from the distribution of one or more other motion pictures, and if only a portion of the total accumulated impounded monies in such country or territory shall be remitted to the United States from time to time, then any such impounded monies so remitted shall be allocated to the photoplay and to such other motion picture or motion pictures in accordance with the following formula:

(a)   No remittances from such country or territory shall be deemed to include any revenue attributable to the photoplay until all impounded monies, accumulated in such country or territory before any impounded monies are realized in such country or territory from the photoplay, have been remitted to the United States.

(b)   Thereafter each remittance of impounded monies from such country or territory shall include a remittance of monies realized from the distribution of the photoplay.  The amount realized from the photoplay which shall be so included in the remittances during a particular accounting period shall be that proportion of such remittances which the total gross film rentals realized by Distributor from the distribution of the photoplay in such country or territory during the respective accounting period bears to the total gross film rentals realized by Distributor in such country or territory during the respective accounting period from all motion pictures distributed by Distributor.  If in any particular accounting period there shall be any impounded monies not entirely remitted, then until the unremitted balance is remitted to the United States, no further remittances from the particular country or territory shall be deemed

EXHIBIT "A"
(Net Profits)

Rev. 8/24/76                    -4-
SHS/sh 7/30/81

to include rentals earned during any subsequent accounting period.

(c)   Notwithstanding the provisions of subdivisions (a) and (b) of this paragraph, if the funds remitted from the respective country or territory are earmarked by the authorities of such country or territory:   (i)   as funds earned during a specific period, in which period gross film rentals shall have been realized in such country or territory from the photoplay, then each remittance of such earmarked funds from such country or territory shall be deemed to include gross film rentals hereunder, the amount thereof to be computed in accordance with the formula set forth in subdivision (b) above, except that the last sentence of said subdivision (b) shall not apply;   (ii)   as funds earned during a specific period, in which period no gross film rentals shall have been realized in such country or territory from the photoplay, then no part of the remittances of funds so earmarked shall be deemed to be gross film rentals hereunder; (iii)   as funds derived from a specific photoplay, then the remittance shall be deemed to be a remittance only as to the specific photoplay so designated.   Distributor shall have the unrestricted right to use impounded monies earned from the photoplay for its own purposes, and the participant shall not be entitled to share in any benefits or profits made by Distributor from such use of such impounded monies.   Distributor shall not be obligated to the participant with respect to impounded monies received by Distributor even if such monies are used by Distributor, prior to the time when remittances to the United States of impounded monies from the respective country or territory are permitted and would have included gross film rentals hereunder

EXHIBIT "A"
(Net Profits)

Rev. 8/24/76                    -5-
SHS/sh 7/30/81

pursuant to the formula set forth in subdivision (b) or (c) of this Article, had such impounded monies not been used by Distributor. At such time Distributor shall be charged as holding in an impounded account an amount equivalent to the portions payable to the participant of such previously impounded monies used by Distributor, and the provisions hereinabove set forth with regard to remitting impounded monies shall apply as to the participant's share of such assumed impounded account.

3. <u>DISTRIBUTION FEES AND DIRECT DISTRIBUTION EXPENSES</u>:

(a) From the gross receipts Distributor shall first recoup and retain as its distribution fees the following percentages of the gross receipts:

(i) Thirty percent of the gross receipts from the United States and Canada.

(ii) Thirty-five percent of the gross receipts from the United Kingdom and Eire.

(iii) Forty percent of the gross receipts from all countries and territories except those specified in clauses (i), (ii) and (iv) of this paragraph.

(iv) Ten percent of the gross receipts from licenses to subdistributors (other than subsidiaries or affiliates of Distributor) where such subdistributors (and not Distributor) supervise and control all matters in connection with the distribution of the photoplay in the territories covered by such licenses.

(v) Distributor has arrangements and may hereafter have arrangements with "Movies En Route," "Inflight Motion Pictures Inc." and other similar agencies with respect to distribution of photoplays to transportation companies, airplane companies and branches of industrial companies located in areas where it would be impractical for Distributor to distribute directly. Such arrangements shall not be considered to be subdistribution licenses for the purposes of this paragraph, and the receipts therefrom shall be subject to the distribution fee

EXHIBIT "A"

(Net Profits)

-6-

Rev. 8/24/76
SHS/sh 7/30/81

designated in clauses (i), (ii) or (iii) of this paragraph, as the case may be. Distributor may enter into agreements with other major distributors (the term "major distributor" being used as commonly understood in the motion picture industry) for the distribution by such companies of all or any photoplays released by Distributor. For the purposes of this paragraph, such distribution shall be considered the same as distribution by Distributor, and the applicable distribution fees shall be those which would apply to the case of distribution by Distributor. Licenses to any government's armed forces shall also not be considered to be subdistribution licenses for the purposes of this paragraph, and the receipts therefrom shall be subject to the distribution fees designated in clauses (i), (ii) and (iii) of this paragraph, the applicable fee being determined by the place of exhibition.

(vi) Any arrangements made by Distributor with third parties with respect to the distribution of the photoplay by means of audio-visual cassettes or cartridges or video-discs, or any other similar devices now or hereafter known shall not be considered to be subdistribution licenses for the purposes of this paragraph (a), and the receipts therefrom shall be subject to the distribution fees designated in clauses (i), (ii) and (iii) of this paragraph (a), as the case may be.

(b) Distributor shall then deduct and pay to every person and company entitled thereto all amounts required to be paid to such person or company based upon or measured by a percentage of the gross receipts.

(c) Distributor shall then recoup its distribution expenses incurred in connection with the photoplay by retaining an amount equal to such distribution expenses. Such distribution expenses are defined in Exhibit "B" attached hereto and by this reference made a part hereof.

4.   <u>NEGATIVE COST</u>:   The gross receipts of the photoplay remaining after the deductions provided for in Article 3 of this

EXHIBIT "A"

(Net Profits)

-7-

Rev. 8/24/76

SHS/sh 7/30/81

Exhibit have been made shall be retained by Distributor until
Distributor shall have retained therefrom (i)  an amount equal
to the negative cost of the photoplay plus interest thereon at
that rate of interest per annum which is equal to the weighted
average during each accounting period of 125% of the prime rate
of interest charged by and computed on borrowings from the Bank
of America National Trust & Savings Association, such interest
to commence from the week within which each item of negative
cost is incurred and continuing thereafter through the end of
the accounting period within which such costs are recouped as
herein provided, with interest being recouped first and princi-
pal subsequently, (ii)  any deferments payable to other persons
with reference to the photoplay, and (iii) any payments paid
or payable to others consisting of or computed as a percentage
of net profits of the photoplay.  Negative cost shall be computed
in accordance with Distributor's "revised Studio Cost Accounting
System and Manual of Costs and Charges" (herein referred to as
the "Manual"), including the overhead charge provided for therein,
as such Manual may be changed from time to time in accordance
with its terms, and shall include any sums paid or payable to
others as advances against payments computed as a percentage
of gross receipts or net profits.  Participant shall be furnished
with a statement of the negative cost of said photoplay upon
request, following the completion of production of the photoplay.

EXHIBIT "A"
(Net Profits)

Rev. 4/30/80                    -8-
SHS/sh 7/30/81

5.  NET PROFITS:  The balance of the gross receipts, if any, after all of the deductions provided for in paragraphs 3 and 4 of this Exhibit "A" have been made (including continuing deductions under sub-paragraphs (a), (b) and (c) of paragraph 3, ~~and clause (iii) of paragraph 4~~ of this Exhibit "A"), are the net profits of the photoplay for the purposes of this agreement.

6.  DISTRIBUTION RECORDS:  Distributor shall keep true and correct books of account with respect to the distribution of the photoplay, showing in reasonable detail the gross receipts and deductions from gross receipts, including expenses of distribution. Such books of account shall be kept at such place or places as may from time to time be customary with Distributor in accordance with its ordinary business practices.  The participant shall have the right to have such records audited and inspected at its own cost by a firm of certified public accountants approved by Distributor in its discretion, at reasonable times during business hours but not more than once annually and for not more than one consecutive thirty day period during each annual period.  Distributor hereby approves any firm of independent national certified public accountants (other than Price, Waterhouse & Co.) which is in good standing and which is a member of the American Institute of Certified Public Accountants and also a member of the corresponding State organization in the State in which such firm has its principal office, for example, the New York or California State Society of Certified Public Accountants.  The right of audit and inspection herein given is limited solely and exclusively to records pertaining

EXHIBIT "A"
(Net Profits)
-9-

Revised 8/24/76
SHS/kc 7/30/81

to the photoplay, and under no circumstances shall the participant
be entitled to audit or examine records pertaining to any other
photoplay or photoplays, for purposes of comparison or otherwise.
Such audit may be made only at the place or places where such
records are then kept; in no event shall Distributor be required
to make such records available at any other place or places.  No
claim on the part of the participant with respect to any such
records or with respect to the transactions reflected therein
shall be maintained unless made in writing within eighteen months
after the date on which Distributor renders the statement in which
the item is first accounted for and could have been discovered or
investigated by audit, and unless suit therefor is filed against
Distributor within six months after the expiration of such eighteen
month period, nor shall the participant have the right to audit
any such records unless such audit is commenced within eighteen
months from the date on which Distributor renders the statement
in which the respective transaction is first reflected and could
have been discovered or investigated by audit.  Said records need
not be retained after the expiration of said eighteen month period
and may be destroyed thereafter unless the participant duly objects
and files suit  with respect thereto as herein provided.

    7.  <u>STATEMENTS AND PAYMENTS</u>:  Commencing with Distributor's
quarterly accounting period in which gross receipts are first
actually received by Distributor with respect to the photoplay,
Distributor shall render statements in its customary form to parti-
cipant showing the gross receipts, the deductions from the gross

EXHIBIT "A"

(Net Profits)

-10-

Revised 8/24/76

SHS/kc 7/30/81

receipts and the amount, if any, due to the participant pursuant to this agreement. The amount so shown to be due, if any, shall be paid concurrently with the rendition of the respective statement. Until the expiration of Distributor's third fiscal year following (and inclusive of) the fiscal year in which the photoplay is first generally released in any country or territory, statements will be rendered quarterly, within ninety days after the end of each quarterly period. After the expiration of the third fiscal year aforesaid, statements will be rendered annually within six months after the end of each respective fiscal year; provided, however, that if the photoplay is reissued generally the quarterly statements will be resumed for one year after such reissue commences. No statements need be rendered for any period during which there are no gross receipts; and after the expiration of the third fiscal year as aforesaid, no statements need be rendered for any period during which no payments are due participant. Statements rendered by Distributor may be changed from time to time to give effect to year-end adjustments or to items overlooked, to correct errors and for similar purposes. Should Distributor make any overpayment to the participant hereunder because of adjustments as between reports, or for other cause or reason, Distributor shall have the right to deduct and retain for its own account an amount equal to any such overpayment from any sums that may thereafter become due or payable by Distributor to the participant, or may demand repayment from

EXHIBIT "A"

(Net Profits)

-11-

Revised 8/24/76

SHS/kc 7/30/81

the participant, in which event the participant agrees to repay the same when such demand is made. Distributor shall use due and diligent efforts to collect any outstanding obligations with respect to the photoplay, but shall not be obligated to bring or maintain any suit or proceeding for the collection thereof and shall have the right to make such settlements or adjustments and to grant such releases with respect to unpaid obligations as it may consider reasonable or advisable.

   8.   TAXES:  Should any amounts payable to the participant hereunder be subject to tax withholdings or other government fees or levies in any part of the world, Distributor shall have the right to make such deductions and withholdings and to pay the same to the governmental agency concerned in accordance with its interpretation in good faith of such laws and regulations and shall not be liable to the participant therefor, it being agreed that the participant shall make and prosecute any and all claims which it may have with respect to the same directly with the governmental agency having jurisdiction in the premises.

   9.   TITLE TO THE PHOTOPLAY:  The participant does not have any right, title or interest of any kind in or to the photoplay or in or to any gross receipts or net profits therefrom, it being agreed that the participant's percentage compensation shall be computed, determined and paid in the manner herein provided, but that it shall not in any way constitute a lien or claim on or against the photoplay or its gross receipts or net profits, or

EXHIBIT "A"

(Net Profits)

-12-

Revised 8/24/76
SHS/kc 7/30/81

an assignment or transfer thereof or of any part thereof or of any interest therein. So far as the participant is concerned the owner of the photoplay has and shall have the unrestricted right to sell or assign, and to pledge, mortgage or otherwise hypothecate, the photoplay and its gross receipts or net profits, either in whole or in part, without obtaining the consent of the participant. Should the owner sell or otherwise dispose of the photoplay (as distinguished from sub-distribution licenses), such sale or other disposition shall be made subject to the obligation on the part of the purchaser or assignee to pay the participant's percentage compensation hereunder, to the same extent and computed in the same manner and subject to the same limitations as though the Distributor were continuing to receive the gross receipts and net profits, if any. Upon the execution of an agreement on the part of the purchaser or assignee to assume such obligation, the Producer and Distributor shall be released from any further obligation or liability to the participant with respect to the payment of such percentage compensation accruing after the effective date of the sale. The participant acknowledges that neither the Distributor nor the Producer has made, and it is fully understood that they are not obligated to make, any representation or warranty with respect to the amount of gross receipts or net profits, if any, which will or may be derived from the photoplay.

10. <u>DISTRIBUTION</u>: Distributor and its subdistributors shall have the full and exclusive charge and control of the distribution,

EXHIBIT "A"

(Net Profits)

-13-

Revised 8/24/76

SHS/kc 7/30/81

sale, exploitation, marketing, reissuing or other disposition or use of the photoplay.  The photoplay may be distributed, sublicensed, exploited, marketed or otherwise disposed of by Distributor and its subdistributors throughout all countries and territories of the world, without limit of time so far as the participant is concerned. Distributor and its subdistributors in their sole discretion shall have the right to withhold or withdraw the photoplay from distribution, either entirely or with respect to any country or territory or portion thereof.  The photoplay may be distributed under any plan or plans which Distributor or its subdistributors may deem proper or expedient.  Distributor and its subdistributors shall have the right to make and cancel contracts involving the distribution or exhibition of the photoplay or any version or part thereof and to adjust and settle all disputes with distributors, licensees and other persons, including the right to give allowances and credits to such persons.  All of the foregoing provisions shall apply both as to domestic and foreign territories.  It is the intent and purpose of this agreement that absolute and sole control and discretion with reference to all matters involving the distribution, re-issuing and sale of the photoplay shall be vested solely and exclusively in Distributor, and shall be exercised by Distributor and its subdistributors and assigns in such manner as in their respective judgment and discretion may be deemed proper, and without any obligation to consult with the participant or to obtain any consent or approval from the participant.  However, Distributor shall distribute the photoplay or cause it to be distributed in good faith, in accordance with the business policies and practices of Distributor.  Without limiting the generality of the foregoing,

EXHIBIT "A"

(Net Profits)

-14-

Revised 8/24/76

SHS/kc 7/30/81

Distributor shall not be under any obligation to release the photo-play for exhibition by means of television, but shall have the right to do so or to license the right to do so, including sub-scription television, pay television, theatre television and free television, both sponsored and unsponsored and private home audio-visual devices.

11. AGENCY: Nothing in this Exhibit or in the agreement to which it is attached shall be construed so as to make any party hereto an agent or partner of any other. None of the parties hereto shall hold themselves out contrary to the terms of this paragraph and none of said parties shall become liable by or because of any representation, act or omission of any other contrary to the provisions hereof.

12. LITIGATION: The participant shall not be entitled to bring any action, suit or proceeding of any nature against the Producer or Distributor, whether at law or in equity or otherwise, based upon or arising from, in whole or in part, any claim that Distributor has not reported, credited, accounted for, remitted or paid any gross receipts, or that Distributor has made charges for expenses of distribution or other deductions from the gross receipts in violation of the provisions of this agreement, unless the action is brought within two years from the alleged breach and (except in a case which the nature of the claim is such that it can be established by the participant without an audit and the participant gives Distributor a written statement specify-ing in detail the basis of such claim) unless an audit shall have been made in accordance with the provisions of paragraph 6 hereof and

EXHIBIT "A"

(Net Profits)

-15-

Revised 8/24/76

SHS/kc 7/30/81

until at least sixty days shall have elapsed after a true and complete copy of the audit report shall have been delivered to Distributor and unless such claim, demand or cause of action shall specifically be set forth in and supported by such audit report, it being agreed, however, that none of the figures, statements, conclusions or other matters contained in any such audit report shall be binding upon Distributor or constitute evidence as against Distributor of the fact, truth or accuracy thereof.  No waiver by any party of any breach of this agreement shall be deemed to be a waiver of any preceding or succeeding breach.  The participant's sole remedy hereunder shall be an action for an accounting and damages, and in no event shall the participant have the right to terminate or rescind the agreement to which this Exhibit is attached, nor shall any rights acquired by the Producer or Distributor under said agreement or this Exhibit be subject to revocation, termination, diminution or injunction because of any breach of contract by the Producer or Distributor.

13.  LAW GOVERNING CONTRACT:  The validity, effect and operation of this agreement shall be determined according to the laws of the State of California applicable to agreements made and performed in that State.  This agreement constitutes the entire agreement between the parties hereto and may be modified only by written instrument duly executed by each of the parties hereto.  This agreement has not been executed in reliance upon any representation or agreement not specifically set forth or referred to herein.

EXHIBIT "A"

(Net Profits)

-16

Revised 8/24/76

SHS/kc 7/30/81

EXHIBIT "B"

EXPENSES OF DISTRIBUTION

The term "direct distribution expenses" or "expenses of dis-
tribution" or terms of similar import, as used in Exhibit "A" to
which this exhibit is attached, shall include all costs and ex-
penses incurred, paid, payable or accrued in connection with the
distribution, advertising, exploitation and turning to account of
the photoplay of whatever kind or nature or which are customarily
treated as distribution expenses in connection with customary
accounting procedures in the motion picture industry.  Without
limiting the generality of the foregoing, the following items,
all of which may be incurred by the Distributor in its discretion
in connection with the distribution of the photoplay, shall
be included as distribution expenses hereunder and subject to
recoupment by the Distributor as provided in said Exhibit "A".

1. The cost of release prints, and parts or replacements
   thereof, dupe negatives, fine grain prints and sound
   records, recordings and re-recordings and all other
   laboratory work in connection with the distribution of
   the photoplay.

2. All shipping and delivery charges, including the cost
   of film cases, cans, containers, packing, transportation
   and storage, and all duties, customs, taxes, fees,
   insurance and imposts in connection with shipments and
   all other costs incidental to providing and delivering
   prints.

3. The costs of making superimposed, dubbed, synchronized,
   narrative and other foreign versions, shorter versions
   and television versions of the photoplay.

4. The cost of re-titling, re-cutting, dubbing and re-dubbing
   the photoplay or making any changes, eliminations or
   additions therein and thereto.

5. The cost of securing and registering copyrights and other
   similar protection.

EXHIBIT "B"

(Net Profits)

-1-

Revised 8/24/76
SHS/kc 7/30/81

6.  The cost of advertising, publicity and exploitation of the photoplay, including but not limited to cooperative advertising, advertising allowances, advertising space (newspapers, magazines, pictorials, radio, television), exploitation (theatres, tie-ups, premieres, tours), trade paper space, press book costs, art work (posters, lobbies, window cards, heralds, direct mail pieces, booklets), mechanicals (newspapers, magazines, radio, television, trade papers, billings, facts books, photostating, biographies), printing, stills (black and white, color), salary and expenses of special press representatives and other publicity and exploitation personnel not covered by Distributor's departmental overhead charge for its advertising and publicity department in accordance with its normal practice, research surveys, screenings, special TV trailers, expenses incurred by contact people and fieldmen, traveling expenses and personal tours of players connected with the photoplay, and a fair pro-rata portion of the cost of group advertising (having due regard for the proportion of space used for the photoplay as compared with the total space used and for the position and prominence given to the photoplay in relation to the other photoplays referred to in the advertisement), and an allowance of ten percent (10%) of all direct charges for advertising, publicity and exploitation incurred by the Distributor in connection with the distribution of the photoplay to cover the cost of the Distributor's advertising and publicity departments, both domestic and foreign, except that the cost of printing, manufacturing, art work and layouts incurred solely and directly with respect to accessories from which revenue is realized and which revenue is not included in the gross receipts as provided in the Exhibit "A" to which this Exhibit is attached, shall not be a deductible item of direct distribution expenses, it being agreed that all other costs not incurred solely and directly with respect to such accessories (e.g. art work used generally for publicity, advertising and exploitation purposes) shall be deducted as an item of direct distribution expense.

7.  Censorship fees.

8.  The cost of any insurance on negatives, positive prints, sound records or other physical property, it being understood that the Distributor shall not be obligated to take out or maintain any such insurance.

9.  Any royalties and license fees paid or payable in connection with the photoplay and not paid as part of the negative cost, including but not limited to royalties and license fees paid or payable under or with respect to any patents or copyrights or for the use of any patented equipment or processes and royalties and license fees paid or payable with respect to the performance of music.

10. All license fees and the cost of acquiring permits necessary to secure the entry, licensing, exhibition, performance or other use or disposition of the photoplay or of the positive prints or other physical property thereof in or into any country or territory or place therein.

<u>EXHIBIT "B"</u>

(Net Profits)

-2-

Revised 8/24/76
SHS/kc 7/30/81

11. The amount of all taxes and fees, however denomin-
ated, imposed upon the negative, duplicate negatives,
prints, sound records, disks, or other physical pro-
perty of the photoplay, including but not limited to
personal property taxes, if any, assessed upon the
photoplay, or any part thereof, after the completion
of production of the photoplay; but personal property
taxes, if any, assessed upon the photoplay prior to
the delivery thereof to the Distributor, in whatever
state of completion the same may then be, shall be
deemed to be part of the negative cost of the photo-
play.  Also, the amount of all taxes and fees however
denominated, imposed upon or measured by the gross
film rentals derived from the photoplay, including
taxes on sales, turnover, gross rentals, percentages
of gross rentals and/or upon the remittance of the
gross film rentals or any part thereof, including
any cost of contesting the same.  Also, the amount
of all taxes and fees, however denominated, upon the
conversion of the gross film rentals into United States
funds and the amount of all other taxes and fees im-
posed upon the Producer and/or Distributor or any of
its subsidiaries or affiliates relating to or on account
of the photoplay or the exercise of any rights under
the agreement to which this Exhibit is attached.
Nothing herein contained shall be deemed to permit
the Distributor, its subsidiaries or affiliates to
recoup any part of its net income, corporate franchise,
excess profits or other similar corporate taxes imposed
upon the Distributor, its subsidiaries and affiliates,
as corporate entities, as distinguished from taxes
(denominated "in lieu of income taxes" or otherwise
denominated) imposed upon the Distributor, its sub-
sidiaries and affiliates, in respect of the gross
film rentals derived from the distribution of the
photoplay.  In no event shall the recoupable amount
of any tax imposed upon the Distributor, its subsid-
iaries and affiliates, in respect of the gross film
rentals or any portion thereof, however denominated,
be decreased (nor the gross film rentals increased)
because of the manner in which such taxes are elected
to be treated by the Distributor, its subsidiaries
and affiliates, in filing net income, corporate fran-
chise, excess profits or similar tax returns.  Not-
withstanding anything to the contrary contained in
this paragraph 11 or elsewhere in this agreement,
participant shall have no right to inspect or copy
any tax return of Distributor or any of its subsidiaries
or affiliates to produce any such tax return or any
information contained therein.

12. Any cost (fairly apportioned to the photoplay) of
contesting any taxes with respect to the photoplay.

13. The cost of checking any exhibition, use or performance
of the photoplay.

<u>EXHIBIT "B"</u>
(Net Profits)

Rev. 8/24/76                    -3-
SHS/sh 7/30/81

14. A pro-rata portion of the cost, if any, contributed by the Distributor or any of its subsidiary or affiliated companies toward maintaining arbitration tribunals, appeal boards or other like procedures relating to the distribution or exhibition of motion pictures, fairly and reasonably allocated to the photoplay in accordance with the customary practice used by the Distributor for such purpose at the time.

15. A pro-rata share of the dues, assessments, contributions or other charges paid by the Distributor or any of its subsidiary or affiliated companies to any trade association or associations, fairly and reasonably allocated to the photoplay in accordance with the customary practice used by the Distributor for such purpose at the time.

16. All costs and expenses, including reasonable attorneys' fees, incurred in preventing or obtaining relief for infringement of the copyright or copyrights of the photoplay or for the unauthorized distribution or exhibition thereof or in enforcing and maintaining the rights of the Distributor under this agreement or with respect to the photoplay, or in other proceedings or litigation for the protection of the interests of the Distributor with respect to the photoplay.

17. Any percentage of gross or net rentals or receipts or other amounts which the Distributor may pay or may become obligated to pay to any governmental agency, labor organization or collective bargaining agent or any representative of the foregoing or pursuant to any agreement with any of the foregoing, with reference to the distribution, exhibition or licensing of the photoplay.

18. The commissions or fees incurred or paid by the Distributor to others, for or in connection with arranging for the licensing of the motion picture or photoplay to subdistributors or licensees.

19. All other expenses specifically referred to as expenses of distribution or as direct distribution expenses in the Exhibit to which this Exhibit is attached, whether or not specifically referred to in this Exhibit.

EXHIBIT "B"

(Net Profits)

-4-

Revised 8/24/76
SHS/kc 7/30/81

In case of any dispute between participant and Distributor with respect to the propriety of any cost or expense covered by paragraph 19 of this Exhibit, or with respect to the fairness or reasonableness of any allocation provided for in this Exhibit, such dispute shall be submitted to and decided by either of Peat Marwick Mitchell & Co., Haskins & Sells or Touche, Ross, Bailey & Smart, in that order, provided that the firm selected shall not be regularly retained as auditors or otherwise by either of the parties to the Agreement.  If the selected firm shall decide in favor of Distributor, the cost of such submittal shall be paid by participant, and if said firm shall decide in favor of participant, the cost of such submittal shall be paid by the Distributor, but if said firm shall decide partially in favor of one party and partially in favor of the other, then the cost of such submittal shall be shared by the parties in such proportion as said firm of certified public accountants shall determined.

Distributor may set up appropriate reserves (subject to adjustment by Distributor from time to time) for any distribution expenses, uncollectible amounts, or for any other matters relating to the photoplay which Distributor reasonably anticipates will be deductible under Exhibit "A" or this Exhibit "B".

<u>EXHIBIT "B"</u>

(Net Profits)

-5-

Revised 8/24/76
SHS/kc 7/30/81

# EXHIBIT 3

# EXHIBIT 3

## CERTIFICATE OF AUTHORSHIP

Each of the undersigned does hereby certify that pursuant to a loanout agreement between JOHNNY B. GOOD, INC. ("Lender") and DAYS PICTURE CORPORATION ("Borrower"), Lender, for good and valuable consideration, receipt of which is hereby acknowledged, loaned Borrower the services of EARL MAC RAUCH ("Artist") and that pursuant to said loanout agreement, all literary material (the "Material") submitted, and to be submitted, by Artist in connection with a motion picture tentatively entitled "SHIELDS AGAINST THE DEVIL" aka "BUCKAROO BANZAI"  were written and/or will be written by Artist as an employee for hire of Borrower and that the Material was written or created and will be written or created by Artist as a work made for hire specially ordered or commissioned by Borrower for use as part of a motion picture, with Borrower being deemed the author of the Material and entitled to the copyrights (and all extensions and renewals of copyrights) therein and thereto, with the right to make such changes therein and such uses thereof as Borrower may from time to time determine as such author.  Each of the undersigned hereby warrants that the Material is original with Artist, does not defame, infringe upon or violate the rights of privacy or other rights of any person, firm or corporation and is not the subject of any litigation or claim that might give rise to litigation, and the undersigned does hereby agree to indemnify Borrower, its assignees and licensees against any breach of any of the aforesaid warranties and undertake to execute such documents and do such other acts and deeds as may be required by Borrower or its assignees or licensees to further evidence or effectuate its rights hereunder.  Borrower's rights in the Material may be freely assigned and licensed, and its rights shall be binding upon the undersigned and inure to the benefit of such assignee and licensee.

IN WITNESS WHEREOF the parties hereto have caused this document to be executed the          day of          1982.

JOHNNY B. GOOD, INC.

(Lender) By: _____
Earl Mac Rauch

(Artist) _____
Earl Mac Rauch


AGREED TO AND ACCEPTED:
DAYS PICTURE CORPORATION



By: _____ (Borrower)
        Vice President

STATE OF          )
                         ) ss:
COUNTY OF        )

On this       day of            , 19  , before me came                          , to me known and known to me to be the individual described in, and who executed the foregoing instrument and acknowledged that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

(SEAL)                            _____
                                       Notary Public

STATE OF          )
                         ) ss:
COUNTY OF        )

On this       day of            , in the year 198 , before me, a Notary Public in and for said County and State, personally appeared                     , to me known to be                    President of the corporation which executed the within instrument and known to me to be the person who executed the within instrument on behalf of the corporation therein named and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

(SEAL)                            _____
                                       Notary Public

# Exhibit 4

# Exhibit 4

# MGM MEMORANDUM

FROM: Mary Ledding
TO: Karla Davidson
DATE: April 10, 1981

SUBJECT:  BUCKAROO BANZAI

Harry Bailly Productions
f/s/o W. D. Richter

Dear Karla:

Please prepare an agreement between MGM and Harry Bailly Productions ("HBP") relating to the directing services of W. D. Richter in connection with the project BUCKAROO BANZAI as follows:

(1) During the period of development, Richter shall render development services as are customarily required of directors in the motion picture industry, including services in connection with supervising the writer(s), developing the screenplay, preparation of the budget in collaboration with MGM, selection of proposed locations, casting, etc. It is agreed that the project shall be developed so as to budget at a direct cost of not more than approximately $5 million and in the event the project budgets in excess of $5 million direct cost, Richter shall make such changes as MGM requests to make the direct cost budget at not more than $5 million.

(2) Following delivery of the final screenplay and budget, MGM shall have a period of 1 year within which to elect to proceed with production of the film. In the event MGM elects not to proceed neither party shall have any further obligation to the other.

(3) In the event MGM elects to proceed with production of the film the services of Richter shall be rendered exclusively during the period 8 weeks in advance of and throughout principal photography of the film and non-exclusively at all other times until delivery of the

R. 6-17-81  8-13-81

To: Karla Davidson
Re: BUCKAROO BANZAI       Richter        Date: April 10, 1981

answer print. Whenever Richter is rendering non-exclusive services his services to himself or to third parties shall in no way interfere with his services to MGM.

It is acknowledged that Richter has a picture entitled "TERRATOMA" in development with Polygram Pictures. In that regard it is contemplated that BUCKAROO BANZAI shall be the next picture to be directed by Richter, except only that in the event "TERRATOMA" is set for production prior to BUCKAROO BANZAI, Richter may direct "TERRATOMA" in advance of BUCKAROO BANZAI.

(4) In the event MGM elects to proceed with production, for Richter's directing services HBP shall be entitled to receive the total sum of $125,000 payable:

$ 12,500 — on election to proceed;

87,500 — over the period 8 weeks in advance of and throughout the scheduled period of principal photography;

12,500 — on delivery of director's cut;

12,500 — on delivery of the director's last cut.

(5) Provided that Richter completes all services as director he shall be entitled to 1 cut beyond his DGA cut and 1 public preview of the film provided that in any event all such cutting and previewing shall be completed expeditiously in accordance with MGM's schedule for delivery and MGM's distribution and exhibition requirements.

(6) Whenever Richter's services are required to be rendered outside of Los Angeles, he is to be provided with round-trip transportation (first class if available) and reimbursed for his actual and reasonable first-class expenses to be accounted for.

R. 6—17—81

— 3 —

To:  Karla Davidson
Re:  BUCKAROO BANZAI          Richter          Date: April 10, 1981

(7)  Provided Richter completes all of his services and
is not in default he shall be accorded credit as director
of the film on a separate card on screen in size of type 50%
the size of type used for the title and in paid ads (subject
to the usual exclusions) in size of type 35% the size of
type used for the title.

(8)  This engagement shall be subject to all of MGM's
customary provisions for deals of this nature.

Agent:  Mark Lichtman (Shapiro-Lichtman)

Subject only to the specific terms hereof, this deal
memorandum shall be deemed to include all of MGM's standard
terms applicable to deals of this nature.  The parties
intend to enter into a formal agreement incorporating the
terms hereof and the parties shall negotiate in good faith with
respect to such standard terms.  However until such formal
agreement is signed, this deal memorandum shall be deemed a
binding agreement upon the parties.

IN WITNESS WHEREOF the parties have executed this agreement as
of the day and year first hereinabove written.

HARRY BAILLY PRODUCTIONS          METRO-GOLDWYN-MAYER FILM CO.

By _W. D. Richter_                By _Karla Davidson_
   Its PRESIDENT                     Vice-President

I have read the foregoing agreement and agree as an express
inducement to the parties entering into the agreement to render
all services, grant all rights necessary and observe all
requirements of me under the agreement.  If I fail to do so,
MGM will have the same rights against me personally as if I
had entered into the agreement directly with MGM.  I agree to
look solely to Company as my employer for payment of compensation
for my services and the discharge of all other obligations of
my employer as my employer.

                              _W. D. Richter_
                              W.D. RICHTER

# EXHIBIT 5

# EXHIBIT 5

DIRECTOR CONTRACT -- LOANOUT
(PRINCIPAL AGREEMENT)


Dated: As of November __, 1982


PRODUCER:    SHERWOOD PRODUCTIONS
    Address:  3964 Overland Avenue, Suite 208
              Culver City, California 90230

EMPLOYER:    HARRY BAILLY PRODUCTIONS
    Address:  c/o SHAPIRO-LICHTMAN
              2049 Century Park East, Suite 1320
              Los Angeles, California 90062

    State of Incorporation:  California

EMPLOYEE:    W. D. RICHTER
    Address:  c/o SHAPIRO-LICHTMAN
              2049 Century Park East, Suite 1320
              Los Angeles, California 90062

    Citizen of: U.S.A.            Resident of: New York

PICTURE
    Title: "BUCKAROO BANZAI"

        1.  <u>SERVICES</u>:  Producer hereby engages Employer
to provide the services of Employee as a director in
connection with the development and production of the
Picture, which Picture is initially based upon the
screenplay by Earl MacRauch ("Work"), subject to
Employee's rewriting the screenplay, to the satisfaction
of Producer, so as to budget at a direct cost of not more
than Ten Million Dollars ($10,000,000.00) (exclusive of
interest or financing charges and completion bond fees).

        2.  <u>START DATE</u>:  Producer shall designate a
start date for the Picture which, subject to the
provisions of paragraph C of Exhibit A, shall be no
earlier than April 18, 1983 and no later than May 16, 1983.

        3.  <u>ABANDONMENT; TERMINATION</u>

            In the event Producer determines, in its sole
discretion, not to proceed with production of the Picture
(<u>i.e.</u>, to abandon, which Producer shall have the right
to do at any time) or not to require Employee to render

Exhibit 5, Page 78

further services in connection with production of the Picture and so notifies (or is deemed to notify) Employer as provided above, then Employer and Employee will have no further obligation to render services hereunder and no additional compensation shall accrue to Employer hereunder.

4.   GUARANTEED COMPENSATION

Subject to the provisions of this agreement and provided that Employer and Employee shall keep and perform all covenants and conditions to be kept and performed by Employee hereunder, Producer agrees as full compensation for services rendered and for all rights granted to Producer hereunder to pay Employer as follows:

(a)   Development Fee:  For the development services referred to herein, the sum of Twenty-Five Thousand Dollars ($25,000.00) payable upon execution of this Agreement.

All compensation paid pursuant to this subparagraph (a) shall constitute a non-returnable advance against the sums payable under subparagraph (b) below.

(b)   Production Fee:  In the event Producer engages Employee to render production services in the manner referred to in paragraph 2 above, Producer will pay Employee the sum of One Hundred Thirty-Five Thousand Dollars ($135,000.00), less the development fee paid pursuant to subparagraph (a) above, in installments as follows:

(i)   Twenty percent (20%) thereof, less all sums theretofore paid (pursuant to subparagraph (a) above), at the commencement of the exclusive period for Employee's services; and

(ii)   Sixty percent (60%) thereof, in approximate equal weekly installments commencing on the start date and continuing until the expiration of the exclusive period; and

(iii)   Ten percent (10%) thereof upon delivery of the final director's cut for the Picture; and

(iv)   Ten percent (10%) thereof upon delivery of the answer print of the completed Picture and all other delivery elements required to Producer.

(c)   Flat Fee Basis:  It is mutually agreed that the guaranteed compensation specified in this

2

paragraph 4 is a "flat fee" and Employee shall not be entitled to any additional or overage compensation for any services rendered during the development, pre-production, production or post production phases or for any additional post production services.

     5.    <u>CREDIT OF FRINGE BENEFITS</u>:  If Producer is required to pay any fringe benefits in respect of Employee's writing services as may be required pursuant to Paragraph 1, the full amount of such fringe benefits shall be deducted from the compensation otherwise due Employer under Paragraph 4 hereof or under the agreement between Producer and Employer for the services of Employee as a co-producer of the Picture.

     6.    <u>CREDITS</u>

        (a)  Employee shall be accorded individual screen and advertising credit in accordance with the provisions of the DGA Agreement.  On screen, such credit shall be fifty percent (50%) of the size of the title, and in paid ads such credit shall be thirty-five percent (35%) of the size of the title.

        (b)  The credit provisions herein provided are subject to the provisions of paragraph K of Exhibit A.

     7.    <u>TAKEOVER; SUBSTITUTION</u>

     Notwithstanding any contrary provisions of this agreement, Producer shall have the right to take over complete and unfettered control of the production of the Picture and to substitute any other person's services for those being provided by Employee ("takeover right") if at any time during the production of the Picture, the estimated final negative cost thereof exceeds the budgeted negative cost for the Picture by ten percent (10%) or more.

     Upon the occurrence of the aforementioned event, Producer shall have the right to take over production and/or to substitute for Employee upon written notice to Employer of Producer's election to do so.  Producer shall not, however, exercise its takeover right with respect to the aforesaid contingency until the expiration of the first two (2) weeks of principal photography of the Picture.  Furthermore, Producer will not exercise its takeover right with respect to the contingency set forth above to the extent such contingency is solely the result of force majeure, retroactive union increases which could not have been reasonably foreseen at the time the budgeted

3

negative cost was approved or changes in the Picture made pursuant to Producer's written instructions.

If Producer exercises its takeover right as herein provided, then (i) Employer and Employee shall assign to Producer all contracts relating to the Picture to which either or both may be a party; (ii) Producer shall have the right to proceed with the production and completion of the Picture in such manner as Producer may deem advisable; (iii) All expenditures made by Producer in connection with its takeover right and the production of the Picture shall be included in the negative cost of the Picture; and (iv) neither Employer nor Employee shall be entitled to any rights of consultation or approval or to render further services on the Picture or any other motion picture based thereon.

If Producer elects to exercise its takeover right for any reason other than Employer's or Employee's default, and Employee's services (except in connection with Producer's takeover right) are no longer required by Producer, then such termination of Employee's services shall not be deemed pursuant to the pay or play provisions of paragraph F.4. of Exhibit A, but Producer shall, nonetheless pay Employer that portion of the guaranteed compensation set forth in paragraph 4 above accrued prior to such takeover.  If, however, Producer continues to utilize Employee's services after the exercise of its takeover right, then such guaranteed compensation shall continue to accrue so long as such services are required, and Employer shall, in addition to the guaranteed compensation, be entitled to Employer's pro rata share of contingent compensation under paragraph 5 above, prorated on the same basis as payments accrue to Employer under paragraph 4 above.  If Producer exercises its takeover right based upon Employer's or Employee's default, no additional compensation, whether guaranteed or contingent, shall be payable to Employer or Employee, and all of Producer's obligations with respect thereto shall terminate.  Nothing contained in this paragraph 7 shall be construed as to limit any other rights or remedies Producer may have under this agreement or at law or in equity by reason of any default of Employer or Employee.

8.   <u>FUTURE SERVICES</u>

If the Picture, as released, was produced substantially under the direct supervision of Employee in the capacity indicated above, and if Employee receives credit in accordance with the provisions of paragraph K of

4

Exhibit A and if this agreement has not bwen terminated by
default of Employer or Employee, then:

(a)   As to each theatrical remake and each
theatrical sequel to the Picture proposed by Producer to
commence photography at any time prior to the expiration
of five (5) years from the actual general release date of
the Picture, if Employee is actively or actually
functioning as a director of theatrical motion pictures at
such time (i.e., Employee has directed a theatrical
motion picture within the preceding two (2) year period),
then Producer shall offer to negotiate in good faith with
Employer for Employee to render services as the director
of such remake or sequel.  Producer's offer with regard to
any such remake or sequel shall be upon at least the same
financial terms and conditions as those contained in this
agreement with respect to the Picture.  Employer shall
have a period of ten (10) days from Producer's offer to
notify Producer that Employer wishes to negotiate in good
faith to provide the services of Employee to be the
director of such remake or sequel.  If Producer is not so
notified, or if Producer is so notified, but if, within
thirty (30) days after receipt by Producer of said notice,
Producer and Employer do not reach a mutually satisfactory
agreement for Employer to provide the services of Employee
to be the director of such remake or sequel, then Producer
shall be free to proceed with such production without any
further obligation to Employer or Employee hereunder.

(b)   With respect to each television remake
or television sequel based thereon proposed by Producer to
commence principal photography at any time prior to the
expiration of five (5) years from the initial general
release of the Picture, if Employee is actively or
actually functioning as a director of television motion
pictures at such time (i.e., Employee has directed a
television motion picture within the preceding two (2)
year period), then, subject to applicable network
approval, Producer shall negotiate in good faith with
Employer for services of Employee as the director
thereof.  Employer shall have a period of ten (10) days
from Producer's offer to notify Producer that Employer
wishes to negotiate in good faith to provide the services
of Employee to be the director of such television remake
or sequel.  If Producer is not so notified, or if Producer
is so notified, but if, within ten (10) days after receipt
by Producer of said notice, Producer and Employer do not
reach a mutually satisfactory agreement for Employer to
provide the services of Employee to be the director of
such television remake or sequel, then Producer shall be

5

free to proceed with such production without any further
obligation to Employer or Employee hereunder.

        9.    REFERENCE:

        The terms of Employee's employment hereunder
shall be as set forth in this Principal Agreement and in
Exhibit A attached hereto and the Glossary attached hereto
and all other exhibits and schedules attached hereto, all
of which are incorporated herein by reference.  Wherever
the words "this agreement," "hereof," "hereunder,"
"hereby" or similar words are used, said words shall be
deemed to refer to this Principal Agreement, Exhibit A,
the Glossary and all additional exhibits and schedules
attached hereto and all amendments hereof.  Any word
defined in the Glossary or in any exhibit or schedule
attached hereto shall be deemed to be used throughout this
agreement as defined therein.  In the event of any express
inconsistency between the provisions of this Principal
Agreement and the provisions of any exhibit or schedule
attached hereto, the provisions of this Principal
Agreement shall control.

        10.    CUTTING AUTHORITY; CUTS AND PREVIEWS:
Producer hereby designates David Begelman (or such other
person as may be the President or Producer) as the person
who, if the individual producer or executive producer of
the Picture does not have final cutting authority, will
exercise final cutting authority on behalf of Producer.
In addition to the single director's cut and single
preview provided for in the DGA Agreement, Producer agrees
to allow Employee to supervise one (1) additional
director's cut to be delivered within two (2) weeks of the
screening described in paragraph 7-505(c) of the DGA
Agreement, and to have at least one (1) preview in
addition to the one (1) preview required under the DGA
Agreement.  Nothing in the foregoing shall be construed so
as to limit Producer's absolute right to final cut of the
Picture.

        11.    PER DIEM:  The expense allowance payable
under Paragraph D of Exhibit A shall commence November 1,
1982; provided, however, that if a third party is
reimbursing or paying Employer or Employee a living
allowance during the term hereof (regardless of the amount
thereof), Producer shall not be obligated to make any

Exhibit 5, Page 83

expense allowance payments otherwise required by Paragraph D of Exhibit A.

IN WITNESS WHEREOF, the parties hereof have executed this agreement as of the date first described above.

SHERWOOD PRODUCTIONS, INC.


By:_____


AGREED TO AND ACCEPTED:

HARRY BAILLY PRODUCTIONS


By: _____
    W. D. Richter, President

7

Exhibit 5, Page 84

EXHIBIT A - DIRECTOR - LOANOUT

A.   RIGHTS

1.   Work Made For Hire:  Producer shall be the sole and exclusive owner of all the results and proceeds of Employee's services hereunder, including acts, poses, plays and appearances of Employee and all literary, dramatic and musical material, as well as inventions, designs and photographs, drawings, plans, specifications and sound recordings containing all or any part of any of the foregoing written, supplied or improvised by Employee, whether or not in writing.  The foregoing shall constitute works prepared by Employee as an employee of Producer within the scope of Employee's employment hereunder, and accordingly, the parties agree that each and all of the foregoing are and shall be considered "works made for hire" for Producer.

Producer is and shall be considered the author of said material for all purposes and the owner of all of the rights comprised of the copyright in and to said material and any and all patents, trademarks and other rights thereto.  Employer hereby grants to Producer all rights which it may have in and to all such materials as Employee's general employer.  Employer and Employee will, upon request, execute, acknowledge and deliver to Producer or its designee such additional documents as Producer may deem necessary to evidence and effectuate Producer's rights hereunder, and Employer and Employee hereby grant to Producer the right, as their attorney-in-fact, irrevocably and coupled with an interest, to execute, acknowledge, deliver and record in the United States Copyright Office or elsewhere any and all such documents concurrently herewith.

2.   Ownership:  Without limiting the generality of the foregoing, Employer and Employee expressly acknowledge that Producer is, and will remain, the owner of all now or hereafter existing rights of every kind and character whatsoever throughout the world, whether or not such rights are now known, recognized or contemplated, and the complete unconditional and unencumbered title throughout the world in and to:  Employee's services pursuant to this agreement; any and all results and proceeds thereof; and any and all literary, dramatic and musical material, incidents, plots, dialogue, characters, action, gags, routines, ideas, titles, inventions and other material written, composed, submitted, added, improvised, interpolated and invented by Employee hereunder; and the complete unencumbered, exclusive and

EXHIBIT A-1

perpetual right throughout the world to exhibit, record, reproduce, broadcast, televise, transmit, publish, copy, print, reprint, vend, sell, distribute, perform and use for any purpose, in any manner, and by any means, whether or not now known, invented, used or contemplated, and whether separately or in synchronism or timed relation with motion pictures, or otherwise, all or any part of the matters and things referred to in this paragraph and to refrain from all or any part of the foregoing.  Producer may add to, subtract from, arrange, rearrange, revise and adapt all such material in any manner, and Employer and Employee hereby waive the "moral rights of authors," as said term is commonly understood, to the full extent now or hereafter permitted by applicable law.

B.  WARRANTIES:  Employer represents, warrants and agrees that:  Employer is free to enter into this agreement and that neither Employer nor Employee is subject to any conflicting obligations or any disability which will or might prevent Employee from, or interfere with, the execution and performance of this agreement, or which will or might conflict with or impair the complete enjoyment of the rights granted to Producer hereunder; neither Employer nor Employee will employ any person to serve in any capacity, nor contract for the purchase or lease of any article or material, nor make any agreement committing Producer to pay any sum of money for any reason whatsoever in connection with the Picture or for services to be rendered by Employee, or otherwise, without first obtaining the prior written approval of Producer; all material of Employer or Employee referred to herein will be wholly original with Employee or in the public domain throughout the world, and neither the Picture nor any part thereof shall infringe upon or violate any copyright of, or the right of privacy of, any person or constitute a libel or slander of any person, and shall not infringe upon or violate any other right of any person; at all times, Employer and Employee shall promptly comply with all of Producer's instructions, directions and requests in all matters; Employer and Employee will indemnify and hold Producer harmless from and against any and all claims, demands, damages, liabilities, losses, costs and expenses (including attorneys' fees) arising out of any breach or claim of breach of any of the representations, warranties or agreements of Employer or Employee herein set forth. Producer will likewise indemnify Employer and Employee with respect to material which Producer requires added to the Picture and material supplied by Producer to Employer.

Employer represents and warrants that Employer is, and has been for more than thirty (30) days prior to

EXHIBIT A-2

the date hereof, a corporation duly organized and existing under the laws of Employer's state or county of incorporation; that Employer is a bona fide corporate business entity established for a valid business purpose within the meaning of the tax laws of the United States and not a mere sham, conduit or agent for Employee; that Employee is under an exclusive written contract of employment with Employer for a term extending at least until the completion of all services required of Employee hereunder, which contract gives Employer the right to loan or furnish the services of Employee to Producer as herein provided; that, if Employer was incorporated outside the United States, it is not engaged in any trade or business in the United States and does not have a "permanent establishment" in the United States as this term is defined in the tax treaty between the United States and the country of incorporation; and that it does not have any agent within the United States who has or habitually exercises general authority to negotiate and conclude contracts on behalf of Employer.  Employer further acknowledges that the foregoing representations and warranties will be relied upon by Producer for the purpose of determining whether or not it is necessary to make withholdings for U.S. federal taxes from monies being paid to or for the account of Employer hereunder, and Employer agrees that if withholdings are not made from said payments, and if, thereafter, it is determined that such withholdings were legally required, Employer and Employee will indemnify Producer against all loss, costs, damages and expenses relating thereto.

C.   SERVICES:  Employer agrees to cause Employee: To comply with all requirements, directions and requests, and with all rules and regulations made by Producer in connection with the regular conduct of its business; to render services during Employee's employment hereunder whenever and wherever and as often as Producer may require in a competent, conscientious and professional manner, and as instructed by Producer in all matters, including those involving artistic taste and judgment, but there shall be no obligation on Producer to cause or allow Employee to render any services, or to include all or any of Employee's work or services in any motion picture, or to produce, release, distribute, advertise or exploit any motion picture or to continue with any of the above once begun.

Commencing on the date hereof, Employee shall perform all of the supervisory and preparatory services customarily rendered by persons in Employee's capacity in the motion picture industry as may be required by Producer

EXHIBIT A-3

in connection with the Picture, including consultations with Producer and the writer(s) selected by Producer with respect to the development of the screenplay, preparation of the budget and shooting schedule and testing and selection of cast members.

If Producer has designated by written notice to Employer a date upon which principal photography of the Picture shall commence ("the start date") or has notified Employer in writing that Employer is entitled to receive the guaranteed compensation specified in paragraph 4(b)(i) of the Principal Agreement, then commencing immediately upon such notice, if any, Employee shall perform all services customarily rendered by persons in Employee's capacity in the motion picture industry as may be required by Producer in connection with the pre-production, production and post production of the Picture.  Employee's services shall be exclusive to Producer commencing on the date eight (8) weeks prior to the start date and continuing until delivery of the initial director's cut of the Picture to Producer ("the exclusive period"); before and after such period, such services shall be on a non-exclusive "first-call" basis to Producer, provided, however, that until delivery of the final, completed answer print to Producer with all ancillary documents required by Producer and otherwise complying with the provisions of paragraph S below, Employee shall not render services in connection with principal photography of any other motion picture nor shall Employee render any services which would interfere with the prompt performance of Employee's services to Producer in connection with the Picture.  The start date may be accelerated or postponed by Producer to accommodate the availability of a principal cast member, or any locations or facilities or on account of an event or contingency specified in paragraph H below.  Time is of the essence with respect to all delivery dates specified herein relating to elements of the Picture to be delivered to Producer hereunder, but such dates may be extended at Producer's option for a period equal to any period of suspension hereunder.

D.   PLACE OF SERVICE:  Employee's services shall be rendered for and as directed by Producer in Los Angeles, California, or at such other place(s) or at such other location(s) as Producer may from time-to-time designate. Producer agrees to provide Employee with round-trip transportation, first-class, if available, and by air, if appropriate, whenever Employee is required to travel on overnight location outside the Gloucester, Massachusetts area to render services pursuant hereto and to pay to Employer a non-accountable expense allowance on any such

EXHIBIT A-4

location in an amount not to exceed One Thousand Two
Hundred Fifty Dollars ($1,250.00) per week, prorated on
the basis of one-seventh (1/7) per diem for any partial
week. Such expense allowance shall be deemed to include
all costs and expenses on any such location, including,
without limitation, lodging, meals and beverages, local
transportation, telephone, etc., and such allowance shall
be in lieu of, and not in addition to, any costs or
expenses required to be paid to Employer or Employee under
the applicable collective bargaining agreement or
otherwise.

    E.   UNION OBLIGATIONS: The parties acknowledge that
this agreement is subject to applicable provisions of
federal, state and local laws and governmental regulations
and the provisions of the DGA Agreement. Prior to the
start date, Employee shall, if required by Producer,
furnish evidence of paid up membership in good standing
with the Directors Guild of America, and Employer shall
furnish evidence of proper status as signatory thereto,
and if either shall fail to do so, Producer may, upon
written notice, terminate this agreement without any
further obligation to Employer or Employee.

    F.   PAYMENT

    1.   Manner of Payment: All compensation which
shall become due to Employer hereunder shall be paid by
check and sent to Employer at the notice address herein
provided. Producer's obligation to pay compensation or
otherwise perform hereunder shall be conditioned upon the
full and faithful performance by Employer or Employee of
each of their obligations hereunder. No compensation
shall accrue or be payable to Employer if any of the
contingencies specified in paragraph H below shall occur.

    2.   Excess Compensation: If the compensation
provided hereunder shall exceed the amount permitted by
any present or future law or governmental order or
regulation, such stated compensation shall be reduced
while such limitation is in effect to the amount which is
legally permitted, and the payment of such reduced
compensation shall be deemed to constitute full
performance by Producer of its obligations hereunder with
respect to compensation for such period; provided,
however, that, if lawful to do so, and at Employer's
written request, Producer shall, after such limitation is
no longer in effect, pay Employer the amount withheld.

    3.   Overpayment: If Producer makes an
overpayment to Employer hereunder for any reason, or if

EXHIBIT A-5

Employer or Employee is indebted to Producer for any reason, Employer or Employee shall pay Producer such overpayment or indebtedness on demand or, at the election of Producer, Producer may deduct and retain for its own account an amount equal to all or any part of such overpayment or indebtedness from any sums that may be due or become due or payable by Producer to Employer or for the account of Employer or Employee, and such deduction or retention shall not be deemed a breach of this agreement.

4.   Pay or Play:  Nothing contained in this agreement shall be construed so as to require Producer actually to develop or produce the Picture or actually to utilize or continue the utilization of Employee's services or the results and proceeds thereof in connection therewith; provided, however, that nothing in the foregoing sentence shall be deemed to relieve Producer of the obligation to pay to Employer the guaranteed compensation otherwise due Employer pursuant to the other terms and conditions of this agreement and subject to any contingencies contained elsewhere herein.

5.   Cure:  With respect to each payment to be made by Producer to Employer hereunder, it is expressly agreed that should Producer for any reason fail to make such payment as herein provided, Producer shall not be deemed in default hereunder unless and until following such failure Employer shall give Producer written notice demanding such payment and Producer shall have failed to make such payment within one (1) week after Producer's receipt of said notice.  In any event, Producer's liability for any such default and Employer's rights and remedies hereunder shall be limited to the recovery of monies only, not exceeding the amount of such payment, and in no event shall any of the rights acquired or to be acquired by Producer hereunder be affected or impaired.

6.   No Additional Payments:  No additional payment shall be required in respect of services rendered at night, on weekends, on holidays or otherwise, or for exhibitions of the Picture on television or in supplemental markets, excepting only the minimum residuals, if any, required pursuant to the DGA Agreement for television or supplemental market exhibition of the Picture.

7.   Employer's Responsibility:  Payments hereunder shall be made to Employer and not to Employee, it being specifically understood and agreed that Employee shall be and remain on Employer's payroll and not on Producer's payroll; that Employer is a general employer

EXHIBIT A-6

and Producer is the special employer of Employee; and that Employee shall look solely to Employer for all wages, salary, pension, health and welfare benefits, social security, unemployment and worker's compensation and state disability insurance.

G. ASSIGNMENT: Producer may assign this agreement or loan or furnish Employee's services to any parent, subsidiary or affiliated corporation of Producer, or to any entity with or into which Producer may merge or consolidate, or which may succeed to all or a substantial portion of Producer's assets, or to any entity which produces the Picture for release and distribution by Producer or with financing supplied in whole or in part by Producer or which may supply financing or studio facilities for the Picture, or which may have the right to distribute the Picture, or which may be or become the owner of the Picture or of the underlying literary property and screenplay. Producer may assign or license any or all of its rights in and to the results and proceeds of Employee's services hereunder or to use Employee's name or likeness and biographical data in and in connection with the Picture and the advertising, exploitation and publicity thereof and all representations and warranties hereunder to any entity whatsoever, and this agreement shall be binding upon and shall inure to the benefit of all such assignees and licensees. In the event Producer assigns this agreement, or any rights herein, Producer shall not be relieved of any of its executory obligations hereunder, except if such assignee is a so-called "major" producer or distributor in the motion picture industry or a person of substantially equal financial responsibility, and such assignee executes an assumption agreement (which assumption agreement shall be in a form authorized under the applicable collective bargaining agreement, if any).

H. CONTINGENCIES: Employee's services and the accrual of compensation hereunder and the running of any periods herein provided for shall be suspended without notice (but written confirmation shall be given) during any periods that:

1. Employee does not render services hereunder because of illness or incapacity or similar matters beyond Employer's or Employee's control;

2. Employer or Employee shall fail, refuse or neglect to comply with their obligations hereunder or shall (directly or through any representative) state his intention to do so (individually or collectively

EXHIBIT A-7

"default"); or Sidney Beckerman Productions Inc. or Sidney Beckerman, the executive producer of the Picture, or Employer or Lakoda Productions, Inc., or Neil Canton or W. D. Richter, the co-producers of the Picture, shall fail, refuse or neglect to comply with their respective obligations under their respective agreements with Producer for services in connection with the Picture or shall (directly or through any representative) state their intention to do so; or

     3.    Production of the Picture is prevented, interrupted or delayed because of force majeure events, or by reason of death, illness, incapacity or breach of a principal member of the cast.

All dates herein set forth or provided for shall be postponed for a period equal to the period of any such event unless Producer notifies Employer in writing to the contrary.  If any such event or contingency occurs prior to the start date, the start date may be postponed by Producer for a period equal to the period of such event or contingency.  A suspension shall not relieve Employer or Employee of any of their obligations to perform hereunder and during periods of suspension Employee shall not render services for others except that during a suspension predicated on any of the events or contingencies specified in subparagraph 3. above, Employee may render any services for others, provided that any and all commitments for such services shall be subordinate to Employer's and Employee's obligations hereunder, including Employee's obligation to resume rendering services hereunder immediately upon termination of the suspension.  If a suspension predicated on any event described in subparagraph 3. shall continue for eight (8) weeks, Employer may give Producer written notice of Employer's desire to terminate this agreement, and unless Producer shall terminate the suspension within one (1) week after its receipt of such notice, this agreement shall terminate.  If Employer or Employee shall default for any period of time or remain unable to perform their obligations hereunder by reason of any matter referred to in subparagraph 1. above for ten (10) or more consecutive days or an aggregate of fourteen (14) or more days, or if an event described in subparagraph 3. above shall continue for eight (8) weeks, Producer may terminate this agreement by delivering written notice to Employer at any time prior to the date one (1) week after the cessation of such event.  In the event either party shall terminate this agreement in accordance with the provisions of this paragraph H, Producer shall be released and discharged from any liability or obligation whatsoever to Employer and Employee hereunder, except that, if Producer

EXHIBIT A-8

terminates this agreement based on an event or contingency
specified in subparagraph 1. or 3. above, then Employer
shall receive the guaranteed compensation accrued and
payable to Employer for services theretofore rendered to
Producer by Employee, and that portion of the contingent
compensation vested pursuant to paragraph 4(b) of the
Principal Agreement. Producer may investigate the nature
and extent of any actual or claimed illness or incapacity
of Employee, and Employee will submit to reasonable
medical examinations in connection therewith and may have
Employee's own physician present at Employee's own expense.

I.   PUBLICITY: Neither Employer nor Employee shall
individually, or through any publicity representative or
otherwise, circulate, publish or otherwise disseminate any
news story or article, book or other publicity containing
Employee's name and relating directly or indirectly to
Employee's employment, the subject matter of this
agreement, the Picture or the services to be rendered by
Employee or others in connection with the Picture unless
first approved in writing by Producer. Neither Employer
nor Employee shall transfer or attempt to transfer any
rights, privileges, title or interest in and to any of the
rights granted or agreed to be granted Producer hereunder
nor shall Employer or Employee at any time grant the
rights to or authorize any person in any way to infringe
upon the rights hereby granted to Producer, and Employer
and Employee authorize Producer, at Producer's expense, in
Employer's or Employee's name or otherwise, to institute
any legal or equitable proceeding to prevent such
infringement. The foregoing shall not be deemed to
prohibit Employer or Employee from issuing personal
publicity concerning Employee incidentally mentioning the
material or the Picture or incidentally mentioning the
Picture in a personal interview not primarily related to
the Picture, providing the same is of a non-confidential
nature, and does not mention the Picture, any personnel
engaged in connection therewith or Producer in an
unfavorable or derogatory manner. Employer and Employee
hereby grant Producer the right to issue and authorize the
issuance of publicity concerning Employee and to use
Employee's name, voice, likeness and biographical data in
connection with the distribution, exhibition, advertising
and exploitation of the Picture. Without limiting
generality of the foregoing, Producer may use Employee's
name, voice and likeness in connection with publications,
by-products, merchandising, commodities and services of
every kind, provided reference is made to the Picture or
the material upon which the Picture is based, or any part
thereof, or to Employee's employment hereunder, and

EXHIBIT A-9

provided Employee is not represented as using or endorsing any such item.

J.   INSURANCE:   Producer may secure in its own name or otherwise all life, health, accident, cast or other insurance covering Employee or Employee and others, and neither Employer nor Employee shall have any right, title or interest in or to such insurance.  Employee will submit to usual and customary medical examinations for Producer's insurance purposes (including self-insurance) and will sign such applications or other documents as may be reasonably required by Producer.  Employee may have Employee's own physician present at any such examination at Employee's own expense.  If Producer is unable to obtain any such insurance on Employee or is able to obtain any such insurance only (i) at higher than ordinary rates; (ii) with more than normal deductions or deductibles; (iii) subject to an exclusion(s) other than a usual exclusion(s) or (iv) with requirement of compliance with extraordinary conditions, Producer shall have the right to terminate this agreement on written notice to Employer; provided, however, that Producer may not terminate after the later of the start of principal photography or three (3) weeks after Employee is available for an exam; and, provided further, that Producer may not terminate for an increased premium if Employer immediately pays such premium.  Employer and Employee further agree that during the exclusive period herein provided, Employee will not ride in any aircraft other than as a passenger on a scheduled flight of a United States or major international air carrier maintaining regularly published schedules, or engage in any extra-hazardous activity or any activity that would cause Producer to lose usual insurance coverage on Employee without obtaining Producer's written consent in each and every case.

K.   CREDIT:   Credit will be given only (i) if the Picture, as released, was produced substantially under the direct supervision of Employee as the sole director thereof; (ii) if this agreement has not been terminated for the default of Employee; and (iii) in accordance with and subject to the limitations with respect thereto, if any, as may be more particularly set forth in the DGA Agreement.  The obligation to accord Employee credit in advertisements shall apply only to paid advertisements issued by Producer or under its direct control relating primarily to the Picture and shall in no event apply to excluded ads, defined as including:  teaser, special advertising, publicity or exploitation relating to the Picture or underlying material upon which the Picture is based, any member of the cast, the author, director,

EXHIBIT A-10

producer or similar matters; group or list advertisements;
trailers, film clips or other advertising (including
promotional films) on the screen or by radio or
television; institutional, group or list advertising;
advertising in narrative form; credits on the screen at
the end of the Picture; on advertising in which no credit
appears other than credit to Producer and any other
company financing or distributing the Picture or the
principal members of the cast; newspaper or other
periodical advertisements of eight (8) column inches or
less; billboards of three (3) sheets or more; by-products,
publications, novelizations, merchandising or commercial
tie-ups, record album jackets and similar packaging or
advertising of such nature that Employee has not granted
consent to the use of Employee's name in connection
therewith.  With respect to paid advertisements, said
obligation to accord credit shall apply to the billing
portion (excluding artwork or advertising copy) of paid
advertisements, it being understood that all references to
"size," however stated, whether as a percentage or
otherwise, shall mean height, width, thickness and
boldness of type and that all references to the title of
the Picture shall be deemed to refer only to the "regular"
title of the Picture (as part of the billing portion of
paid advertisements) and not to any "artwork" title.
Except as specifically set forth in paragraph 6 of the
Principal Agreement, all matters relating to Employee's
credit, such as size, style of type, placement, color,
etc., shall be at Producer's sole discretion.
Notwithstanding anything to the contrary contained in this
paragraph K or in the Principal Agreement:

        1.    There shall be no obligation whatsoever to
accord Employee credit of any kind in any award ads
(including consideration, nominations or congratulations
for an award) relating to any other person involved with
the Picture; and

        2.    Omitted.

No casual or inadvertent failure to comply with credit
requirements shall be deemed a breach of this agreement,
but Producer agrees to take steps to prospectively cure
such failure promptly upon receipt of notice thereof from
Employer.  The sole remedy of Employer or Employee for a
breach of any of the provisions of this paragraph K or of
the Principal Agreement shall be an action at law for
damages, it being agreed that in no event shall Employer
or Employee seek or be entitled to injunctive or other
equitable relief by reason of any breach or threatened
breach of any of the credit requirements, nor shall

EXHIBIT A-11

Employer or Employee be entitled to seek to enjoin or restrain the exhibition, distribution, advertising, exploitation or marketing of the Picture.

L.   GOVERNING LAW; CAPTIONS, ETC.:  This agreement shall be construed in accordance with the laws of the state of California applicable to agreements which are executed and fully performed within such state.  The captions used in connection with the sections, paragraphs and subparagraphs of this agreement are used only for purposes of reference and shall not be deemed to govern, limit, modify or in any manner affect the scope, meaning or intent of the provisions of this agreement or any part thereof, nor shall such captions be given any legal effect.  If any action or proceeding commences in any court in the state of California for the purpose of enforcing this agreement or any rights granted herein or any order or decree predicated thereon, any summons, order to show cause, writ, judgment, decree or other process, issued by such court, may be served on Employee at the address indicated in the agreement or personally without the state of California, and when so served, Employer or Employee shall be subject to the jurisdiction of such court as though the same had been served within the state of California.

M.   MISCELLANEOUS:  This agreement cancels and supersedes all prior agreements and understandings between the parties relating to the subject matter hereof, and contains all of the terms, conditions and promises of the parties hereto in the premises, and no modification of any provision hereof shall be valid or binding unless in writing.  If the parties have concurrently entered into an agreement ("Aquisition Agreement") in which Producer acquires rights in or to a screenplay or other literary material or underlying material for the Picture, and if Producer exercises its right pursuant to paragraph F.4 above not to actually utilize Employee's services hereunder, then, in addition to the sums set forth in the Aquisition Agreement, Producer shall pay to Employee the negotiated sum of Ten Dollars ($10).  No officer, employee or representative of either party hereto has any authority to make any representation or promise not contained in this agreement, and both parties expressly agree that they have not executed this agreement in reliance on any such representation or promise.

N.   NOTICES:  All notices which either party hereto is required or may desire to give to the other shall be given by personal delivery or by addressing the same to the other at the address shown on the face hereof, or at

EXHIBIT A-12

such other address as may be designated in writing by any
such party in a notice to the other given in the manner
prescribed in this paragraph.  All such notices shall be
sufficiently given when the same shall be deposited, so
addressed, postage prepaid, in the United States mail or
when the same shall have been delivered, so addressed, to
a telegraph or cable company, toll prepaid, and the date
of such mailing or telegraphing shall be the date of the
giving of such notice.  A copy of all notices given to
Producer hereunder shall also be sent to Gibson, Dunn &
Crutcher, 2029 Century Park East, Suite 4000, Los Angeles,
California 90067, Attention:  Don Parris.  A copy of all
notices given to Employer or Employee hereunder shall also
be sent to Ziffren, Brittenham, Gullen & Ingber, 2049
Century Park East, Suite 2350, Los Angeles, California
90067, Attention: Thomas Hoberman.

    O.   <u>OFFICE AND SECRETARY</u>:

    Producer agrees to furnish Employee with an
office and one (1) secretary (or to reimburse Employer for
the cost thereof, provided Producer has approved such
cost) during the exclusive period hereunder.

    P.   Omitted.

    Q.   <u>SEVERABILITY</u>:  Nothing herein contained shall be
construed so as to require the commission of any act
contrary to law or collective bargaining agreements
(including the DGA Agreement), and wherever there is any
conflict between any provision of this agreement and any
present or future law or collective bargaining agreement,
contrary to which the parties have no legal right to
contract, the latter shall prevail, but in such event, the
provision(s) of this agreement effected shall be curtailed
and limited only to the extent necessary to bring it
within the requirements of such law or collective
bargaining agreement.

    R.   <u>REMEDIES</u>:

    1.   <u>Remedies Cumulative</u>:  All remedies accorded
herein or otherwise available to Producer shall be
cumulative, and no one such remedy shall be exclusive of
any other.  Without waiving any of Producer's rights or
remedies under this agreement or otherwise, Producer may
from time-to-time recover, by action, any damages arising
out of any breach of this agreement by Employer or
Employee, and may institute and maintain subsequent
actions for additional damages which may arise from the
same or other breaches.  The commencement or maintenance

EXHIBIT A-13

of any such action or actions by Producer shall not constitute or result in the termination of Employee's employment hereunder unless Producer shall expressly so elect by written notice to Employer. The pursuit by Producer of any remedy under this agreement or otherwise shall not be deemed to waive any other or different remedy which may be available under this agreement or otherwise, either at law or in equity. No waiver by Producer of any breach of this agreement shall be deemed a waiver of any preceding or succeeding breach of the same or any other provision hereof.

    2. <u>Services Unique</u>: Employer and Employee acknowledge that the services herein agreed to be performed by Employee and the rights herein granted are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law, and that Employer's or Employee's default will cause Producer irreparable injury and damage. Employer and Employee agree that in the event of a breach or threatened breach by Employer or Employee, Producer shall be entitled to injunctive or equitable relief. In addition to such injuntive or equitable relief, Producer shall be entitled to such other remedies as may be available at law, including damages.

    3. <u>No Rescission</u>: Employer and Employee agree that, in the event of any default by Producer, Employer's and Employee's only remedy shall be an action at law for money damages, if any, actually suffered by Employer or Employee, and in no event, shall Employer or Employee be entitled to rescind this agreement or to receive injunctive or other equitable relief.

S.   <u>PICTURE SPECIFICATIONS</u>: Employer and Employee warrant, represent and agree that:

    1. <u>Services</u>: Employee shall render services in the capacity herein provided on the Picture and shall, subject to Producer's approval rights and instructions, complete the Picture in conformity with the shooting script approved by Producer and the negative cost budget and production schedule approved in writing by Producer (but overbudget or over-schedule shall not be a default, but shall be treated pursuant to paragraph 7 of the Principal Agreement).

    2. <u>Running Time</u>: The Picture shall have a running time of not less than ninety-five (95) nor more than one hundred ten (110) minutes.

EXHIBIT A-14

3.   Delivery:  Principal photography of the Picture shall commence at the place and on the start date approved by Producer, and Employer and Employee agrees to cause delivery of the Picture to be completed to Producer in accordance with all delivery requirements of Producer within nine (9) months from commencement of principal photography or five (5) months after completion of principal photography of the Picture, whichever occurs first, time being of the essence of such commencement and delivery, subject to extensions for force majeure and to comply with Producer's written instructions.

4.   Rating:  The Picture, as completed, shall have been submitted to the Code and Rating Administration of the MPAA for a rating, and a rating of "G" or "PG" or "R" (at Producer's discretion) shall be obtained before the Picture shall be deemed completed.

5.   Unions:  The Picture must qualify for and bear the I.A.T.S.E. seal and must comply with Producer's usual first-class production quality and exhibition requirements and conform to all of Producer's collective bargaining agreements and governmental requirements.

6.   Approvals:  Subject to any contrary provisions of the Principal Agreement, Producer shall have final approval over all artistic and production elements in connection with the pre-production, production and post production of the Picture, both "above the line" and "below the line" personnel and elements and all commitments and contracts relative to any of the foregoing, subject only to applicable guild and union requirements.  Producer shall have the right in all events to initiate action in connection with any of such personnel or elements or to designate the element or person involved.

7.   Cutting and Access Rights:  Subject only to the minimum rights granted Employee pursuant to the DGA Agreement, Producer reserves the complete and unconditional right to cut, edit, add to, subtract from, arrange, rearrange and revise the Picture in any manner Producer may, in its sole discretion, determine.  If Producer has, pursuant to the Principal Agreement, granted Employee the right to one (1) or more cuts or previews of the Picture in addition to those required pursuant to the DGA Agreement, nothing in such grant shall be construed so as to prevent Producer from authorizing third parties to view or edit portions of the Picture while such additional cuts are being prepared or to preview other versions of the Picture in lieu of or in addition to such additional

EXHIBIT A-15

cuts; provided, however, that, if Employee delivers each
cut in accordance with the schedule set forth in
paragraph 10 of the Principal Agreement, then Producer
agrees not to allow anyone to edit portions of the Picture
while such additional cuts are being made.  All such
additional cuts may, at Producer's discretion, be viewed
by the person having final cutting authority or such other
person(s) as Producer may designate.  Producer shall have
total access to all phases of production, including the
right to view the dailies, the rough cut and all
subsequent cuts of the Picture.

     8.   <u>Dailies</u>:  Producer shall have the right to
view the dailies during the production of the Picture.

     9.   <u>Credit Compliance</u>:  Employer and Employee
agree to comply with all contractual and union and guild
obligations and Producer's requirements with respect to
screen and advertising credits for the Picture.

     10.   <u>Television Cover Shots</u>:  Employer and
Employee will cause Producer to receive, as and when
requested by Producer (but no later than the expiration of
Employee's exclusive period) all protective or "cover"
shots as necessary for release of the Picture on
television based on network continuity standards in
existence at the time principal photography of the Picture
commences.

     11.   <u>Sales Policies</u>:  Producer shall have sole
and absolute discretion regarding the sales policy,
distribution, release, advertisng and exploitation of the
Picture.

EXHIBIT A-16

GLOSSARY

The following terms shall have the following meanings:

A.   "Additional Motion Picture":  A motion picture based upon some character or portion of the plot or story line from the Work, but which character or portion was not used in such Picture.

B.   "Additional Motion Picture Rights":  The right to make an additional motion picture.

C.   "Agreement":  The term Agreement includes the Principal Agreement, this Glossary and any other attached exhibits, schedules and amendments thereto.

D.   "Author Sequel Motion Picture":  A motion picture based upon an author-written sequel.

E.   "Author-Written Sequel":  New literary material written by the author of the Work in which:

1.   The principal character(s) is taken from the Work, and

2.   Said principal character(s) is shown as participating in new events and situations different from those in which said principal character(s) participated in the Work, and

3.   The plot or story differs from that of the Work.

F.   "Budgeted Negative Cost":  The total Negative Cost of the Picture established in the budget approved by Producer prior to start of principal photography of the Picture.

G.   "Canada":  Includes the Dominion of Canada and military installations, aircraft and ships flying the flags thereof, but not other territories or possessions.

H.   "Copy(ies)":  With reference to a motion picture or a sound record -- includes any negative, positive print, dupe negative, video or other electronic tape recording, disc or other physical article of any kind

-G1-

Exhibit 5, Page 101

produced, reproduced or re-recorded by means of any photographic, electrical, electronic, mechanical or other processes or devices now or hereafter known or invented, used or contemplated on which such motion picture or sound record or any part thereof, is printed, imprinted, recorded, reproduced or duplicated, together with any package, cartridge, cassette or other container in which the same may be distributed or sold.

With reference to a screenplay or teleplay -- includes any typewritten or printed copies thereof in substantially the form used in connection with production of the motion picture involved, whether or not accompanied by explanatory notes or comments, still photographs or other illustrations.

With reference to a musical composition or the lyrics thereof -- includes any copies, arrangements, orchestrations or versions thereof, whether or not in the form used in connection with the motion picture involved.

I.   "DGA Agreement":  The Directors Guild of America Basic Agreement of 1978, as the same may be amended from time-to-time.

J.   "Force Majeure":  The interruption of or material interference with the preparation, production, completion, or distribution of the Picture or of a substantial number of motion pictures produced or distributed or proposed to be produced or distributed by Producer by any cause or occurrence beyond the control of Producer including fire, flood, epidemic, earthquake, explosion, accident, war, blockade, embargo, act of a public enemy, civil disturbance, labor dispute (or threatened dispute), strike, lockout, inability to secure sufficient labor, essential commodities, necessary equipment or adequate transporation facilities, any applicable law, any act of God, or the incapacity or unavailability of the director, a principal member of the cast or the direction of photography of the motion picture.

K.   "Free Television Distribution":  The lease or license of motion pictures to one (1) or more parties with the right to engage in the free television exhibition thereof or to grant licenses to other parties to engage in the free television exhibition or free television distribution thereof.

L.   "Free Television Exhibition":  The telecast of a motion picture by means of over-the-air broadcast or cable transmission using any form of motion picture copy

Exhibit 5, Page 102

for reception on a television receiver or comparable device without a charge being made to the viewer by the telecaster for the privilege of viewing such telecast. For purposes of this definition, the regular periodic service charge (other than a charge paid with respect to pay television exhibition) paid by a subscriber to a cable television transmission service shall not be deemed a charge being made to the viewer.

M.   "Home Video Distribution":  The distribution of motion pictures by means of video cassettes, video discs or any other means or method, whether now known or hereafter invented, primarily intended for the viewing of visual images by means of a device contained in the home and not by means of broadcast to the home.

N.   "In Perpetuity":  The most extensive period of time permitted, including renewal and extension periods, if any, by any applicable law.

O.   "Includes" (and equivalents such as "included" or "including"):  Are illustrative only, and the examples given thereafter should not be in any way construed as limiting.

P.   "Initial Release Date" of the Picture:  The date on which regular theatrical exhibition of the Picture commences in more than one (1) major metropolitan area in the United States other than special exhibitions of the Picture at the end of a calendar year for Academy Award qualification, previews, exhibitions for test screening or other similar purposes not generally considered by Producer to constitute initial general release of the Picture.

Q.   "Law":  Any present or future statute or ordinance, whether municipal, county, state, national, or territorial; any executive, administrative or judicial regulation, order, judgment or decree; any treaty or international convention; any rule or principle of common law or equity or any requirement with the force of law.

R.   "Legitimate Stage Rights":  The right to present the Work upon the spoken stage, with living performers appearing and speaking in the immediate presence of the viewing audience, provided no broadcast, telecast, recording, photography or other reproduction of such performance is made, and provided that, if such rights are reserved, the first exercise by Owner of such legitimate stage rights is a "first-class" production as this term is known and understood in the legitimate stage business.

-G3-

Exhibit 5, Page 103

S.    "Live Television Rights":  The right to telecast the performance of living performers for reception on a television receiver or comparable device at the same time such performance actually takes place, rather than the telecast of such performance by use of a motion picture copy.  Live television rights include the right to reproduce any live television exhibition by means of motion picture copy during the period of thirty (30) days after the original live television exhibition, but only for the purpose of supplemental coverage or delayed broadcast in localities not reached by the original live television exhibition.

T.    "Merchandising Rights":  The right to license, manufacture, distribute and sell articles of merchandise based on or utilizing characters, names, likenesses and characteristics of artists, physical properties or other materials appearing or used in or in connection with the Picture or all or any part of the Work and the right to publish, distribute and sell advertising accessories, souvenir programs, picture books, photonovels, comic books, illustration books, and activity books or booklets based on or utilizing any such characters, names, likenesses or characteristics or printed copies of the screenplay on which any motion picture is based.

U.    "Motion Picture" or its equivalent:  Includes motion pictures, cinematographic films and photoplays of every kind and character whatsoever, including the sound records thereof, as well as trailers and clips thereof, produced by means of any photographic, electronic, mechanical or other processes or devices now or hereafter known, invented, used or contemplated, by which photographs, pictures, drawings, images or other visual reproductions or representations are or may be printed, imprinted, recorded or otherwise preserved on film, tape, or any other material of any description (whether translucent or not) for later projection, exhibition or transmission by any means or media now known or hereafter devised, in such manner that the same are or appear to be in motion or in sequence on a screen, mirror, tube or other medium or device, whether or not accompanied by sound records.

V.    "Music Publishing Rights":  The right to copyright, copy, publish, distribute and sell the music or lyrics of musical compositions and to license the right to make soundtrack records of musical compositions and to make soundtrack records of musical compositions in synchronization or timed relation with the Picture and to license the performance of musical compositions.

-G4-

Exhibit 5, Page 104

W.   "Non-Theatrical Distribution":  The lease or license of the Picture to one (1) or more parties with the right to engage in the non-theatrical exhibition of the Picture or to grant licenses to other parties to engage in the non-theatrical exhibition and/or non-theatrical distribution of the Picture.

X.   "Non-Theatrical Exhibition":  The exhibition of the Picture in any manner or media now known or hereafter devised other than theatrical exhibition, free television exhibition, pay-television exhibition or through home video distribution; including exhibition in any guage of film or in or by schools, college campuses, hospitals, airplanes, ships, railroads, prisons, oil companies, private institutions, social clubs, churches and similar uses.

Y.   "Or":  Not only is disjunctive, but may also be conjunctive and shall be read as "and/or."

Z.   "Outright Sale":  The exclusive leasing or licensing of the theatrical exhibition rights only of the Picture to a third party other than an exhibitor (whether or not such exhibitor is authorized to grant licenses to third parties) for a fixed period of time in excess of two (2) years for a fixed price without any obligation to account for or report any monies derived or expenses incurred by such third party from such exhibition.

AA.   "Owner":  Includes and is binding upon the heirs, executors, administrators, next-of-kin, successors and assigns of Owner and when more than one person executes this Agreement as the Owner, then each and all of the persons executing this Agreement as the Owner shall be deemed to have jointly and severally made and entered into all of the covenants, agreements, warranties and representations herein contained and shall be jointly and severally obligated and bound thereby.

BB.   "Party":  Any individual, corporation, partnership, joint venture, organization or any other business entity, firm or governmental agency.

CC.   "Pay-Television Distribution":  The lease or license of the Picture to one (1) or more parties with the right to engage in the pay-television exhibition of the Picture and/or to grant licenses to other parties to engage in the pay-television exhibition or pay-television distribution of the Picture.

-G5-

DD.   "Pay-Television Exhibition":  The exhibition of the Picture by means of over-the-air, cable, closed circuit, satellite, micro-wave or laser transmission using any form of motion picture copy for reception on a television receiver or a comparable device located in a living accommodation, where a supplemental charge is made to the viewer for the privilege of viewing such exhibition in his home or in a hotel, motel, hospital or other living accommodation, whether such exhibition is a particular program selected by the viewer which would not be available for viewing by the viewer but for the payment of such supplemental charge, or is a program being exhibited over one (1) or more assigned channels which would not be available for viewing by the viewer but for the payment of such supplemental charge, or where a charge is made to the operator of a hotel, motel, hospital or other living accommodation for the obtaining of such exhibition for viewing at such location.

EE.   "Person":  Any association, organization, partnership, business trust, joint venture, corporation or other business entity or firm or governmental agency, as well as natural persons.

FF.   "Picture":  The first feature-length theatrical motion picture based upon the Work produced hereunder.

GG.   "Pilot":  A television motion picture produced as a sample for the purpose of interesting an exhibitor or sponsor in ordering additional television motion pictures.  A pilot may be exhibited separately or as an episode of an episodic or anthology television series.

HH.   "Principal Agreement":  The agreement to which this Glossary is attached and any amendments thereto, but not including any other exhibits or schedules attached thereto.

II.   "Publishing Rights":  The right to publish, distribute and sell hard or soft cover printed publications of all or any part of the Work or other material used in connection with the Picture for sale to the public other than publications incuded within merchandising rights.

JJ.   "Purchaser" or "Producer":  Includes its successors and assigns.  Purchaser shall have the free, full, unrestricted and unlimited right to sell, assign, license the use of, transfer or otherwise dispose of or

-G6-

Exhibit 5, Page 106

deal in or with any or all of the rights, licenses, privileges or property herein conveyed, in whole or in part.

KK. "Radio Rights": The right to broadcast the Work by sound (as distinguished from visually) by radio; subject, however, to Purchaser's right at all times to exercise its radio rights for advertising, publicity and exploitation purposes by living actors or otherwise, by the use of excerpts from or condensations of the Work or any motion pictures produced hereunder and, in any event, to broadcast its motion pictures produced hereunder by radio.

LL. "Remake": A picture, other than the initial Picture, which is based upon a prior Picture or upon the same elements, the plot or story of the Work. The term remake does not include:

      1.    An additional motion picture,

      2.    A sequel,

      3.    Foreign, shortened or expanded versions of the Picture.

MM. "Remake Rights": The right to make a remake.

NN. "Restricted Currency": A foreign currency which is or becomes subject to moratorium, embargo, banking or exchange restrictions, or restrictions against remittances to the United States, or which in the business judgment of Producer is commercially impracticable to remit.

OO. "SAG Agreement": The Screen Actors Guild of America Basic Agreement of 1980, as the same may be amended from time-to-time.

PP. "Sequel": An author sequel motion picture or a studio sequel motion picture. If the only character or characters taken from the Work and used in a sequel are minor characters in the Work or are not used in the sequel by the same names or characterizations as in the Work, then no sequel payment shall be owing to Owner by such sequel.

QQ. "Sequel Motion Picture Rights": The right to make a sequel.

-G7-

Exhibit 5, Page 107

RR.   "Sound Record":  Includes sound recordings and reproductions of every kind and character whatsoever produced by means of any electrical, electronic, mechanical or other processes or devices now known or hereafter known, invented, used or contemplated by which sound may be recorded for later transmission or playback, whether or not simultaneously, or in synchronization or time relation with motion pictures.

SS.   "Soundtrack Record":  Includes sound recordings and reproductions of the soundtrack of the Picture, reproduced by any and all means for the recording and distribution of audio recordings only without accompanying visual images, including reel-to-reel tape, cartridge and cassette.

TT.   "Studio Sequel Motion Picture":  a Picture in which:

1.   One (1) or more of the principal characters is taken from the Work or from the prior Picture;

2.   Said principal character(s) is shown as participating, for the most part, in new and different events and situations from the events and situations in which said principal character(s) participated (whether or not as principal characters) in the Work or in said prior Picture or any remake thereof or in any earlier studio sequel motion picture or any remake thereof or of any additional motion picture; and

3.   The plot or story differs from that of the Work or of said prior Picture or any remake thereof or of any earlier studio sequel motion picture or any remake thereof or of any additional motion picture.

The term studio sequel motion picture does not include any additional motion picture, any remake of the said prior Picture, any remake of any studio sequel motion picture, any remake of any remake or any television series.

UU.   "Subdistributor":  Any third party licensed by Producer to distribute the Picture in one (1) or more media in one (1) or more territories, but not including exhibitors or any licensee pursuant to an outright sale.

VV.   "Television Motion Picture":  A motion picture produced hereunder based upon the Work intended for initial television exhibition, whether as a pilot or as an episode of a television series (episodic or anthology), it being understood that a "television series"

Exhibit 5, Page 108

includes a pilot therefor, regardless of length and regardless of whether there is any binding commitment for any ensuing series of episodes from such pilot, a so-called single or movie-of-the-week ("MOW") or a so-called "mini-series" consisting of a television motion picture which is a serialization of the plot or story of the Work, and is intended for exhibition sequentially in two or more segments, such as "The Captains and the Kings." Subject to the other terms hereof, any such television motion picture may be a remake or sequel as defined herein.

WW.  "Territory": Any state or country or political subdivision thereof. Wherever a sale or license to or for a particular territory is described, whether for the purpose of determining the applicable distribution fee or otherwise, the applicable territory shall be the territory in which the Picture is exhibited or in which copies of the Picture are primarily intended for use, rather than the territory in which the contract was executed or physical possession of copies of the Picture were delivered.

XX.  "Theatrical Distribution": The lease or license of the Picture to one (1) or more parties with the right to engage in theatrical exhibition of the Picture and/or to grant licenses to other parties to engage in the theatrical exhibition and/or theatrical distribution of the Picture.

YY.  "Theatrical Exhibition": The exhibition of the Picture using any form of motion picture copy by any process now known or hereafter devised in conventional or drive-in theatres open to the general public on a regularly scheduled basis where a fee is charged for admission to view the Picture.

ZZ.  "Theatrical Motion Picture": A feature length motion picture produced hereunder based upon the Work and intended for initial theatrical exhibition. The initial theatrical motion picture produced hereunder shall not be considered to be either a remake or sequel, even though one (1) or more television motion picture(s) may previously have been produced hereunder.

AAA.  "Theatrical Re-Issue": A re-release of the Picture for theatrical exhibition on a percentage or four wall engagement basis in first-run theatres.

BBB.  "Theatrical Remake": A theatrical motion picture which is a remake.

-G9-

Exhibit 5, Page 109

CCC.   "Theatrical Sequel":  A theatrical motion picture which is a sequel.

DDD.   "United States":  Includes the continental United States of America, including the District of Columbia and the states of Alaska and Hawaii and military installations, aircraft and ships flying the flags thereof, and its territories and possessions.

EEE.   "Western Europe":  Includes The United Kingdom, Ireland, France, Corsica, Belgium, Netherlands, Luxemburg, Republic of West Germany, Liechtenstein, Monaco, Austria, Switzerland, Spain, Portugal, Italy, Sardinia, Sicily, Denmark, Norway, Sweden, Finland, Iceland and Greece, and military installations, aircraft and ships flying the flags thereof, but no other territories or possessions.

FFF.   "WGA Agreement":  The Writers Guild of America Theatrical and Television Basic Agreement of 1977, as the same may be amended from time-to-time.

GGG.   "Work":  The particular literary material, whether published or unpublished, and whether in the form of novel, treatment, screenplay or otherwise, included in or upon which the Picture is based and includes all prior, present and future versions, adaptations and translations thereof (whether written by Author or others under his authority), its theme, story, plot, characters and their names, its title or titles and subtitles, if any, its music, lyrics, choreography, sets, costumes, orchestrations, arrangements, if any, and wherever throughout the world protectible thereby, its statutory and common law copyright or copyrights, all present or future renewals and extensions of such copyrights and all rights comprehended in such copyrights, and each and every part thereof.  Work does not include any material written or prepared by Purchaser or under Purchaser's authority.

HHH.   The singular shall be deemed to include the plural, and the masculine shall be deemed to include the feminine, whenever the context requires.

III.   Notwithstanding anything to the contrary contained herein, the definitions of "motion pictures," "sound recordings," "copies," "literary work" and "perform" and any other term used in the Agreement and this Glossary shall not mean or include less than the meaning prescribed for such term in the United States Copyright Act, at present or in the future.

Exhibit 5, Page 110

CERTIFICATE OF AUTHORSHIP

I hereby certify that I wrote all or part of the script tentatively entitled "BUCKAROO BANZAI" as an employee of SHERWOOD PRODUCTIONS, INC. pursuant to an employment agreement dated as of November ___, 1982 in performance of my duties thereunder and in the regular course of my employment, and that SHERWOOD PRODUCTIONS, INC. is the author of such work made for hire and the owner thereof and of all other material heretofore and hereafter written by me under and pursuant to said agreement, and that SHERWOOD PRODUCTIONS, INC. is entitled to the copyright therein and thereto, with the right to make such changes therein and such uses thereof as it may determine as such author and owner.

IN WITNESS WHEREOF, I have hereto set my hand this _____ day of _____, 198__.

_____
W. D. Richter


STATE OF                      )
                              ) ss.
COUNTY OF                     )

On _____, 19___, before me, the undersigned, a Notary Public in and for said County and State, personally appeared W. D. Richter, known to me to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

_____
Notary Public in and for
said County and State


-G11-

Exhibit 5, Page 111

# EXHIBIT 6

# EXHIBIT 6

# MGM MEMORANDUM

FROM: Mary Ledding
TO: Karla Davidson
DATE: April 10, 1981

SUBJECT: BUCKAROO BANZAI

Sidney Beckerman Productions Inc.
f/s/o Sidney Beckerman

Atlantic Films
f/s/o Neil Canton and W.D. Richter

Dear Karla:

Please prepare agreements between MGM and Sidney Beckerman
Productions Inc. ("SBP") relating to the services of
Sidney Beckerman as executive producer and between MGM
and Atlantic Films ("AF") relating to the services of
Neil Canton and W.D. Richter as co-producers in connection
with the project entitled BUCKAROO BANZAI on the following
terms:

(1)  During the development period, Beckerman shall
render services as executive producer and Canton and
Richter shall render services as co-producers of the
project.  Such services shall include those as are customarily
required of such individuals in the motion picture industry
including supervision of the writer(s), selection of
locations, preparation of the budget in collaboration
with MGM, and such other matters as may be reasonably required.
It is agreed that the project shall be developed so as to
budget at a direct cost of not more than approximately $5
million and in the event the project budgets in excess of $5
million direct cost, Beckerman, Canton and Richter shall make
such changes as MGM requires to make the direct cost budget
at not more than $5 million.

(2)  For such supervisory services, MGM shall pay
the total sum of $25,000, which shall be allocated 1/2
to SBP and 1/2 to AF.  Said $25,000 shall be payable 1/2
upon execution of the aforesaid agreements with SBP and AF and
1/2 on delivery of the final screenplay and budget, or
upon election not to proceed with production, whichever first
occurs.

R. 5-17-81  8/13/8

- 2 -

To:  Karla Davidson
Re:  BUCKAROO BANZAI
     Beckerman/Canton/Richter          Date: April 10, 1981

     (3)  Following delivery of the final screenplay and
budget for the film MGM shall have a period of 1 year in
which to elect to proceed with production.  In the event
MGM elects not to proceed then SBP and AF shall, jointly,
be entitled to a 1-year turnaround on the property, subject
to MGM's standard changed/added elements clause.  In
the event the turnaround is exercised the purchase price
for the property shall be an amount equal to MGM's direct
costs plus interest in the project.

     (4)  In the event MGM elects to proceed with production
of the film, the services of Beckerman as executive producer,
and Canton and Richter as co-producers, shall be rendered
exclusively during the period 8 weeks in advance of and
throughout principal photography and non-exclusively at all
other times, until delivery of the answer print.  Whenever
non-exclusive services are required, their services to
themselves or to third parties shall in no way interfere with
their services to MGM.

     (5)  In the event MGM elects to proceed with production
SBP shall be entitled to receive the total sum of $200,000
(inclusive of its aforesaid share of the development money)
for the services of Beckerman as executive producer and
AF shall be entitled to receive the total sum of $100,000
(inclusive of its aforesaid share of the development money)
for the co-producing services of Canton and Richter.
Said amounts shall be payable as follows:

     (a)  As to SBP:

         $ 12,500 – during development, as provided
                    above;

           12,500 – on election to proceed with
                    production;

          130,000 – over the period 8 weeks in advance
                    of and throughout the scheduled
                    period of principal photography;

           15,000 – on completon of scoring;

           17,500 – on delivery of answer print;

$ 12,500 — on delivery of the final cost
statement for the picture. In the
event the final cost statement
exclusive of "excluded costs" as herein-
after provided exceeds the approved budgeted
negative cost then said $12,500 shall be
reduced by .50¢ for each $1.00 of such
excess and the amount by which said
$12,500 is reduced shall not be payable
as a final payment, but shall be paid as
a deferment pari passu with other deferments
payable after recoupment of distribution
fees, distribution expenses, negative cost,
interest and gross participations, if any.

(b)   As to AF:

$ 12,500 — during development as provided above;

   5,000 — on election to proceed with production;

  60,000 — over the period 8 weeks in advance
           of and throughout the scheduled period
           of principal photography;

  10,000 — on completion of scoring;

  12,500 — on delivery of the final cost statement
           for the picture.  In the event the final
           cost statement exclusive of "excluded
           costs" as hereinafter provided exceeds
           the approved budgeted negative cost then
           said $12,500 shall be reduced by .50¢
           for each $1.00 of such excess and the
           amount by which said $12,500 is reduced
           shall not be payable as a final payment,
           but shall be paid as a deferment pari
           passu with other deferments payable after
           recoupment of distribution fees, distribution
           expenses, negative cost, interest and
           gross participations, if any.

(c)   "Excluded costs" shall be any additional direct
      costs incurred by reason of force majeure, and
      the like, increases due to collective bargaining
      agreements, costs covered by insurance recoveries
      and added costs caused by added scenes and
      retakes required by MGM after approval of the
      final budget, which are not caused by any
      action or omission on the part of Beckerman/
      Canton/Richter.  The final cost statement shall
      be delivered within a period of 60 days after
      delivery of the answer print.

R. 6-18-81

- 4 -

To: Karla Davidson
Re: BUCKAROO BANZAI
        Beckerman/Canton/Richter          Date: April 10, 1981

---

 (6) In addition for Beckerman's executive producing services and the producing services of Canton and Richter, SBP and AF shall, jointly, be entitled to receive an amount equal to 50% of the net profits of the film, with all third-party net and gross participations deducted out of their said share of the net profits.

 In computing net profits, there shall first be deducted distribution fees (30% U.S. and Canada, 35% U.K., 40% rest of the world – theatrical and television), distribution expenses (including advertising overhead of 10%), negative cost (including general overhead of 15%), interest, deferments and gross participations, if any.

 In the event the final negative cost of the picture exceeds the approved negative cost by more than 110%, exclusive of the excluded costs as defined above, MGM shall be entitled to recoup an additional amount equal to such excess over 110% prior to the payment of the aforesaid deferment (if any) and percentage of profits.

 (7) Beckerman shall have mutual approval with MGM over the major stars and key crew, provided, however, in the event of a conflict, MGM's decision shall control.  Such approval rights shall be exercised in a manner consistent with the budget.  The picture shall be produced so as to qualify for at least an "R" rating.

 (8) Whenever the services of Beckerman and/or Canton and/or Richter are required by MGM to be rendered outside of Los Angeles, he/they is/are to be provided with round-trip transportation (first class if available) and reimbursed for his/their actual and reasonable first-class expenses to be accounted for.  In addition each shall be entitled to one additional transportation to location, one time during production, if used.

 (9) Provided they complete their services, Beckerman shall be accorded credit as executive producer of the film on

R. 6-17-81

To:  Karla Davidson
Re:  BUCKAROO BANZAI
        Beckerman/Canton/Richter        Date: April 10, 1981
_____

a separate card and Canton and Richter shall be accorded
credit as    producers of the film on a card on which only
their names shall appear.  Said credits shall be accorded on
screen in size of type 50% the size of type used for the
title and in paid ads (subject to the usual exclusions) in
size of type 35% the size of type used for the title.


    In addition, Beckerman, Canton and Richter shall be accorded
a production credit "A Beckerman/Canton/Richter Production" above
the title on screen and in paid ads (subject to the usual
exclusions) in size of type 50% the size of type used for
the title on screen and 35% the size of title in ads.


    (10)  The aforesaid agreements shall incorporate
all of MGM's customary provisions for deals of this nature.
NOTE:  MGM is concurrently entering into an agreement with
Barry Bailly Productions ("BBP") relating to the directing
services of Richter on this project.  In accordance with
MGM's standard provisions, the agreement with AF should
provide that, in the event of a breach by Richter and/or
BBP under said directing agreement, Richter may accordingly
be deemed in breach under the agreement with AF and vice versa.


Agent:  Mark Lichtman (Shapiro-Lichtman)


Subject only to the specific terms hereof, this deal
memorandum shall be deemed to include all of MGM's standard
terms applicable to deals of this nature.  The parties
intend to enter into a formal agreement incorporating the
terms hereof and the parties shall negotiate in good faith with
respect to such standard terms.  However until such formal


                                        R. 6-17-81  8-13-81

To:  Karla Davidson
Re:  BUCKAROO BANZAI
    Beckerman/Canton/Richter          Date: April 10, 1981

agreement is signed, this deal memorandum shall be deemed a binding agreement upon the parties.

IN WITNESS WHEREOF the parties have executed this agreement as of the day and year first hereinabove written.

SIDNEY BECKERMAN PRODUCTIONS INC.   METRO-GOLDWYN-MAYER FILM CO.

By _____     By _____
   Its _____                Vice President

ATLANTIC FILMS

By _____
   Its _____

I have read the foregoing agreement and agree as an express inducement to the parties entering into the agreement to render all services, grant all rights necessary and observe all requirements of me under the agreement. If I fail to do so, MGM will have the same rights against me personally as if I had entered into the agreement directly with MGM. I agree to look solely to Company as my employer for payment of compensation for my services and the discharge of all other obligations of my employer as my employer.

_____
SIDNEY BECKERMAN

_____
NEIL CANTON

_____
W.D. RICHTER

R. 6-17-81