# EXHIBIT 7

# EXHIBIT 7

PRODUCER CONTRACT -- LOANOUT
(PRINCIPAL AGREEMENT)


Dated: As of November __, 1982


Producer:      SHERWOOD PRODUCTIONS
  Address:     3964 Overland Avenue, Suite 208
               Culver City, California 90230

Employer:      HARRY BAILLY PRODUCTIONS, INC. and
               LAKODA PRODUCTIONS, INC.
  Address:     c/o SHAPIRO-LICHTMAN
               2049 Century Park East, Suite 1320
               Los Angeles, California 90062

      State of Incorporation:  California

Employee:      NEIL CANTON and W. D. RICHTER
  Address:     c/o SHAPIRO-LICHTMAN
               2049 Century Park East, Suite 1320
               Los Angeles, California 90062

      Citizen of:  U.S.A.        Resident of:  California

PICTURE
  Title:       "BUCKAROO BANZAI"

      1.    SERVICES:  Producer hereby engages Employer
to provide the services of Employee as individual
co-producers in connection with the development and
production of the Picture, which Picture is initially
based upon the screenplay by Earl MacRauch ("Work"),
subject to a rewrite of the screenplay, to the
satisfaction of Producer, so as to budget at a direct cost
of not more than Ten Million Dollars ($10,000,000.00)
(exclusive of interest or financing charges and completion
bond fees).

      2.    START DATE:  Producer shall designate a
start date for the Picture which, subject to the
provisions of paragraph C of Exhibit A, shall be no
earlier than April 18, 1983 and no later than May 16, 1983.

      3.    ABANDONMENT; TURNAROUND

      For purposes of Paragraph 3 only, the term
"Employer" refers jointly and severally to Harry Bailly
Productions, Inc., Lakoda Productions, Inc. and Sidney
Beckerman Productions Inc., and the term "Employee" refers
jointly and severally to Neil Canton, W. D. Richter and
Sidney Beckerman.

In the event Producer determines, in its sole discretion, not to proceed with production of the Picture (*i.e.*, to abandon, which Producer shall have the right to do at any time), and so notifies (or is deemed to notify) Employer as provided above, Employer shall have the right, provided neither Employer nor Employee is in default hereunder, to acquire Producer's interest in the project and arrange for the production of the Picture for a period of one (1) year from the date of Producer's notice not to proceed with production or thirty (30) days before the expiration of any applicable option for the Work, whichever is earlier ("the turnaround period"), but subject to the following:

(a)  Employer shall be obligated, if any new element has been changed or added to the Picture which had not previously been presented to Producer, first to advise Producer of the change or addition of any such new element and to afford Producer a period of ten (10) days from the date of receipt of Employer's notice in which to exercise its option to proceed with production of the Picture predicated on the use of such new element or (at Producer's option) on the terms hereof, it being understood that Producer shall not be required to accept any terms or elements which cannot be as easily met by one person as another.  As used herein, the term "new element" shall mean a new or changed (i) principal member of the cast, (ii) screenplay writer, (iii) director, (iv) line producer, (v) executive producer, (vi) storyline or leading character in the screenplay, or (vii) lesser budget or other change in economics less favorable to Employer or Employee or any of the persons mentioned in sub-sections (i) through (v) above than previously presented to Producer during the development period.

(b)  Employer shall not enter into any agreement calling for further development or production of the Picture or commence principal photography thereof during the turnaround period without forthwith repaying to Producer a sum equal to the amounts paid or incurred by Producer in connection with developing the Picture plus interest on such amounts at the annual rate of one hundred twenty-five percent (125%) of the prevailing prime rate charged by Chemical Bank as the same may vary from time-to-time from the date incurred to the date of payment.

(c)  Incident to any acquisition of Producer's rights in the project, Employer and the financing entity for the Picture must assume in writing all obligations or commitments with respect to the Picture which Producer may have incurred or entered into during

2

the term of this agreement and provide Producer with documentation in form and substance reasonably satisfactory to Producer (including an Assumption Agreement in the form prescribed under the WGA Agreement) that Producer shall be indemnified and held harmless from and against any claim, demand, liability, loss, cost or expense (including attorneys' fees) in respect to any such obligation or commitment.  Employee and the financing entity for the Picture shall also agree that the first motion picture based on the Work or any screenplay or other material developed hereunder shall be generally released theatrically before being exhibited on television.

(d)  If Employer shall enter into an agreement with any other person for the financing, production, sale or distribution of any motion picture based upon the project developed hereunder or the Work then Producer shall be entitled to receive, and Employer does hereby irrevocably assign to Producer, an amount equal to five percent (5%) of one hundred percent (100%) of the net profits derived from the distribution, exhibition and exploitation of each and every picture and/or other production of whatsoever kind or nature based upon the project or Work.  The term "net profits" as used in the immediately preceding sentence shall be defined as calculated, accounted for and paid (i) in accordance with the applicable agreement for the production concerned; (ii) in a manner no less favorable to Producer than that accorded any person (including Employee) rendering services or granting rights in connection with the production concerned; and (iii) so that Producer's net profit interest is not subject to any reduction for third party participations, cross-collateralization or so-called "overbudget penalties" whatsoever.  In this connection, Employer hereby agrees to cause the financier or distributor of the production concerned to grant to Producer the right to audit said financier or distributor's books and records with respect to the production concerned (which books and records shall be maintained in Los Angeles or New York City) no less frequently than Employer has or shall have said right, but in no event less frequently than annually, but if Employer cannot secure such agreement from such financier or distributor, Employer shall assign all of its rights to audit the production to Producer.

(e)  Until Producer shall have been paid the amounts set forth in subparagraph (b) above, if during or following the turnaround period, Producer fails to extend or exercise the applicable option, if any, regarding the Work and thereby loses its rights, if any, to the Work

3

Producer shall have a security interest in any rights which Employer may thereafter acquire in the Work whether directly or indirectly, and Employer shall hold such rights as trustee for Producer's benefit.  Employer agrees to execute such further documents as Producer may reasonably require to perfect, protect, renew and continue such security interest or to effectuate the purposes and intents of this paragraph 3, including, without limitation, the execution of a Security Agreement and Financing Statement, and Employer irrevocably grants Producer the power coupled with an interest to execute such instruments in Employer's name if Employer fails so to do upon the request of Producer.

(f)  If during the turnaround period Employer does not comply with any of the foregoing provisions of this paragraph 3 or does not reimburse Producer for all of its costs and expenses, as more particularly provided in subparagraph (b) above, all right, title and interest in and to the screenplay, the Work and the Picture shall thereafter vest in Producer, in perpetuity, free and clear of any further obligation to Employer or Employee hereunder and without the necessity of any further documentation.  In the event Employer shall, during the turnaround period, cause any additional writing to be done in connection with the project and does not acquire Producer's right, title and interest in the Picture as herein provided, Producer shall have the right, after the expiration of the turnaround period to acquire all of Employer's right, title and interest in and to such additional material by paying Employer one hundred ten percent (110%) of Employer's direct verified out-of-pocket cost for such material.  If Producer does not exercise said right, Producer will not use any of such additional material developed by Employer, but it is nonetheless recognized that screenplays stemming from the same source or underlying material may have certain similarities.

4.   <u>GUARANTEED COMPENSATION</u>

Subject to the provisions of this agreement and provided that Employer and Employee shall keep and perform all covenants and conditions to be kept and performed by them hereunder, Producer agrees as full compensation for services rendered and for all rights granted to Producer hereunder to pay Employer as follows:

(a)  <u>Production Fee</u>:  In the event Producer engages Employee to render production services in the manner referred to in paragraph 2 above, Producer will pay Employer the sum of One Hundred Thousand Dollars ($100,000.00), less all sums paid to Employer for

4

development of the Picture by Metro-Goldwyn-Mayer Film Co., in installments as follows:

(i)  Twenty percent (20%) thereof, less all sums paid to Employer for development of the Picture by Metro-Goldwyn-Mayer Film Co., at the commencement of the exclusive period for Employee's services; and

(ii)  Sixty percent (60%) thereof, in approximate equal weekly installments commencing on the start date and continuing until the expiration of the exclusive period; and

(iii)  Ten percent (10%) thereof upon completion of scoring and dubbing for the Picture; and

(iv)  Ten percent (10%) thereof upon delivery of the answer print of the completed Picture.

Any such compensation which may become payable hereunder will be paid by Producer one-half (1/2) to Harry Bailly Productions, Inc. and one-half (1/2) to Lakoda Productions, Inc., and Producer will have no further responsibility with respect to the division or allocation of such net profits between such parties or their principals.

(b)  _Flat Fee Basis_:  It is mutually agreed that the guaranteed compensation specified in this paragraph 4 is a "flat fee" and neither Employer nor Employee shall be entitled to any additional or overage compensation for any services rendered during the development, pre-production, production or post production phases or for any additional post production services.

5.  CONTINGENT COMPENSATION:  If the Picture, as released, was produced substantially under the direct supervision of Employee in the capacity indicated above, and if Employee receives credit in accordance with the provisions of paragraph K of Exhibit A and if Employer and Employee have kept and performed all covenants and conditions to be kept and performed by them hereunder, then Producer will pay jointly to Employer and to Sidney Beckerman Productions, Inc. for the services of Sidney Beckerman, the executive producer of the Picture, as contingent compensation an amount equal to an aggregate of forty percent (40%) of one hundred percent (100%) of net profits from the Picture which shall be computed, determined and paid in accordance with and subject to the attached Exhibit "NP," with all third-party net and gross participations payable to any other person supplying goods or services to Producer deducted out of said share of net profits; provided, however, that the net profit

Exhibit 7, Page 122

participation of National Research Group will be shared on a pro rata basis (after deduction of all other third party participations as provided above) between Producer on the one hand and Employer and Sidney Beckerman Productions Inc. on the other hand.  (Thus, for example, if 10 net profit points were given to a writer and a star, Employer and Sidney Beckerman Productions Inc. would end up with 30% of the net profits and Producer would have 60%.  Under that set of circumstances, Producer would bear 2/3, and Employer and Sidney Beckerman Productions Inc. would bear 1/3, of the points given to National Research Group.)  Any such net profits which may become payable hereunder will be paid by Producer one-fourth (1/4) to Harry Bailly Productions, Inc., one-fourth (1/4) to Lakoda Productions, Inc. and one-half (1/2) to Sidney Beckerman Productions, Inc., and Producer will have no further responsibility with respect to the division or allocation of such net profits between such parties or their principals.

6.    CREDITS

(a)  Employee shall be accorded individual screen and advertising credit as follows:

(i)  On screen, such credit shall appear on a separate card in a size not less than fifty percent (50%) of the size of the title; and

(ii)  In paid ads, the size of such credit shall be thirty-five percent (35%) of the size of the title and Employee shall receive credit in paid ads whenever Sidney Beckerman receives individual credit as executive producer in such paid ad; and

(iii)  Both on screen and in paid ads, the size of Employee's credit shall in no event be less than the individual credit given Sidney Beckerman as the executive producer.

(b)  The credit provisions herein provided are subject to the provisions of paragraph K of Exhibit A.

7.    TAKEOVER; SUBSTITUTION

Notwithstanding any contrary provisions of this agreement, Producer shall have the right to take over complete and unfettered control of the production of the Picture and to substitute any other person's services for those being provided by Employee ("takeover right") if at any time during the production of the Picture, the estimated final negative cost thereof exceeds the budgeted negative cost for the Picture by ten percent (10%) or more.

6

Upon the occurrence of the aforementioned event, Producer shall have the right to take over production and/or to substitute for Employee upon written notice to Employer of Producer's election to do so. Producer shall not, however, exercise its takeover right with respect to the aforesaid contingency until the expiration of the first two (2) weeks of principal photography of the Picture. Furthermore, Producer will not exercise its takeover right with respect to the contingency set forth above to the extent such contingency is solely the result of force majeure, retroactive union increases which could not have been reasonably foreseen at the time the budgeted negative cost was approved or changes in the Picture made pursuant to Producer's written instructions.

If Producer exercises its takeover right as herein provided, then (i) Employer and Employee shall assign to Producer all contracts relating to the Picture to which either or both may be a party; (ii) Producer shall have the right to proceed with the production and completion of the Picture in such manner as Producer may deem advisable; (iii) All expenditures made by Producer in connection with its takeover right and the production of the Picture shall be included in the negative cost of the Picture; and (iv) Neither Employer nor Employee shall be entitled to any rights of consultation or approval or to render further services on the Picture or any other motion picture based thereon.

If Producer elects to exercise its takeover right for any reason other than Employer's or Employee's default, and Employee's services (except in connection with Producer's takeover right) are no longer required by Producer, then Producer shall pay Employer that portion of the guaranteed compensation set forth in paragraph 4 above accrued prior to such takeover. If, however, Producer continues to utilize Employee's services after the exercise of its takeover right, then such guaranteed compensation shall continue to accrue so long as such services are required, and Employer shall, in addition to the guaranteed compensation, be entitled to Employer's pro rata share of contingent compensation under paragraph 5 above, prorated on the same basis as payments accrue to Employer under paragraph 4 above. If Producer exercises its takeover right based upon Employer's or Employee's default, no additional compensation, whether guaranteed or contingent, shall be payable to Employer or Employee, and all of Producer's obligations with respect thereto shall terminate. Nothing contained in this paragraph 7 shall be construed as to limit any other rights or remedies Producer may have under this agreement or at law or in equity by reason of any default of Employer or Employee.

7

8.   <u>FUTURE SERVICES</u>

If the Picture, as released, was produced substantially under the direct supervision of Employee in the capacity indicated above, and if Employee receives credit in accordance with the provisions of paragraph K of Exhibit A and if Employer and Employee have kept and performed all covenants and conditions to be kept and performed by them hereunder, then:

(a)  As to each theatrical remake and each theatrical sequel to the Picture proposed by Producer to commence photography at any time prior to the expiration of five (5) years from the initial release date of the Picture, if Employee is actively or actually functioning as a producer of theatrical motion pictures at such time (<u>i.e.</u>, Employee has produced a theatrical motion picture within the preceding two (2) year period), then Producer shall offer to negotiate in good faith with Employer for Employee to render services as the producer of such remake or sequel.  Producer's offer with regard to any such remake or sequel shall be upon at least the same financial terms and conditions as those contained in this agreement with respect to the Picture.  Employer shall have a period of ten (10) days from Producer's offer to notify Producer that Employer wishes to negotiate in good faith to provide the services of Employee to be the producer of such remake or sequel.  If Producer is not so notified, or if Producer is so notified, but if, within thirty (30) days after receipt by Producer of said notice, Producer and Employer do not reach a mutually satisfactory agreement for Employer to provide the services of Employee to be the producer of such remake or sequel, then Producer shall be free to proceed with such production without any further obligation to Employee or Employee hereunder.

(b)  With respect to each television remake or television sequel based thereon proposed by Producer to commence principal photography at any time prior to the expiration of five (5) years from the actual general release of the Picture, if Employee is actively or actually functioning as a producer of television motion pictures at such time (<u>i.e.</u>, Employee has produced a television motion picture within the preceding two (2) year period), then, subject to applicable network approval, Producer shall negotiate in good faith with Employer for services of Employee as the producer thereof.  Employer shall have a period of ten (10) days from Producer's offer to notify Producer that Employer wishes to negotiate in good faith to provide the services of Employee to be the producer of such television remake or sequel.  If Producer is not so notified, or if Producer

8

is so notified, but if, within ten (10) days after receipt
by Producer of said notice, Producer and Employer do not
reach a mutually satisfactory agreement for Employer to
provide the services of Employee to be the producer of
such television remake or sequel, then Producer shall be
free to proceed with such production without any further
obligation to Employer or Employee hereunder.

     9.   <u>REFERENCE</u>:

     The terms of Employer's engagement and Employee's
employment hereunder shall be as set forth in this
Principal Agreement and in Exhibit A attached hereto and
the Glossary attached hereto and all other exhibits and
schedules attached hereto, all of which are incorporated
herein by reference.  Wherever the words "this agreement,"
hereof," "hereunder," "hereby" or similar words are used,
said words shall be deemed to refer to this Principal
Agreement, Exhibit A, the Glossary and all additional
exhibits and schedules attached hereto and all amendments
hereof.  Any word defined in the Glossary or in any
exhibit or schedule attached hereto shall be deemed to be
used throughout this agreement as defined therein.  In the
event of any express inconsistency between the provisions
of this Principal Agreement and the provisions of any
exhibit or schedule attached hereto, the provisions of
this Principal Agreement shall control.

     IN WITNESS WHEREOF, the parties hereof have
executed this agreement as of the date first described
above.

               SHERWOOD PRODUCTIONS, INC.


               By:_____


AGREED TO AND ACCEPTED:

HARRY BAILLY PRODUCTIONS, INC.


By: _____
     W. D. Richter, President


LAKODA PRODUCTIONS, INC.


By: _____
     Neil Canton, President


                     9

EXHIBIT A - PRODUCER - LOANOUT

A.   <u>RIGHTS</u>

   1.   <u>Work Made For Hire</u>:  Producer shall be the
sole and exclusive owner of all the results and proceeds
of Employee's services hereunder, including acts, poses,
plays and appearances of Employee and all literary,
dramatic and musical material, as well as inventions,
designs and photographs, drawings, plans, specifications
and sound recordings containing all or any part of any of
the foregoing written, supplied or improvised by Employee,
whether or not in writing.  The foregoing shall constitute
works prepared by Employee as an employee of Producer
within the scope of Employee's employment hereunder, and
accordingly, the parties agree that each and all of the
foregoing are and shall be considered "works made for
hire" for Producer.

   Producer is and shall be considered the author of
said material for all purposes and the owner of all of the
rights comprised of the copyright in and to said material
and any and all patents, trademarks and other rights
thereto.  Employer hereby grants to Producer all rights
which it may have in and to all such materials as
Employee's general employer.  Employer and Employee will,
upon request, execute, acknowledge and deliver to Producer
or its designee such additional documents as Producer may
deem necessary to evidence and effectuate Producer's
rights hereunder, and Employer and Employee hereby grant
to Producer the right, as their attorney-in-fact,
irrevocably and coupled with an interest, to execute,
acknowledge, deliver and record in the United States
Copyright Office or elsewhere any and all such documents
concurrently herewith.

   2.   <u>Ownership</u>:  Without limiting the generality
of the foregoing, Employer and Employee expressly
acknowledge that Producer is, and will remain, the owner
of all now or hereafter existing rights of every kind and
character whatsoever throughout the world, whether or not
such rights are now known, recognized or contemplated, and
the complete unconditional and unencumbered title
throughout the world in and to:  Employee's services
pursuant to this agreement; any and all results and
proceeds thereof; and any and all literary, dramatic and
musical material, incidents, plots, dialogue, characters,
action, gags, routines, ideas, titles, inventions and
other material written, composed, submitted, added,
improvised, interpolated and invented by Employee
hereunder; and the complete unencumbered, exclusive and

Exhibit A
1

perpetual right throughout the world to exhibit, record, reproduce, broadcast, televise, transmit, publish, copy, print, reprint, vend, sell, distribute, perform and use for any purpose, in any manner, and by any means, whether or not now known, invented, used or contemplated, and whether separately or in synchronism or timed relation with motion pictures, or otherwise, all or any part of the matters and things referred to in this paragraph and to refrain from all or any part of the foregoing. Producer may add to, subtract from, arrange, rearrange, revise and adapt all such material in any manner, and Employer and Employee hereby waive the "moral rights of authors," as said term is commonly understood, to the full extent now or hereafter permitted by applicable law.

B.   WARRANTIES: Employer represents, warrants and agrees that: Employer is free to enter into this agreement and that neither Employer nor Employee is subject to any conflicting obligations or any disability which will or might prevent Employee from, or interfere with, the execution and performance of this agreement, or which will or might conflict with or impair the complete enjoyment of the rights granted to Producer hereunder; neither Employer nor Employee will employ any person to serve in any capacity, nor contract for the purchase or lease of any article or material, nor make any agreement committing Producer to pay any sum of money for any reason whatsoever in connection with the Picture or for services to be rendered by Employee, or otherwise, without first obtaining the prior written approval of Producer; all material of Employer or Employee referred to herein will be wholly original with Employee or in the public domain throughout the world, and neither the Picture nor any part thereof shall infringe upon or violate any copyright of, or the right of privacy of, any person or constitute a libel or slander of any person, and shall not infringe upon or violate any other right of any person; at all times, Employer and Employee shall promptly comply with all of Producer's instructions, directions and requests in all matters; Employer and Employee will indemnify and hold Producer harmless from and against any and all claims, demands, damages, liabilities, losses, costs and expenses (including attorneys' fees) arising out of any breach or claim of breach of any of the representations, warranties or agreements of Employer or Employee herein set forth. Producer will likewise indemnify Employer and Employee with respect to material which Producer requires added to the Picture and material supplied by Producer to Employee.

Exhibit A
2

Employer represents and warrants that Employer is, and has been for more than thirty (30) days prior to the date hereof, a corporation duly organized and existing under the laws of Employer's state or county of incorporation; that Employer is a bona fide corporate business entity established for a valid business purpose within the meaning of the tax laws of the United States and not a mere sham, conduit or agent for Employee; that Employee is under an exclusive written contract of employment with Employer for a term extending at least until the completion of all services required of Employee hereunder, which contract gives Employer the right to loan or furnish the services of Employee to Producer as herein provided; that, if Employer was incorporated outside the United States, it is not engaged in any trade or business in the United States and does not have a "permanent establishment" in the United States as this term is defined in the tax treaty between the United States and the country of incorporation; and that it does not have any agent within the United Staes who has or habitually exercises general authority to negotiate and conclude contracts on behalf of Employer.  Employer further acknowledges that the foregoing representations and warranties will be relied upon by Producer for the purpose of determining whether or not it is necessary to make withholdings for U.S. federal taxes from monies being paid to or for the account of Employer hereunder, and Employer agrees that if withholdings are not made from said payments, and if, thereafter, it is determined that such withholdings were legally required, Employer and Employee will indemnify Producer against all loss, costs, damages and expenses relating thereto.

C.  SERVICES:  Employer agrees to cause Employee: To comply with all requirements, directions and requests, and with all rules and regulations made by Producer in connection with the regular conduct of its business; to render services during Employee's employment hereunder whenever and wherever and as often as Producer may require in a competent, conscientious and professional manner, and as instructed by Producer in all matters, including those involving artistic taste and judgment, but there shall be no obligation on Producer to cause or allow Employee to render any services, or to include all or any of Employee's work or services in any motion picture, or to produce, release, distribute, advertise or exploit any motion picture or to continue with any of the above once begun.

Exhibit A

3

Commencing on the date hereof, Employee shall perform all of the supervisory and preparatory services customarily rendered by persons in Employee's capacity in the motion picture industry as may be required by Producer in connection with the Picture, including consultations with Producer and the writer(s) selected by Producer with respect to the development of the screenplay, preparation of the budget and shooting schedule and testing and selection of the director and cast members.

If Producer has designated by written notice to Employer a date upon which principal photography of the Picture shall commence ("the start date") or has notified Employer in writing that Employer is entitled to receive the guaranteed compensation specified in paragraph 4(b)(i) of the Principal Agreement, then commencing immediately upon such notice, if any, Employee shall perform all services customarily rendered by persons in Employee's capacity in the motion picture industry as may be required by Producer in connection with the pre-production, production and post production of the Picture. Employee's services shall be exclusive to Producer commencing on the date eight (8) weeks prior to the start date and continuing until delivery of the initial director's cut of the Picture to Producer ("the exclusive period"); before and after such period, such services shall be on a non-exclusive "first-call" basis to Producer, provided, however, that until delivery of the final, completed answer print to Producer with all ancillary documents required by Producer and otherwise complying with the provisions of paragraph S below, Employee shall not render services in connection with principal photography of any other motion picture nor shall Employee render any services which would interfere with the prompt performance of Employee's services to Producer in connection with the Picture. The start date may be accelerated or postponed by Producer to accommodate the availability of a director or principal cast member, or any locations or facilities or on account of an event or contingency specified in paragraph H below. Time is of the essence with respect to all delivery dates specified herein relating to elements of the Picture to be delivered to Producer hereunder, but such dates may be extended at Producer's option for a period equal to any period of suspension hereunder.

D.   PLACE OF SERVICE: With respect to W. D. Richter, the subject matter of this Paragraph D will be covered exclusively in the agreement with Producer for his services as director of the Picture. For purposes of this Paragraph D only, the term "Employee" refers solely to Neil Canton. Employee's services shall be rendered for

Exhibit A
4

and as directed by Producer in Los Angeles, California, or at such other place(s) or at such other location(s) as Producer may from time-to-time designate.  Producer agrees to provide Employee with round-trip transportation, first-class, if available, and by air, if appropriate, whenever Employee is required to travel on overnight location outside the Los Angeles, California area to render services pursuant hereto and to reimburse Employer for the actual and reasonable first class expenses of Employee to be accounted for in accordance with Producer's policies.  In addition, Producer agrees to provide Employee with one (1) additional round-trip transportation, first class, if available, and by air, if appropriate, one time during production on location, if used.  Such expense reimbursement shall be deemed to include all costs and expenses on any such location, including, without limitation, lodging, meals and beverages, local transportation, telephone, etc., and such reimbursement shall be in lieu of, and not in addition to, any costs or expenses required to be paid to Employer or Employee under the applicable collective bargaining agreement or otherwise.

     E.   UNION OBLIGATIONS:  Prior to the start date, Employee shall, if required by Producer, furnish evidence of paid up membership in good standing with any applicable guild with which Producer may be a signatory, and Employer shall furnish evidence of proper status as a signatory thereto,   d if either shall fail to do so, Producer may, upon written notice, terminate this agreement without any further obli  tion to Employer or Employee.

     F.   PAYMENT

          1.   Manner of Payment:  All compensation which shall become due to Employer hereunder shall be paid by check and sent to Employer at the notice address herein provided.  Producer's obligation to pay compensation or otherwise perform hereunder shall be conditioned upon the full and faithful performance by Employer or Employee of each of their obligations hereunder.  No compensation shall accrue or be payable to Employer if any of the contingencies specified in paragraph H below shall occur.

          2.   Excess Compensation:  If the compensation provided hereunder shall exceed the amount permitted by any present or future law or governmental order or regulation, such stated compensation shall be reduced while such limitation is in effect to the amount which is legally permitted, and the payment of such reduced compensation shall be deemed to constitute full

Exhibit A
5

performance by Producer of its obligations hereunder with respect to compensation for such period; provided, however, that, if lawful to do so, and at Employer's written request, Producer shall, after such limitation is no longer in effect, pay Employer the amount withheld.

3.   Overpayment:  If Producer makes an overpayment to Employer hereunder for any reason, or if Employer or Employee is indebted to Producer for any reason, Employer or Employee shall pay Producer such overpayment or indebtedness on demand or, at the election of Producer, Producer may deduct and retain for its own account an amount equal to all or any part of such overpayment or indebtedness from any sums that may be due or become due or payable by Producer to Employer or for the account of Employer or Employee, and such deduction or retention shall not be deemed a breach of this agreement.

4.   Pay or Play:  Nothing contained in this agreement shall be construed so as to require Producer actually to develop or produce the Picture or actually to utilize or continue the utilization of Employee's services or the results and proceeds thereof in connection therewith; provided, however, that nothing in the foregoing sentence shall be deemed to relieve Producer of the obligation to pay to Employer the guaranteed compensation otherwise due Employer pursuant to the other terms and conditions of this agreement and subject to any contingencies contained elsewhere herein.

5.   Cure:  With respect to each payment to be made by Producer to Employer hereunder, it is expressly agreed that should Producer for any reason fail to make such payment as herein provided, Producer shall not be deemed in default hereunder unless and until following such failure Employer shall give Producer written notice demanding such payment and Producer shall have failed to make such payment within one (1) week after Producer's receipt of said notice.  In any event, Producer's liability for any such default and Employer's rights and remedies hereunder shall be limited to the recovery of monies only, not exceeding the amount of such payment, and in no event shall any of the rights acquired or to be acquired by Producer hereunder be affected or impaired.

6.   No Additional Payments:  No additional payment shall be required in respect of services rendered at night, on weekends, on holidays or otherwise, or for exhibitions of the Picture on television or in supplemental markets, excepting only the minimum residuals, if any, required pursuant to applicable

Exhibit A
6

collective bargaining agreements to which Producer is a signatory.

       7.   <u>Employer's Responsibility</u>:  Payments hereunder shall be made to Employer and not to Employee, it being specifically understood and agreed that Employee shall be and remain on Employer's payroll and not on Producer's payroll; that Employer is a general employer and Producer is the special employer of Employee; and that Employee shall look solely to Employer for all wages, salary, pension, health and welfare benefits, social security, unemployment and worker's compensation and state disability insurance.

       G.  <u>ASSIGNMENT</u>:  Producer may assign this agreement or loan or furnish Employee's services to any parent, subsidiary or affiliated corporation of Producer, or to any entity with or into which Producer may merge or consolidate, or which may succeed to all or a substantial portion of Producer's assets, or to any entity which produces the Picture for release and distribution by Producer or with financing supplied in whole or in part by Producer or which may supply financing or studio facilities for the Picture, or which may have the right to distribute the Picture, or which may be or become the owner of the Picture or of the underlying literary property and screenplay.  Producer may assign or license any or all of its rights in and to the results and proceeds of Employee's services hereunder or to use Employee's name or likeness and biographical data in and in connection with the Picture and the advertisin exploitation and publicity thereof and all representations and warranties hereunder to any entity whatsoever, and this agreement shall be binding upon and shall inure to the benefit of all such assignees and licensees.  In the event Producer assigns this agreement, or any rights herein, Producer shall not be relieved of any of its executory obligations hereunder, except if such assignee is a so-called "major" producer or distributor or a person of substantially equal financial responsibility, and such assignee executes an assumption agreement (which assumption agreement shall be in a form authorized under the applicable collective bargaining agreement, if any).

       H.  <u>CONTINGENCIES</u>:  Employee's services and the accrual of compensation hereunder and the running of any periods herein provided for shall be suspended without notice (but written prompt confirmation shall be given) during any periods that:

Exhibit A
7

1.    Employee does not render services hereunder because of illness or incapacity or similar matters beyond Employer's or Employee's control;

2.    Employer or Employee shall fail, refuse or neglect to comply with their obligations hereunder or shall (directly or through any representative) state his intention to do so; or Sidney Beckerman Productions, Inc. or Sidney Beckerman, the executive producer of the Picture, or Harry Bailly Productions, Inc. or W.D. Richter, the director of the Picture, shall fail, refuse or neglect to comply with their respective obligations under their respective agreements with Producer for services in connection with the Picture or shall (directly or through any representative) state their intention to do so (individually or collectively "default"); or

3.    Production of the Picture is prevented, interrupted or delayed because of force majeure events, or by reason of death, illness, incapacity or breach of the director or a principal member of the cast.

All dates herein set forth or provided for shall be postponed for a period equal to the period of any such event unless Producer notifies Employer in writing to the contrary.  If any such event or contingency occurs prior to the start date, the start date may be postponed by Producer for a period equal to the period of such event or contingency.  A suspension shall not relieve Employer or Employee of any of their obligations to perform hereunder and during periods of suspension Employee shall not render services for others except that during a suspension predicated on any of the events or contingencies specified in subparagraph 3. above, Employee may render any services for others, provided that any and all commitments for such services shall be subordinate to Employer's and Employee's obligations hereunder, including Employee's obligation to resume rendering services hereunder immediately upon termination of the suspension.  If a suspension predicated on any event described in subparagraph 3. shall continue for eight (8) weeks, Employer may give Producer written notice of Employer's desire to terminate this agreement, and unless Producer shall terminate the suspension within one (1) week after its receipt of such notice, this agreement shall terminate.  If Employer or Employee shall default for any period of time or remain unable to perform their obligations hereunder by reason of any matter referred to in subparagraph 1. above for ten (10) or more consecutive days or an aggregate of fourteen (14) or more days, or if an event described in subparagraph 3. above shall continue for eight (8) weeks, Producer may terminate

Exhibit A
8

Exhibit 7, Page 134

this agreement by delivering written notice to Employer at any time prior to the date one (1) week after the cessation of such event.  In the event either party shall terminate this agreement in accordance with the provisions of this paragraph H, Producer shall be released and discharged from any liability or obligation whatsoever to Employer and Employee hereunder, except that, if Producer terminates this agreement based on an event or contingency specified in subparagraph 1. or 3. above, then Employer shall receive the guaranteed compensation accrued and payable to Employer for services theretofore rendered to Producer by Employee, and that portion of the contingent compensation vested pursuant to paragraph 4(a) of the Principal Agreement.  Producer may investigate the nature and extent of any actual or claimed illness or incapacity of Employee, and Employee will submit to reasonable medical examinations in connection therewith and may have Employee's own physician present at Employee's own expense.  If an event described in paragraph 1 above affects only one (1) Employee, then the applicable suspension or termination shall only affect the Employer supplying such Employee's services and the portion of the compensation payable to such Employer hereunder.

     I.   PUBLICITY:  Neither Employer nor Employee shall individually, or through any publicity representative or otherwise, circulate, publish or otherwise disseminate any news story or article, book or other publicity containing Employee's name and relating directly or indirectly to Employee's employment, the subject matter of this agreement, the Picture or the services to be rendered by Employee or others in connection with the Picture unless first approved in writing by Producer.  Neither Employer nor Employee shall transfer or attempt to transfer any rights, privileges, title or interest in and to any of the rights granted or agreed to be granted Producer hereunder nor shall Employer or Employee at any time grant the rights to or authorize any person in any way to infringe upon the rights hereby granted to Producer, and Employer and Employee authorize Producer, at Producer's expense, in Employer's or Employee's name or otherwise, to institute any legal or equitable proceeding to prevent such infringement.  The foregoing shall not be deemed to prohibit Employer or Employee from issuing personal publicity concerning Employee incidentally mentioning the material or the Picture or incidentally mentioning the Picture in a personal interview not primarily related to the Picture, providing the same is of a non-confidential nature, and does not mention the Picture, any personnel engaged in connection therewith or Producer in a derogatory manner.  Employer and Employee hereby grant

Producer the right to issue and authorize the issuance of publicity concerning Employee and to use Employee's name, voice, likeness and biographical data in connection with the distribution, exhibition, advertising and exploitation of the Picture.  Without limiting generality of the foregoing, Producer may use Employee's name, voice and likeness in connection with publications, by-products, merchandising (but only as a part of the Picture credits), commodities and services of every kind, provided reference is made to the Picture or the material upon which the Picture is based, or any part thereof, or to Employee's employment hereunder, and provided Employee is not represented as using or endorsing any such item.

    J.   INSURANCE:  Producer may secure in its own name or otherwise all life, health, accident, cast or other insurance covering Employee or Employee and others, and neither Employer nor Employee shall have any right, title or interest in or to such insurance.  Employee will submit to usual and customary medical examinations for Producer's insurance purposes (including self-insurance) and will sign such applications or other documents as may be reasonably required by Producer.  Employee may have Employee's own physician present at any such examination at Employee's own expense.  If Producer is unable to obtain any such insurance on Employee or is able to obtain any such insurance only (i) at higher than ordinary rates; (ii) with more than normal deductions or deductibles; (iii) subject to an exclusion(s) other than a usual exclusion(s) or (iv) with requirement of compliance with extraordinary conditions, Producer shall have the right to terminate this agreement on written notice to Employer; provided, however, that Producer may not terminate after the later of the start of principal photography or three (3) weeks after Employee is available for an exam; and, provided further, that Producer may not terminate for an increased premium if Employer immediately pays such premium.  Termination pursuant to the preceding sentence shall be individual to the Employee and Employer involved in the same manner as termination for illness under paragraph H above.  Employer and Employee further agree that during the exclusive period herein provided, Employee will not ride in any aircraft other than as a passenger on a scheduled flight of a United States or major international air carrier maintaining regularly published schedules, or engage in any extra-hazardous activity or any activity that would cause Producer to lose usual insurance coverage on Employee without obtaining Producer's written consent in each and every case.

K.  CREDIT:  Credit will be given only (i) if the Picture, as released, was produced substantially under the direct supervision of Employee in the capacity set forth herein; (ii) if this agreement has not been terminated for the default of Employee; and (iii) in accordance with and subject to the limitations with respect thereto, if any, as may be more particularly set forth in applicable collective bargaining agreements.  The obligation to accord Employee credit in advertisements shall apply only to paid advertisements issued by Producer or under its direct control relating primarily to the Picture and shall in no event apply to exclude ads, defined as including: teaser, special advertising, publicity or exploitation relating to the Picture or underlying material upon which the Picture is based, any member of the case, the author, director, producer or similar matters; group or list advertisements; trailers, film clips or other advertising (including promotional films) on the screen or by radio or television; institutional, group or list advertising; advertising in narrative form; credits on the screen at the end of the Picture; on advertising in which no credit appears other than credit to Producer and any other company financing or distributing the Picture or the principal members of the cast; newspaper or other periodical advertisements of eight (8) column inches or less; billboards of three (3) sheets or more; by-products, publications, novelizations, merchandising or commercial tie-ups, record album jackets and similar packaging or advertising of such nature that Employee has not granted consent to the use of Employee's name in connection therewith.  With respect to paid advertisements, said obligation to accord credit shall apply to the billing portion (excluding artwork or advertising copy) of paid advertisements, it being understood that all references to "size," however stated, whether as a percentage or otherwise, shall mean height, width, thickness and boldness of type and that all references to the title of the Picture shall be deemed to refer only to the "regular" title of the Picture (as part of the billing portion of paid advertisements) and not to any "artwork" title. Except as specifically set forth in paragraph 6 of the Principal Agreement, all matters relating to Employee's credit, such as size, style of type, placement, color, etc., shall be at Producer's sole discretion. Notwithstanding anything to the contrary contained in this paragraph K or in the Principal Agreement:

1.  There shall be no obligation whatsoever to accord Employee credit of any kind in any award ads (including consideration, nominations or congratulations for an award) relating to any other person involved with the Picture; and

Exhibit A
11

2.   Omitted.

No casual or inadvertent failure to comply with credit requirements shall be deemed a breach of this agreement, but Producer agrees to take steps to prospectively cure such failure promptly upon receipt of notice thereof from Employer.  The sole remedy of Employer or Employee for a breach of any of the provisions of this paragraph K or of the Principal Agreement shall be an action at law for damages, it being agreed that in no event shall Employer or Employee seek or be entitled to injunctive or other equitable relief by reason of any breach or threatened breach of any of the credit requirements, nor shall Employer or Employee be entitled to seek to enjoin or restrain the exhibition, distribution, advertising, exploitation or marketing of the Picture.

L.   <u>GOVERNING LAW; CAPTIONS, ETC.</u>:  This agreement shall be construed in accordance with the laws of the state of California applicable to agreements which are executed and fully performed within such state.  The captions used in connection with the sections, paragraphs and subparagraphs of this agreement are used only for purposes of reference and shall not be deemed to govern, limit, modify or in any manner affect the scope, meaning or intent of the provisions of this agreement or any part thereof, nor shall such captions be given any legal effect.  If any action or proceeding commences in any court in the state of California for the purpose of enforcing this agreement or any rights granted herein or any order or decree predicated thereon, any summons, order to show cause, writ, judgment, decree or other process, issued by such court, may be served on Employee at the address indicated in the agreement or personally without the state of California, and when so served, Employer or Employee shall be subject to the jurisdiction of such court as though the same had been served within the state of California.

M.   <u>MISCELLANEOUS</u>:  This agreement cancels and supersedes all prior agreements and understandings between the parties relating to the subject matter hereof, and contains all of the terms, conditions and promises of the parties hereto in the premises, and no modification of any provision hereof shall be valid or binding unless in writing.

No officer, employee or representative of any party hereto has any authority to make any representation or promise not contained in this agreement, and all parties expressly agree that they have not executed this agreement in reliance on any such representation or promise.

Exhibit A
12

N.   NOTICES:  All notices which either party hereto is required or may desire to give to the other shall be given by personal delivery or by addressing the same to the other at the address shown on the face hereof, or at such other address as may be designated in writing by any such party in a notice to the other given in the manner prescribed in this paragraph.  All such notices shall be sufficiently given when the same shall be deposited, so addressed, postage prepaid, in the United States mail or when the same shall have been delivered, so addressed, to a telegraph or cable company, toll prepaid, and the date of such mailing or telegraphing shall be the date of the giving of such notice.  A copy of all notices given to Producer hereunder shall also be sent to Gibson, Dunn & Crutcher, 2029 Century Park East, Suite 4000, Los Angeles, California 90067, Attention:  Don Parris.  A copy of all notices given to Employer or Employee hereunder shall also be sent to Ziffren, Brittenham, Gullen & Ingber, 2049 Century Park East, Suite 2350, Los Angeles, California 90067, Attention:  Thomas Hoberman.

O.   OFFICE AND SECRETARY:

Producer agrees to furnish Employee with an office and one (1) secretary (or to reimburse Employer for the cost thereof, provided Producer has approved such cost) during the exclusive period hereunder.

P.   Omitted.

Q.   SEVERABILITY:  Nothing herein contained shall be construed so as to require the commission of any act contrary to law or collective bargaining agreements, and wherever there is any conflict between any provision of this agreement and any present or future law or collective bargaining agreement, contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event, the provision(s) of this agreement effected shall be curtailed and limited only to the extent necessary to bring it within the requirements of such law or collective bargaining agreement.

R.   REMEDIES

1.   Remedies Cumulative:  All remedies accorded herein or otherwise available to Producer shall be cumulative, and no one such remedy shall be exclusive of any other.  Without waiving any of Producer's rights or remedies under this agreement or otherwise, Producer may from time-to-time recover, by action, any damages arising out of any breach of this agreement by Employer or Employee, and may institute and maintain subsequent

Exhibit A
13

actions for additional damages which may arise from the
same or other breaches.  The commencement or maintenance
of any such action or actions by Producer shall not
constitute or result in the termination of Employee's
employment hereunder unless Producer shall expressly so
elect by written notice to Employer.  The pursuit by
Producer of any remedy under this agreement or otherwise
shall not be deemed to waive any other or different remedy
which may be available under this agreement or otherwise,
either at law or in equity.  No waiver by Producer of any
breach of this agreement shall be deemed a waiver of any
preceding or succeeding breach of the same or any other
provision hereof.

    2.   <u>Services Unique</u>:  Employer and Employee
acknowledge that the services herein agreed to be
performed by Employee and the rights herein granted are of
a special, unique, unusual, extraordinary and intellectual
character which gives them a peculiar value, the loss of
which cannot be reasonably or adequately compensated in
damages in an action at law, and that Employer's or
Employee's default will cause Producer irreparable injury
and damage.  Employer and Employee agree that in the event
of a breach or threatened breach by Employer or Employee,
Producer shall be entitled to injunctive or equitable
relief.  In addition to such injunctive or equitable
relief, Producer shall be entitled to such other remedies
as may be available at law, including damages.

    3.   <u>No Rescission</u>:  Employer and Employee agree
that, in the event of any default by Producer, Employer's
and Employee's only remedy shall be an action at law for
money damages, if any, actually suffered by Employer or
Employee, and in no event, shall Employer or Employee be
entitled to rescind this agreement or to receive
injunctive or other equitable relief.

    S.   <u>PICTURE SPECIFICATIONS</u>:  Employer and Employee
warrant, represent and agree that:

    1.   <u>Services</u>:  Employee shall render services
in the capacity herein provided on the Picture and shall,
subject to Producer's approval rights and instructions,
complete the Picture in conformity with the shooting
script approved by Producer and the negative cost budget
and production schedule approved in writing by Producer
(but overbudget or over-schedule shall not be a default,
but shall be treated pursuant to paragraph 7 of the
Principal Agreement).

Exhibit A
14

2.   <u>Running Time</u>:  The Picture will have a running time of not less than ninety-five (95) nor more than one hundred ten (110) minutes.

3.   <u>Delivery</u>:  Principal photography of the Picture shall commence at the place and on the start date approved by Producer, and Employer and Employee agree to cause delivery of the picture to be completed to Producer in accordance with all delivery requirements of Producer within nine (9) months from commencement of principal photography or five (5) months after completion of principal photography of the Picture, whichever occurs first, time being of the essence of such commencement and delivery, subject to extensions for force majeure and to comply with Producer's written instructions.

4.   <u>Rating</u>:  The Picture, as completed, shall have been submitted to the Code and Rating Administration of the MPAA for a rating, and a rating of "R," "G" or "PG" (at Producer's discretion) shall be obtained before the Picture shall be deemed completed.

5.   <u>Unions</u>:  The Picture must qualify for and bear the I.A.T.S.E. seal and must comply with Producer's usual first-class production quality and exhibition requirements and conform to all of Producer's collective bargaining agreements and governmental requirements.

6.   <u>Approvals</u>:  Subject to any contrary provisions of the Principal Agreement, Producer shall have final approval over all artistic and production elements in connection with the pre-production, production and post production of the Picture, both "above the line" and "below the line" personnel and elements and all commitments and contracts relative to any of the foregoing, subject only to applicable guild and union requirements.  Producer shall have the right in all events to initiate action in connection with any of such personnel or elements or to designate the element or person involved.

7.   <u>Cutting and Access Rights</u>:  Producer reserves the complete and unconditional right to cut, edit, add to, subtract from, arrange, rearrange and revise the Picture in any manner Producer may, in its sole discretion, determine.  If Producer has, pursuant to the Principal Agreement, granted Employee the right to one (1) or more cuts or previews of the Picture, nothing in such grant shall be construed so as to prevent Producer from authorizing third parties to view or edit portions of the Picture while such additional cuts are being prepared or

Exhibit A
15

to preview other versions of the Picture in lieu of or in addition to such additional cuts.  All such additional cuts may, at Producer's discretion, be viewed by the peron having final cutting authority or such other person(s) as Producer may designate.  Producer shall have total access to all phases of production, including the right to view the dailies, the rough cut and all subsequent cuts of the Picture.

8.   Dailies:  Producer shall have the right to view the dailies during the production of the Picture.

9.   Credit Compliance:  Employer and Employee agree to comply with all contractual and union and guild obligations and Producer's requirements with respect to screen and advertising credits for the Picture.

10.   Television Cover Shots:  Employer and Employee will cause Producer to receive, as and when requested by Producer (but no later than the expiration of Employee's exclusive period) all protective or "cover" shots as necessary for release of the Picture on television based on network continuity standards in existence at the time principal photography of the picture commences.

11.   Sales Policies:  Producer shall have sole and absolute discretion regarding the sales policy, distribution, release, advertising and exploitation of the Picture.

Exhibit A
16

GLOSSARY

The following terms shall have the following meanings:

A.   "Additional Motion Picture":  A motion picture based upon some character or portion of the plot or story line from the Work, but which character or portion was not used in such Picture.

B.   "Additional Motion Picture Rights":  the right to make an additional motion picture.

C.   "Agreement":  The term Agreement includes the Principal Agreement, this Glossary and any other attached exhibits, schedules and amendments thereto.

D.   "Author Sequel Motion Picture":  A motion picture based upon an author-written sequel.

E.   "Author-Written Sequel":  New literary material written by the author of the Work in which:

1.   The principal character(s) is taken from the Work, and

2.   Said principal character(s) is shown as participating in new events and situations different from those in which said principal character(s) participated in the Work, and

3.   The plot or story differs from that of the Work.

F.   "Budgeted Negative Cost":  The total Negative Cost of the Picture established in the budget approved by Producer prior to start of principal photography of the Picture.

G.   "Canada":  Includes the Dominion of Canada and military installations, aircraft and ships flying the flags thereof, but not other territories or possessions.

H.   "Copy(ies)":  With reference to a motion picture or a sound record -- includes any negative, positive print, dupe negative, video or other electronic tape recording, disc or other physical article of any kind produced, reproduced or re-recorded by means of any photographic, electrical, electronic, mechanical or other processes or devices now or hereafter known or invented,

Exhibit G
1

Exhibit 7, Page 143

used or contemplated on which such motion picture or sound record or any part thereof, is printed, imprinted, recorded, reproduced or duplicated, together with any package, cartridge, cassette or other container in which the same may be distributed or sold.

With reference to a screenplay or teleplay -- includes any typewritten or printed copies thereof in substantially the form used in connection with production of the motion picture involved, whether or not accompanied by explanatory notes or comments, still photographs or other illustrations.

With reference to a musical composition or the lyrics thereof -- includes any copies, arrangements, orchestrations or versions thereof, whether or not in the form used in connection with the motion picture involved.

I.   "DGA Agreement":  The Directors Guild of America Basic Agreement of 1978, as the same may be amended from time-to-time.

J.   "Force Majeure":  The interruption of or material interference with the preparation, production, completion, or distribution of the Picture or of a substantial number of motion pictures produced or distributed or proposed to be produced or distributed by Producer by any cause or occurrence beyond the control of Producer including fire, flood, epidemic, earthquake, explosion, accident, war, blockade, embargo, act of a public enemy, civil disturbance, labor dispute (or threatened dispute), strike, lockout, inability to secure sufficient labor, essential commodities, necessary equipment or adequate transporation facilities, any applicable law, any act of God, or the incapacity or unavailability of the director, a principal member of the cast or the direction of photography of the motion picture.

K.   "Free Television Distribution":  The lease or license of motion pictures to one (1) or more parties with the right to engage in the free television exhibition thereof or to grant licenses to other parties to engage in the free television exhibition or free television distribution thereof.

L.   "Free Television Exhibition":  The telecast of a motion picture by means of over-the-air broadcast or cable transmission using any form of motion picture copy for reception on a television receiver or comparable device without a charge being made to the viewer by the telecaster for the privilege of viewing such telecast.

Exhibit G
2

For purposes of this definition, the regular periodic service charge (other than a charge paid with respect to pay television exhibition) paid by a subscriber to a cable television transmission service shall not be deemed a charge being made to the viewer.

    M.    "Home Video Distribution":  The distribution of motion pictures by means of video cassettes, video discs or any other means or method, whether nor known or hereafter invented, primarily intended for the viewing of visual images by means of a device contained in the home and not by means of broadcast to the home.

    N.    "In Perpetuity":  The most extensive period of time permitted, including renewal and extension periods, if any, by any applicable law.

    O.    "Includes" (and equivalents such as "included" or "including"):  Are illustrative only, and the examples given thereafter should not be in any way construed as limiting.

    P.    "Initial Release Date" of the Picture:  The date on which regular theatrical exhibition of the Picture commences in more than one (1) major metropolitan area in the United States other than special exhibitions of the Picture at the end of a calendar year for Academy Award qualification, previews, exhibitions for test screening or other similar purposes not generally considered by Producer to constitute initial general release of the Picture.

    Q.    "Law":  Any present or future statute or ordinance, whether municipal, county, state, national, or territorial; any executive, administrative or judicial regulation, order, judgment or decree; any treaty or international convention; any rule or principle of common law or equity or any requirement with the force of law.

    R.    "Legitimate Stage Rights":  The right to present the Work upon the spoken stage, with living performers appearing and speaking in the immediate presence of the viewing audience, provided no broadcast, telecast, recording, photography or other reproduction of such performance is made, and provided that, if such rights are reserved, the first exercise by Owner of such legitimate stage rights is a "first-class" production as this term is known and understood in the legitimate stage business.

Exhibit G
3

S.   "Live Television Rights":  The right to telecast the performance of living performers for reception on a television receiver or comparable device at the same time such performance actually takes place, rather than the telecast of such performance by use of a motion picture copy.  Live television rights include the right to reproduce any live television exhibition by means of motion picture copy during the period of thirty (30) days after the original live television exhibition, but only for the purpose of supplemental coverage or delayed broadcast in localities not reached by the original live television exhibition.

T.   "Merchandising Rights":  The right to license, manufacture, distribute and sell articles of merchandise based on or utilizing characters, names, likenesses and characteristics of artists, physical properties or other materials appearing or used in or in connection with the Picture or all or any part of the Work and the right to publish, distribute and sell advertising accessories, souvenir programs, picture books, photonovels, comic books, illustration books, and activity books or booklets based on or utilizing any such characters, names, likenesses or characteristics or printed copies of the screenplay on which any motion picture is based.

U.   "Motion Picture" or its equivalent:  Includes motion pictures, cinematographic films and photoplays of every kind and character whatsoever, including the sound records thereof, as well as trailers and clips thereof, produced by means of any photographic, electronic, mechanical or other processes or devices now or hereafter known, invented, used or contemplated, by which photographs, pictures, drawings, images or other visual reproductions or representations are or may be printed, imprinted, recorded or otherwise preserved on film, tape, or any other material of any description (whether translucent or not) for later projection, exhibition or transmission by any means or media now known or hereafter devised, in such manner that the same are or appear to be in motion or in sequence on a screen, mirror, tube or other medium or device, whether or not accompanied by sound records.

V.   "Music Publishing Rights":  The right to copyright, copy, publish, distribute and sell the music or lyrics of musical compositions and to license the right to make soundtrack records of musical compositions and to make soundtrack records of musical compositions in synchronization or timed relation with the Picture and to license the performance of musical compositions.

Exhibit 7, Page 146

W.   "Non-Theatrical Distribution":  The lease or license of the Picture to one (1) or more parties with the right to engage in the non-theatrical exhibition of the Picture or to grant licenses to other parties to engage in the non-theatrical exhibition and/or non-theatrical distribution of the Picture.

X.   "Non-Theatrical Exhibition":  The exhibition of the Picture in any manner or media now known or hereafter devised other than theatrical exhibition, free television exhibition, pay-television exhibition or through home video distribution; including exhibition in any guage of film or in or by schools, college campuses, hospitals, airplanes, ships, railroads, prisons, oil companies, private institutions, social clubs, churches and similar uses.

Y.   "Or":  Not only is disjunctive, but may also be conjunctive and shall be read as "and/or."

Z.   "Outright Sale":  The exclusive leasing or licensing of the theatrical exhibition rights only of the Picture to a third party other than an exhibitor (whether or not such exhibitor is authorized to grant licenses to third parties) for a fixed period of time in excess of two (2) years for a fixed price without any obligation to account for or report any monies derived or expenses incurred by such third party from such exhibition.

AA.   "Owner":  Includes and is binding upon the heirs, executors, administrators, next-of-kin, successors and assigns of Owner and when more than one person executes this Agreement as the Owner, then each and all of the persons executing this Agreement as the Owner shall be deemed to have jointly and severally made and entered into all of the covenants, agreements, warranties and representations herein contained and shall be jointly and severally obligated and bound thereby.

BB.   "Party":  Any individual, corporation, partnership, joint venture, organization or any other business entity, firm or governmental agency.

CC.   "Pay-Television Distribution":  The lease or license of the Picture to one (1) or more parties with the right to engage in the pay-television exhibition of the Picture and/or to grant licenses to other parties to engage in the pay-television exhibition or pay-television distribution of the Picture.

DD.  "Pay-Television Exhibition":  The exhibition of the Picture by means of over-the-air, cable, closed circuit, satellite, micro-wave or laser transmission using any form of motion picture copy for reception on a television receiver or a comparable device located in a living accommodation, where a supplemental charge is made to the viewer for the privilege of viewing such exhibition in his home or in a hotel, motel, hospital or other living accommodation, whether such exhibition is a particular program selected by the viewer which would not be available for viewing by the viewer but for the payment of such supplemental charge, or is a program being exhibited over one (1) or more assigned channels which would not be available for viewing by the viewer but for the payment of such supplemental charge, or where a charge is made to the operator of a hotel, motel, hospital or other living accommodation for the obtaining of such exhibition for viewing at such location.

EE.  "Person":  Any association, organization, partnership, business trust, joint venture, corporation or other business entity or firm or governmental agency, as well as natural persons.

FF.  "Picture":  The first feature-length theatrical motion picture based upon the Work produced hereunder.

GG.  "Pilot":  A television motion picture produced as a sample for the purpose of interesting an exhibitor or sponsor in ordering additional television motion pictures.  A pilot may be exhibited separately or as an episode of an episodic or anthology television series.

HH.  "Principal Agreement":  The agreement to which this Glossary is attached and any amendments thereto, but not including any other exhibits or schedules attached thereto.

II.  "Publishing Rights":  The right to publish, distribute and sell hard or soft cover printed publications of all or any part of the Work or other material used in connection with the Picture for sale to the public other than publications incuded within merchandising rights.

JJ.  "Purchaser" or "Producer":  Includes its successors and assigns.  Purchaser shall have the free, full, unrestricted and unlimited right to sell, assign, license the use of, transfer or otherwise dispose of or

Exhibit G
6

Exhibit 7, Page 148

deal in or with any or all of the rights, licenses, privileges or property herein conveyed, in whole or in part.

KK.  "Radio Rights":  The right to broadcast the Work by sound (as distinguished from visually) by radio; subject, however, to Purchaser's right at all times to exercise its radio rights for advertising, publicity and exploitation purposes by living actors or otherwise, by the use of excerpts from or condensations of the Work or any motion pictures produced hereunder and, in any event, to broadcast its motion pictures produced hereunder by radio.

LL.  "Remake":  A picture, other than the initial Picture, which is based upon a prior Picture or upon the same elements, the plot or story of the Work.  The term remake does not include:

  1. An additional motion picture,

  2. A sequel,

  3. Foreign, shortened or expanded versions of the Picture.

MM.  "Remake Rights":  The right to make a remake.

NN.  "Restricted Currency":  A foreign currency which is or becomes subject to moratorium, embargo, banking or exchange restrictions, or restrictions against remittances to the United States, or which in the business judgment of Producer is commercially impracticable to remit.

OO.  "SAG Agreement":  The Screen Actors Guild of America Basic Agreement of 1980, as the same may be amended from time-to-time.

PP.  "Sequel":  An author sequel motion picture or a studio sequel motion picture.  If the only character or characters taken from the Work and used in a sequel are minor characters in the Work or are not used in the sequel by the same names or characterizations as in the Work, then no sequel payment shall be owing to Owner by such sequel.

QQ.  "Sequel Motion Picture Rights":  The right to make a sequel.

Exhibit G
7

RR.   "Sound Record":  Includes sound recordings and reproductions of every kind and character whatsoever produced by means of any electrical, electronic, mechanical or other processes or devices now known or hereafter known, invented, used or contemplated by which sound may be recorded for later transmission or playback, whether or not simultaneously, or in synchronization or time relation with motion pictures.

SS.   "Soundtrack Record":  Includes sound recordings and reproductions of the soundtrack of the Picture, reproduced by any and all means for the recording and distribution of audio recordings only without accompanying visual images, including reel-to-reel tape, cartridge and cassette.

TT.   "Studio Sequel Motion Picture":  a Picture in which:

1.   One (1) or more of the principal characters is taken from the Work or from the prior Picture;

2.   Said principal character(s) is shown as participating, for the most part, in new and different events and situations from the events and situations in which said principal character(s) participated (whether or not as principal characters) in the Work or in said prior Picture or any remake thereof or in any earlier studio sequel motion picture or any remake thereof or of any additional motion picture; and

3.   The plot or story differs from that of the Work or of said prior Picture or any remake thereof or of any earlier studio sequel motion picture or any remake thereof or of any additional motion picture.

The term studio sequel motion picture does not include any additional motion picture, any remake of the said prior Picture, any remake of any studio sequel motion picture, any remake of any remake or any television series.

UU.   "Subdistributor":  Any third party licensed by Producer to distribute the Picture in one (1) or more media in one (1) or more territories, but not including exhibitors or any licensee pursuant to an outright sale.

VV.   "Television Motion Picture":  A motion picture produced hereunder based upon the Work intended for initial television exhibition, whether as a pilot or as an episode of a television series (episodic or

Exhibit G
8

anthology), it being understood that a "television series" includes a pilot therefor, regardless of length and regardless of whether there is any binding commitment for any ensuing series of episodes from such pilot, a so-called single or movie-of-the-week ("MOW") or a so-called "mini-series" consisting of a television motion picture which is a serialization of the plot or story of the Work, and is intended for exhibition sequentially in two or more segments, such as "The Captains and the Kings." Subject to the other terms hereof, any such television motion picture may be a remake or sequel as defined herein.

WW. "Territory": Any state or country or political subdivision thereof. Wherever a sale or license to or for a particular territory is described, whether for the purpose of determining the applicable distribution fee or otherwise, the applicable territory shall be the territory in which the Picture is exhibited or in which copies of the Picture are primarily intended for use, rather than the territory in which the contract was executed or physical possession of copies of the Picture were delivered.

XX. "Theatrical Distribution": The lease or license of the Picture to one (1) or more parties with the right to engage in theatrical exhibition of the Picture and/or to grant licenses to other parties to engage in the theatrical exhibition and/or theatrical distribution of the Picture.

YY. "Theatrical Exhibition": The exhibition of the Picture using any form of motion picture copy by any process now known or hereafter devised in conventional or drive-in theatres open to the general public on a regularly scheduled basis where a fee is charged for admission to view the Picture.

ZZ. "Theatrical Motion Picture": A feature length motion picture produced hereunder based upon the Work and intended for initial theatrical exhibition. The initial theatrical motion picture produced hereunder shall not be considered to be either a remake or sequel, even though one (1) or more television motion picture(s) may previously have been produced hereunder.

AAA. "Theatrical Re-Issue": A re-release of the Picture for theatrical exhibition on a percentage or four wall engagement basis in first-run theatres.

BBB.  "Theatrical Remake":  A theatrical motion picture which is a remake.

CCC.  "Theatrical Sequel":  A theatrical motion picture which is a sequel.

DDD.  "United States":  Includes the continental United States of America, including the District of Columbia and the states of Alaska and Hawaii and military installations, aircraft and ships flying the flags thereof, and its territories and possessions.

EEE.  "Western Europe":  Includes The United Kingdom, Ireland, France, Corsica, Belgium, Netherlands, Luxemburg, Republic of West Germany, Liechtenstein, Monaco, Austria, Switzerland, Spain, Portugal, Italy, Sardinia, Sicily, Denmark, Norway, Sweden, Finland, Iceland and Greece, and military installations, aircraft and ships flying the flags thereof, but no other territories or possessions.

FFF.  "WGA Agreement":  The Writers Guild of America Theatrical and Television Basic Agreement of 1977, as the same may be amended from time-to-time.

GGG.  "Work":  The particular literary material, whether published or unpublished, and whether in the form of novel, treatment, screenplay or otherwise, included in or upon which the Picture is based and includes all prior, present and future versions, adaptations and translations thereof (whether written by Author or others under his authority), its theme, story, plot, characters and their names, its title or titles and subtitles, if any, its music, lyrics, choreography, sets, costumes, orchestrations, arrangements, if any, and wherever throughout the world protectible thereby, its statutory and common law copyright or copyrights, all present or future renewals and extensions of such copyrights and all rights comprehended in such copyrights, and each and every part thereof.  Work does not include any material written or prepared by Purchaser or under Purchaser's authority.

HHH.  The singular shall be deemed to include the plural, and the masculine shall be deemed to include the feminine, whenever the context requires.

III.  Notwithstanding anything to the contrary contained herein, the definitions of "motion pictures," "sound recordings," "copies," "literary work" and

Exhibit G
10

"perform" and any other term used in the Agreement and
this Glossary shall not mean or include less than the
meaning prescribed for such term in the United States
Copyright Act, at present or in the future.

Exhibit G
11

EXHIBIT "NP"

THIS EXHIBIT "NP" attached to and made a part of that certain agreement ("Principal Agreement") dated as of November ___, 1982, between SHERWOOD PRODUCTIONS, INC. ("Producer"), and HARRY BAILLY PRODUCTIONS, INC. and LAKODA PRODUCTIONS, INC. (collectively "Participant"), relating to that certain motion picture entitled "BUCKAROO BANZAI" ("the Picture").  The participation of Participant in the Picture as set forth in the Principal Agreement shall be defined, computed, paid and accounted for in accordance with the provisions of this Exhibit "NP."

I.  DEFINITIONS

A.  "Net Profits" means the amount of Gross Receipts remaining, if any, after first deducting therefrom, on a continuing basis, the aggregate of the following items, in the order of priority set forth below:

1.   Distribution Fees.

2.   Distribution Expenses.

3.   All contingent amounts (including amounts calculated on a fixed or percentage basis) agreed or consented to by Producer, and not included in Negative Cost payable to any person (including Participant) prior to recoupment of negative cost hereunder.

4.   Interest on Negative Cost.

5.   Negative Cost.

6.   All contingent deferments or other contingent amounts (including amounts calculated on a fixed or percentage basis) agreed or consented to by Producer, and not included in Negative Cost or deducted under subparagraph 3 above, payable to any person (including Participant) based upon or computed in respect of Gross Receipts of the Picture (whether or not such Gross Receipts are defined or computed in the same manner as set forth herein and whether defined as payable before or after a so-called "actual" or artificial fixed or moving "breakeven" or otherwise) or any portion thereof.

7.   All third party participations in Net Profits (whether or not such Net Profits are defined in the same manner as set forth herein), except:  (i) To the extent, if any, prohibited by the provisions of the

NP 1

Exhibit 7, Page 154

Principal Agreement; or (ii) If Participant's participation hereunder is to be calculated as a percentage of one hundred percent (100%) of Net Profits.

E.   "Gross receipts" means all monies (subject to the exclusions in Paragraph C below) to the extent actually received by Producer or any Subdistributor, as:

1.   "Theatrical Rentals," which shall be all monies from theatrical distribution of the Picture other than pursuant to Outright Sales.  Theatrical Rentals shall also include "Four Wall Receipts" which shall be defined as all monies from theatre box offices operated by Producer (such as in four wall or road show exhibitions) to the extent receipts from such engagements, taken as a whole, exceed costs (other than advertising and promotional cost which shall be included in Distribution Expenses) incurred for all such engagements.  If such costs exceed such receipts, the excess costs shall be deductible as a Distribution Expense.

2.   "Free Television Rentals," which shall be all monies from Free Television Distribution of the Picture.

3.   "Non-Theatrical Rentals," which shall be all monies from Non-Theatrical Distribution, Pay Television Distribution and Home Video Distribution of the Picture.

4.   "Outright Sales Receipts," which shall be all monies from Outright Sales of the Picture.

5.   "Copyright Litigation Receipts," which shall be all monies from settlement, or judgment or decree of any litigation relative to infringement by third parties of the copyright in the Picture, after first deducting all costs and expenses incurred in connection with obtaining such monies, including attorneys' fees.  If such costs exceed such receipts, the excess costs shall be deductible as a Distribution Expense.

6.   "Miscellaneous Receipts," which shall mean the following:

(a)  With regard to music or lyrics originally composed for and synchronized in the Picture, to the extent that Producer acquired the right to exploit the music publishing rights therein, all monies from the exploitation of such music publishing rights, after deducting therefrom any and

NP 2

all costs and expenses incurred in connection therewith, including all composer royalties, charges of any agent, trustee or administrator involved in the collection of monies, and any co-publisher's share of such monies.  In addition to the foregoing, to the extent that Producer shall itself administer the exploitation of such music publishing rights, it shall be entitled to deduct an administration fee equal to fifteen percent (15%) of all gross monies received by it in connection with the exploitation thereof.

(b)  With regard to soundtrack records manufactured for sale to the public, which embody music or dialogue as recorded for the soundtrack of the Picture, to the extent that Producer acquired the right to exploit such soundtrack record rights, all monies therefrom after first deducting all costs, expenses, packaging charges, royalties and participations in connection therewith, if any, and, to the extent that Producer shall itself directly engage in the business of releasing such soundtrack recording, deduction of a packager's fee of thirty percent (30%) of all gross monies received by Producer in connection therewith.

(c)  With regard to merchandising rights and publishing rights with respect to the Picture, to the extent Producer acquired the right to exploit same, all monies therefrom after deduction of any and all costs and expenses incurred in connection therewith, including all royalties and participations payable in connection therewith; provided, however, that if Producer shall be directly engaged in the business of exploiting such merchandising rights or publishing rights, then, in lieu of the foregoing, Miscellaneous Receipts shall include an amount equal to ten percent (10%) of the gross sales prices actually received by Producer for all sales in connection therewith, less quantity and trade discounts and all returns of merchandise and publications.

MP 3

(d)  Notwithstanding the foregoing, if Participant or any person affiliated with Participant is, pursuant to the Principal Agreement or otherwise, entitled to a royalty or other participation in monies in any way derived from the exploitation of music publishing rights, soundtrack album rights, merchandising rights or publishing rights, then no monies from the exploitation of any such particular right(s) shall be included in Gross Receipts.

7.   "Subsidies," which shall mean all monies on account of direct subsidies, aid or prizes relating specifically to the Picture.  If local laws require use of such monies as a condition to the grant of such subsidy or aid, such monies shall not be included in Gross Receipts until actually used.

8.   "Trailer Income," which shall mean all monies actually received in connection with the lease, sale or other exploitation of trailers for the Picture, after deduction of a Producer administrative charge equal to fifteen percent (15%) of all such monies.

9.   Notwithstanding anything to the contrary contained herein, if Producer grants theatrical, free television or non-theatrical exhibition or distribution rights in the Picture to any third party on a basis requiring such third party to account to Producer with respect to rentals therefrom, then Gross Receipts shall mean (as Producer may elect from time-to-time with regard to each territory licensed to each such third party) either:

(a)  Film rentals or other amounts received by such third party which Producer accepts for the purpose of its accountings with such third party; or

(b)  Producer's share (actually received and net of all Subdistributor or agency fees) of rentals received by such third party; provided, however, that to the extent Producer makes the election described in this subparagraph (b), then the distribution fee shall be as set forth in Paragraph D.6 hereinbelow, and Producer will not deduct any distribution expenses in connection with such territory, except to

NP 4

the extent such expenses are actually
incurred or borne by Producer.

It is the express intent of this Exhibit "NP" that any
losses with regard to any territory borne by a
Subdistributor and not in any manner incurred or borne or
shared in by Producer shall not be applied as a deduction
by Producer against sums earned by it in any other
territory. Accordingly, if Producer elects to treat the
receipts of any such Subdistributor in accordance with
subparagraph (a) above, then Producer will make an
appropriate adjustment in the distribution expenes from
such territory so as to accomplish the intent of the
immediately preceding sentence.

   C.   Exclusions from Gross Receipts:  Gross Receipts
shall be determined after all refunds, credits, discounts,
allowances and adjustments granted to exhibitors and other
licensees, whether occasioned by condemnation by boards of
censorship, settlement of disputes, or otherwise, but
notwithstanding the foregoing, there shall be no
adjustment in Gross Receipts by reason of allowances for
co-op advertising.  Neither advance payments, nor security
deposits shall be included in Gross Receipts until earned
by the exhibition of the Picture, forfeited or applied by
Producer to the Picture.  Additionally, Gross Receipts
shall not include:

     1.   Any monies derived by any theatre or other
exhibitor from exhibition of the Picture, whether or not
such theatre or the exhibitor is owned, operated, managed
or controlled by Producer or any Subdistributor, except as
expressly set forth in Paragraph B.1. above.

     2.   Sums derived from the exhibition of the
Picture contributed or paid to charitable organizations.

     3.   Amounts collected by Producer or any
Subdistributor as taxes or for payment of taxes, such as
admission, sales and value added taxes.

     4.   Receipts of broadcasters (including both
free and pay television and radio), book or music
publishers, wholesale or retail distributors or sellers of
video discs, video cassettes or similar devices, record
producers or distributors or stores, and merchandisers or
any other similar user or consumer whether or not owned,
operated, managed or controlled by, or otherwise
affiliated with, Producer or any Subdistributor.

NP 5

5.    Salvage value or receipts derived from print stocks, stock footage, stills, props, sets, wardrobe or other items included in Negative Cost.

6.    Receipts from exploitation of derivative, subsidiary or ancillary rights of any kind or nature, except as expressly set forth to the contrary elsewhere herein, including soundtrack recording rights, music publishing rights, merchandising rights, literary publishing rights, television rights (whether live, taped, filmed or otherwise recorded), radio rights, legitimate stage rights, remake rights and sequel rights and additional motion picture rights.

D.    "Distribution Fees."  Producer shall be entitled to retain for its own account as distribution fees for the Picture, the following percentages of Gross Receipts:

1.    With respect to Theatrical Rentals:

(a)  Thirty percent (30%) for the United States and Canada;

(b)  Thirty-five percent (35%) for the United Kingdom and Ireland.

(c)  Forty percent (40%) with respect to all other territories.

2.    With respect to Free Television Rentals:

(a)  Twenty-five percent (25%) of Free Television Rentals derived from any prime time U.S. network television license of the Picture.

(b)  Thirty-five percent (35%) with respect to U.S. Free Television Rentals derived from the U.S. other than pursuant to a prime time network television license.

(c)  Forty percent (40%) with respect to all other Free Television Rentals.

3.    With respect to Non-Theatrical Rentals:

(a)  Thirty-five percent (35%) for the U.S.;

(b)  Forty percent (40%) for any other territory.

NP 6

4.    With respect to Outright Sales Receipts, fifteen percent (15%).

5.    With respect to Miscellaneous Receipts, fifty percent (50%), which fifty percent (50%) shall include all fees of third party licensees.

6.    Notwithstanding anything to the contrary contained hereinabove, with respect to any territory in which Producer makes the election described in Paragraph I.B.9.(b) above, the distribution fee shall be fifteen percent (15%) of all monies treated as Gross Receipts pursuant to such election.

E.    Distribution Expenses.  Producer shall deduct and retain, on a continuing basis, all costs and expenses incurred, and payments made or accrued, by Producer or a Subdistributor, directly or indirectly, for or in connection with the sale, lease, license, exhibition, distribution or other disposition of the Picture, or which are treated as distribution expenses under Producer's customary accounting procedures.  Without limiting the generality of the foregoing, the following particular cost items (to the extent not previously included in Negative Cost) shall be included in distribution expenses hereunder:

1.    Ad and Publicity Costs.  All costs of advertising, promoting and exploiting by such means and to such extent as Producer may, in its sole discretion deem desirable, including pre-release advertising and publicity, so-called cooperative or theatre advertising, or other advertising engaged in, with, or for exhibitors, to the extent Producer or a Subdistributor pays, shares in, or is charged with all or a portion of such costs; advertising allowances, advertising space, time, physical material used for production of broadcasting ads and commercials, shipping, integrating and monitoring of ads and commercials, preparation and distribution of ad and promotional material, salaries, fees, and travel and business expenses of personalities connected with the Picture, publicists, press representatives and field exploitation persons and travel and business expenses of Producer advertising and marketing executives (to the extent appropriately allocable to the Picture), research surveys, press books and kits, trailers, stills and other accessories and other publicity release materials, plus an amount equal to ten percent (10%) of all costs described in this subparagraph 1 to cover the indirect costs and

NF  7

overhead of Producer's advertising and publicity activities. There shall be included in such ten percent (10%) overhead the salaries of any executive officer or employee of Producer except that salaries of regular employees of Producer rendering services in connection with field exploitation and salaries and fees of special publicists and advertising personnel shall not be included. To the extent that Producer itself receives any trade or cash discounts in connection with any of the foregoing costs, such costs shall be adjusted by the amount of such discount.

2. Conversion and Transmission Costs. All costs, discounts and expenses incurred in obtaining remittances of receipts to the United States, including costs of contesting imposition of restricted funds.

3. Checking Expenses. All costs of checking theatre attendance and receipts, and investigating unauthorized usage of the Picture, whether payable to or incurred by Producer, employees or other persons.

4. Claims. All costs in connection with claims and litigation asserted by third parties arising out of or relating to the distribution, exhibition or exploitation of the Picture (including claims of infringement, unfair competition, violation of any right of privacy, defamation or breach of contract), including all attorneys' fees, auditing costs, investigation expenses and other litigation expenses of every kind and nature. Producer shall have the right, in its sole discretion to settle and pay any such claim; provided, however, that nothing in the foregoing shall be construed as a waiver of any of Participant's warranties or indemnifications contained in the Principal Agreement, or a waiver of any other right or remedy at law or otherwise against Participant and in favor of Producer.

5. Collection Costs. All costs incurred in connection with the collection, or attempted collection, of monies included within gross receipts, including attorneys' and auditors' fees and costs, and any and all loss, damage or liability suffered or incurred by Producer in the collection of such monies, whether by litigation or otherwise.

6. Copyright Costs and Royalties. All costs and expenses to obtain copyright and extension and renewal thereof and similar protections throughout the world, and any royalties or license fees payable in connection with the Picture including royalties to manufacturers of sound

NP 8

recording and reproducing equipment, royalties and license fees payable under or with respect to any patents or copyrights or for the use of any patented equipment or process and royalties and license fees payable with respect to the performance of music.

   7.   Other Versions.  All costs of preparing and delivering the Picture for distribution, including all costs incurred in connection with the producton of foreign language versions of the Picture, whether dubbed, superimposed, or otherwise, as well as any and all costs and expenses in connection with changing the title of the Picture, recutting, re-editing or shortening or lengthening the Picture for release in any territory or for exhibition on television or for home video distribution or any other media or in order to conform to the requirements of censorship authorities or in order to conform to the peculiar national or political prejudices likely to be encountered in any territory or for any other purpose or reason.

   8.   Residuals.  All amounts paid or payable to or for the benefit of any persons rendering services or providing rights in connection with the Picture, pursuant to applicable collective bargaining agreements or any law or government regulation or decree now or hereafter in force by reason of or as a condition or consideration for any exhibition, use, reuse, rerun, performance, sale, license or distribution of the Picture or copies of all or any part thereof on television, in supplemental markets, or otherwise, together with all taxes, pension fund contributions and other costs paid or payable with respect to such payments or with respect to participations in Gross Receipts or Net Profits of the Picture; provided, however, that if Participant, or any principal stockholder of Participant, or heirs, executors, administrators, successors or assigns of Participant, or any such stockholder, are entitled, either directly or by way of participating in any pension plan, to any such residuals, the amount payable on account thereof shall be treated as an advance against Participant's share of Net Profits hereunder, and, to the extent not expressly prohibited by such collective bargaining agreement, any share of Net Profits previously paid to Participant hereunder shall be treated as an advance against any such residual due to Participant.

   9.   Insurance.  All costs for insurance coverage of any and all risks of loss with respect to the Picture or any components or copies thereof, including errors and omission insurance and loss and damage to negatives,

positive prints, sound materials or other physical property. Producer may elect to self insure as to any items of risk and charge as an insurance cost an amount equal to the insurance premium Producer would otherwise have paid for such insurance. Any insurance recoveries in connection with distribution of the Picture shall be credited against Distribution Expenses.

10. Industry Assessments. An allocable portion of all dues and assessments, including fees and costs and contributions to the MPAA, AMPTP, MPEA, and Academy of Motion Picture Arts and Sciences, and other trade associations or industry groups comprised of a substantial number of motion picture producers or distributors, and contributions to campaigns endorsed and supported by a substantial number of motion picture producers or distributors and assessments for awards, settlements, contributions, judgments, legal fees and other costs incurred in connection with anti-trust proceedings, and other law suits and arbitrations of any kind having an impact on a substantial portion of the motion picture or television industry, in which Producer is involved or to which Producer is contributing.

11. Taxes. Any and all sums paid or accrued on account of sales, use, receipts, income, excise, remittance and other taxes (however denominated) to any governmental authority, assessed upon the negative, duplicate negatives, video or other copies, prints or sound records of the Picture, or upon the use or distribution of the Picture, or upon the revenues derived therefrom, or any part thereof, or upon the remittance of such revenues, or any part thereof; any and all sums paid or accrued on account of duties, customs and imposts, costs of acquiring permits, quotas, and any similar authority to secure the entry, licensing, exhibition, performance, use or televising of the Picture in any country or part thereof, regardless of whether such payments or accruals are assessed against the Picture or the proceeds thereof or against a group of motion pictures in which the Picture or the proceeds thereof may be included. In no event shall the deductible amount of any such tax (however denominated) imposed upon Producer be decreased (nor the Gross Receipts increased) because of the manner in which such taxes are elected to be treated by Producer in filing net income, corporate franchise, excess profits or similar tax returns. Subject to the foregoing, Producer's own United States federal and state income taxes and franchise taxes based upon Producer's net income, and any income taxes paid to any country or territory by Producer based on the net earnings of

Producer in such country or territory (to the extent computed and assessed solely by reason of the voluntary retention in such country or territory by Producer of any portion of the Gross Receipts) shall not be deductible hereunder.  Notwithstanding anything to the contrary herein contained, Participant shall have no right to inspect or copy any income or franchise tax return of Producer or any of its subsidiaries or affiliates or to require Producer or any of its subsidiaries or affiliates to produce any such tax return or any information contained therein.

12.  Physical Material Costs.  All costs of tangible copies of the Picture, whether on film in any guage, video or audio tapes, cassette or disc, or any other kind of photographic, electrical, electronic, mechanical or other process or device now known or hereafter devised on whch visual or aural information is printed, imprinted, recorded, reproduced, duplicated or otherwise preserved, including all duped and dubbed negatives, master tapes and other preprint material, and including all laboratory, labor, service, materials' and facilities' costs in connection therewith.  To the extent that Producer itself receives any trade or cash discounts in connection with any of the foregoing costs, such costs shall be adjusted by the amount of such discount.

13.  Shipping and Delivery Costs.  All costs of transportation, shipping and delivery of any physical materials including any and all costs of inspection, repair, checking and renovation thereof and any and all reels, containers, cassettes and packing therefor, and any and all costs of checking exhibitors' projection and sound equipment and facilities and assisting exhibitors in connection therewith.

14.  General.  All other expenses referred to as expenses of distribution or as direct distribution expenses in the Principal Agreement, or elsewhere in this Exhibit, all sales agent and sub-agent fees and any and all other customary expenses paid or incurred by Producer or any Subdistributor in connection with the distribution, exploitation or turning to account of the Picture, which are customarily treated by Producer as distribution expenses.

15.  No Double Deduction.  There shall be no double deduction of distribution expenses.  Accordingly, no item deducted as a distribution expense under one section of this Paragraph I.E. shall be again deducted under another section.  Additionally, no item included as

NP 11

an element of Negative Cost hereunder, nor any item excluded or deducted in determining Gross Receipts hereunder shall again be deducted as a distribution expense.  In no event may there be any deduction on account of any distribution expenses incurred solely in connection with income items not included in Gross Receipts.

F.    "Interest on Negative Cost."

1.    "Interest on Negative Cost" shall be deemed to be at the following annual rate:

(a)  The annual rate equal to one hundred twenty-five percent (125%) of the U.S. prime rate of the Chemical Bank of New York, as the same may vary from time-to-time; or

(b)  If principal photography of the Picture shall primarily occur outside the U.S., then, at Producer's option, either the rate described in rate equal to one hundred twenty-five percent (125%) of the prime rate, or the equivalent thereof, charged by the principal bank of the applicable country, as the same may vary from time-to-time.

2.    The above-described interest shall be charged commencing from the respective dates on which amounts chargeable to Negative Cost are incurred or paid and continuing until the end of the accounting period with respect to which said amounts are recouped as herein provided.

G.    "Negative Cost" means the total of Production Costs plus Producer Overhead Charge plus Overbudget Charge.

1.    "Production Costs" means the total direct cost of production of the Picture, including the cost of all items required pursuant to Producer's normal policies to constitute delivery of the Picture, computed and determined in all respects in the same manner as Producer then customarily determines such matters.  The full amount of all direct costs of production of the Picture (whether payable in cash, deferred or accrued) shall be included in the direct cost of the Picture at the time liability therefor is incurred or contracted for, regardless of whether the same has actually been paid to the party or parties entitled thereto at the time involved.  Any insurance recoveries in connection with production of the Picture shall be credited against Production Costs. Deferments, bonuses, "puts," and participations in Gross Receipts of the Picture agreed or consented to by Producer

NP 12

(however defined) shall be treated as direct costs of production, whether the same shall be in a definite amount or based on a percentage of the Gross Receipts or other variable amount, and whether the same are fixed obligations or contingent upon receipts of the Picture, or any other contingency; provided, however, contingent participations based on a percentage of Gross Receipts shall not be included in Production Costs to the extent that they are based on Gross Receipts which are received in a statement period after the period in which the Negative Cost is recouped hereunder.

2.    "Producer's Overhead Charge" shall be in an amount equal to ten percent (10%) of the Production Costs of the Picture, with the understanding that any facilities, equipment, or personnel supplied by Producer or by a studio owned or controlled by Producer or in which Producer has a substantial financial interest (and which are not furnished within the Overhead Charge) shall be supplied at Producer's usual rental or facilities' rates charged for such items, and such charges shall be treated as direct costs of production of the Picture and shall bear said Overhead Charge.  Producer's Overhead Charge shall accrue and be included in the Negative Cost of the Picture concurrently with the incurring of the respective cost to which it applies.

3.    "Overbudget Charge."  If the Negative Cost (excluding this subparagraph 3) shall exceed the Budgeted Negative Cost of the Picture by seven and one-half percent (7-1/2%) or more, then, as additional consideration for the increased risk incurred by Producer as a result of the additional investment in the Picture, there shall be added to the sums described hereinabove, for purposes of determining Negative Cost hereunder, an additional amount equal to the amount by which the Negative Cost (excluding this subparagraph 3) exceeds one hundred seven and one-half percent (107-1/2%) of the budgeted cost.  For purposes of this subparagraph 3, the Negative Cost shall not include costs incurred solely by reason of force majeure events (including currency fluctuations, but not including weather), union increases which were not capable of being reflected in the budget, and overbudget costs incurred at the written request of an executive officer of Producer.

H.    Additional Terms.  In addition to the foregoing, all terms defined in the Glossary attached hereto, and by this reference made a part hereof, are used herein as therein defined.

Exhibit 7, Page 166

II. ACCOUNTINGS AND PAYMENTS.

    A.   Rendition of Statements.  Producer shall render statements relating to the distribution of the Picture covering each accounting period for the Picture, within ninety (90) days following the conclusion of such accounting period.  The first accounting period shall commence on the Initial Release Date of the Picture in the U.S., and continue for a period designated by Producer, but in no event for longer than four and one-half (4-1/2) months.  The next eleven (11) accounting periods shall be three (3) months in length.  Thereafter, each accounting period shall be one (1) year in length; provided, however, that, if the Picture is licensed for prime time exhibition on a U.S. television network, and if the first monies from such license are received after the conclusion of the first three (3) years following the Initial Release Date, then a special accounting period shall be declared hereunder ending no more than three (3) months following the receipt of such sums; provided further, that in the event of a major U.S. theatrical re-release of the Picture, accounting periods of three (3) months each shall recommence for a period of six (6) months following the initial date of such re-release.  Notwithstanding anything to the contrary contained hereinabove, after the conclusion of the first three (3) years following the Initial Release Date, no statement shall be required for any accounting period if such statement would indicate no payment would be due to Participant.  Losses incurred with respect to one accounting period may be applied against profits derived from any preceding or subsequent accounting period.  Each statement shall show in summary form the appropriate calculations relating to the computation of net profits, if any, hereunder.  Any portion of net profits payable to Participant hereunder shall be remitted to Participant with the particular statement indicating such amount to be due.  There shall be deducted from any remittance due or for the account of Participant, the amount of any tax required to be withheld by Producer based on payments due or for the account of Participant, or any other withholding or deduction which Producer may be required to make pursuant to any law or governmental order.  All statements rendered hereunder may be on a billing or collection basis as Producer may elect from time-to-time.  Additionally, Producer shall render a statement hereunder setting forth the Negative Cost of the Picture no later than the date on which the first statement is rendered hereunder.  All statements hereunder shall be deemed rendered when deposited, postage prepaid, in the U.S. mails addressed to Participant at the notice address designated pursuant to the Principal Agreement.

Exhibit 7, Page 167

B.    Finality of Statements.  Each statement, and all items contained therein, shall be deemed correct and shall be conclusive and binding upon Participant upon the expiration of eighteen (18) months from the date rendered, unless within such eighteen (18) month period Participant delivers a written notice to Producer objecting to one or more items of such statement, and such notice specifies in reasonable detail the items to which Participant objects and the nature of and reason for Participant's objections thereto; in such event, Participant may question the particular items objected to, notwithstanding the expiration of said eighteen (18) month period, but only for the particular reasons for which Participant gave Producer such written notice, and not after the expiration of the period of the applicable statute of limitations established by law.  In no event, may Participant institute any action, suit or proceeding or recover or enforce any judgment, order or decree against Producer or any Subdistributor or other third party with respect to:

1.    Any item of cost incurred or expended in good faith by or on behalf of Producer in connection with the picture; or

2.    Any item in connection with the sale, lease, license, distribution, disposition, marketing, advertising or exploitation of the Picture reported, charged or credited by a Subdistributor or any other third party and either accepted by Producer as a proper charge or not questioned by Producer.

If Producer shall include cumulative figures in any statement, the time within which Participant may commence any audit or make any objection in respect of any statement shall not be enlarged or extended thereby. Notwithstanding anything contained to the contary in this Exhibit "NP," or in the Principal Agreement, in no event may Participant institute or maintain any action, suit or proceeding or recover or enforce any judgment, order or decree against Producer with respect to any item contained or not contained in any statement or with respect to any transaction or accounting had in connection with, or any other similar or dissimilar matter relating to, the Picture at any time subsequent to thirty (30) days prior to the expiration of the period of time after which Producer would be barred by the applicable statute of limitations or contractual provision from instituting any action, suit or proceeding against the relevant Subdistributor or other third party with respect to such item, transaction, accounting or matter, regardless of whether or not such Subdistributor or other third party

NP 15

does at any time assert the defense of such statute of limitations or contractual provision.

C.     Books of Account and Audits.   Producer shall keep books of account relating to the production and distribution of the Picture which shall be kept on the same basis and in the same manner and for the same periods as such records are customarily kept by Producer. Participant may, at its own expense, audit the applicable records at the place where Producer maintains same in order to verify statements rendered hereunder.  Any such audit shall be conducted only by a certified public accountant approved by Producer (which approval shall not be unreasonably withheld), such audit to take place during reasonable business hours and in such manner as not to interfere with Producer's normal business activities. Producer shall be furnished with a copy of such auditor's report within thirty (30) days after the completion of such audit.  In no event shall an audit with respect to any statement rendered hereunder commence after the date on which such statement has become incontestable pursuant to subparagraph B above, nor shall any audit continue for longer than thirty (30) consecutive days, nor shall audits be made hereunder more frequently than once annually, nor shall the records supporting any such statement be audited more than once.

D.     Foreign Receipts.  Notwithstanding anything to the contrary contained elsewhere herein, no sums received by Producer relating to the Picture shall be included in Gross Receipts hereunder unless and until such sums have been received by Producer in U.S. dollars in the United States.  All sums received by Producer in foreign currency will be converted to U.S. dollars and remitted to Producer in the United States as promptly as possible, consistent with Producer's reasonable business judgment and with applicable laws.  Producer will promptly after receipt of a written request from Participant (but not more frequently than once annually) advise Participant in writing as to foreign revenues not included in Gross Receipts as aforesaid, and Producer shall, at the written request and expense of Participant (subject to any and all limitations, restrictions, laws, rules and regulations affecting such transactions), deposit into a bank designated by Participant in the country involved, or pay to any other party designated by Participant in such country, such part thereof as would have been payable to Participant hereunder.  Such deposits or payments to or for Participant shall constitute due remittance to Participant, and Producer shall have no further interest therein or responsibility therefor.  Producer makes no

warranties or representations that any part of any such foreign currencies may be converted into U.S. dollars or transferred to the account of Participant in any foreign country.  In no event shall Producer be obligated to apply revenues from any territory not actually received by Producer in U. S. dollars in the United States to the recoupment of any costs or expenses incurred with respect to the Picture in any other territory.

E.   Allocations.  In any instance where revenues are earned or expenses are incurred with respect to a group of motion pictures, including the Picture, and such revenues or expenses are not specifically allocated among said group of motion pictures, Producer shall make such allocations as are determined by Producer in good faith. With regard to trailers and shorts utilized with the Picture outside of the United States and Canada, an allocation of three percent (3%) of Gross Receipts therefrom for trailers and five percent (5%) thereof for shorts shall be conclusively deemed a reasonable good faith allocation with respect thereto.

F.   Reserves.  Producer shall have the right to establish appropriate reserves and adjust same from time-to-time for any Production Costs, Distribution Expenses, uncollectible accounts or other items which Producer reasonably anticipates will be deductible from Gross Receipts hereunder.  Reserves established hereunder shall be liquidated within a reasonable time, and in no event shall any sum remain in any such reserve for more than two (2) years.

G.   Tax Credits.  As between Producer and Participant, Producer shall have the sole right to take the full amount of whatever credits, including, without limitation, investment tax credits, deductions or other benefits as may be available to it, throughout the world, with respect to taxes and excises payable with respect to the Picture or any activity related thereto, without any accounting, credit or payment obligation to Participant of any kind or nature.

H.   No Trust Imposed.  Gross Receipts are Producer's sole and exclusive property and not trust funds, nor otherwise held by Producer for Participant's benefit.  Producer's obligation to make payments to Participant is that of a debtor only.  Participant shall not own any interest whatsoever in or to the Picture, Gross Receipts or Net Profits, or have any lien or other claim thereon.  Producer's obligation to pay Participant hereunder shall not bear interest nor entitle Participant

NP 17

to gains which may accrue to such funds prior to the payment thereof to Participant.

I.    No Obligation to Exploit.  Nothing herein shall be deemed to obligate Producer to produce, distribute, exhibit or otherwise exploit the Picture. Producer may do so or refrain therefrom as it may decide in its own absolute discretion, and if it elects to produce, distribute, exhibit or otherwise exploit the Picture, the manner in which it does so shall not subject it to any liability to Participant of any kind or nature. Producer makes no warranty or representation as to the amount of Net Profits, or that there may be any Net Profits.

III.    DISPOSITION OF RIGHTS.

Producer shall have the right to sell, transfer or assign all or any of its rights in and to the Picture and the negative and copyright thereof.  Any such sale, transfer or assignment shall be subject to Participant's rights hereunder, and upon the purchaser, transferee or assignee assuming performance of this agreement in place and instead of Producer (provided that such purchaser, transferee or assignee is a so-called "major" producer or distributor or another financially responsible party), Producer shall be released and discharged of and from any further liability or obligation hereunder.  No part of any sale price or other consideration received by, or payable to, Producer in connection with such sale, transfer or assignment shall be included in the Gross Receipts hereunder, and Participant shall have no rights in respect of any thereof.

IV.    RELATIONSHIP OF THE PARTIES.

A.    No Joint Venture.  Nothing herein contained shall be construed to create a partnership or joint venture by or between Producer and Participant, or to make either the agent of the other.  Each of Producer and Participant agrees not to hold itself out as a partner or agent of the other, or to otherwise state or imply by advertising or otherwise any relationship between the parties in any manner contrary to the terms of this Exhibit and the Principal Agreement, and neither shall become liable or bound by any representation, act, omission or agreement whatsoever of the other which may be contrary to the provisions of this Exhibit or the Principal Agreement.

B.   Right to Mortgage.   Producer shall have the right to mortgage, pledge, assign, encumber or otherwise hypothecate the Picture or the Gross Receipts or Net Profits therefrom, either in whole or in part, for any purpose whatsoever without obtaining Participant's consent, subject of course, to the provisions of this Exhibit with respect to the payment of Participant's Participation.

C.   Exclusive Control.   It is expressly agreed that Producer shall have full and exclusive charge and control of the production, distribution, sale, exploitation, marketing, reissuing or other disposition of the Picture and all rights therein or thereto, and the Picture may be distributed, sold outright, exploited, marketed or otherwise disposed of by Producer throughout the universe, in perpetuity, and Producer may, in its sole discretion, withhold or withdraw the Picture from distribution, either entirely or with respect to any country or territory, or portion thereof.  Nothing herein contained shall be deemed to limit Producer from entering into any agreement with any Subdistributor with respect to the Picture on whatever terms and conditions Producer and such Subdistributor may agree.  It is further understood that the Picture may be distributed under any plan or plans which Producer or such Subdistributor may deem proper or expedient, and Producer or such Subdistributor shall have the right to lease the Picture and make all bookings, lending, licensing and rental contracts for the exhibition thereof, and to grant to others the right to distribute and exhibit the Picture, or any part thereof. Producer and such Subdistributor, as the case may be, shall have the right to make and cancel contracts involving the distribution or exhibition of the Picture or any part thereof, and, in accordance with their good faith business judgment, to adjust and settle all disputes with Subdistributors, exhibitors, licensees and other persons, including the right to give allowances, rebates and credits to such persons.  All of the foregoing provisons shall apply to both domestic and foreign territories.  In the event that Producer shall license, sell or otherwise dispose of any rights in the Picture to any party owning, owned by or under joint ownership with Producer, such disposition shall be made on terms substantially equivalent to the terms which would apply had such disposition been made to an unrelated third party, it being understood that Producer's good faith determination of such terms shall be binding on the parties hereto.  It is the intent and purpose of this Exhibit that absolute and sole control and discretion with reference to all matters involving the production, distribution,

NP 19

exhibition, sale and reissuing of the Picture shall, as between Producer and Participant, be vested solely and exclusively in Producer, and shall be exercised by Producer in such manner as in Producer's sole judgment and discretion may be deemed proper, and that Participant shall have no right of approval or control whatsoever in connection therewith.

V.  ASSIGNMENTS

Participant shall not have the right, prior to the completion of all services, if any, required to be performed by Participant in connection with the Picture, to sell, assign, transfer or hypothecate (all hereinafter referred to as "Assign") all or any part of Participant's right to receive any Participation hereunder.  Thereafter, Participant may Assign Participant's said right provided, however, that (i) Producer shall not be required to accept or honor any assignment or assignments which would result in requiring Producer to make payments to an aggregate of more than one (1) party (but such party may be a disbursing agent for more than one (1) party), and (ii) in no event shall any party other than Participant have the right to audit Producer's records by reason of such assignment.  Any such assignment shall, at all times, be subject to all pertinent laws and government regulations and to all rights of Producer hereunder and at law, including any right to offset Producer may have against Participant with regard to any claim by Producer against Participant, whether such claim arises under the Principal Agreement, this Exhibit, or otherwise.  In the event that Participant (or any assignee) shall propose to Assign all or part of the monies payable to Participant (or any assignee) hereunder, other than by way of a bona fide gift, bequest or devise, dissolution of the Participant (if a corporation) or corporate merger or acquisition of all or substantially all of Participant's assets (if Participant has substantial assets other than the Participation), Producer shall have the right of first refusal to acquire the same, which right Producer may exercise within ten (10) business days after receipt of written notice from Participant (or any assignee) specifying the terms and conditions upon which Participant (or any assignee) proposes to make such assignment. Failure to give such notice to Producer ten (10) or more business days prior to the date of such assignment, shall make such assignment null and void for all purposes. Should Producer fail to exercise said right of first refusal as aforesaid, then Participant (or any assignee) shall not assign such monies or any part thereof to any third party upon terms and conditions more favorable to

Exhibit 7, Page 173

such third party than those set forth in such written
notice without again giving Producer the opportunity to
exercise said right of first refusal in accordance with
the foregoing procedures.

NP 21

RIDER

THIS RIDER, attached to Exhibit "NP" attached to and made a part of that certain agreement ("Principal Agreement") dated as of November __, 1982, between SHERWOOD PRODUCTIONS, INC. ("Producer"), and HARRY BAILLY PRODUCTIONS, INC. and LAKODA PRODUCTIONS, INC. (collectively "Participant") relating to that certain motion picture entitled "Buckaroo Banzai" (the "Picture").  Said Exhibit "NP" is hereby modified as follows (numbered in accordance with the paragraphs thereof):

I.B.1    In the event that there are "Four Wall Receipts" derived from theaters owned by Producer or the U.S. distributor of the Picture, the expenses deducted in connection therewith shall be no greater than the expenses which would have been charged had such theaters been rented on an arms-length basis to an unrelated third party distributor.

I.B.5  The litigation described in this paragraph shall include litigation relating to misappropriation, unfair competition and similar interference with rights, the proceeds of which are includable in Gross Receipts, but shall not include litigation of the nature of breach of contract with exhibitors or subdistributors because the receipts therefrom shall be included in Gross Receipts in the applicable category hereunder, and the costs therefrom being included as Distribution Expenses.

I.B.6  The soundtrack records described in subparagraph (b) shall include soundtrack records containing music which was originally recorded for the soundtrack of the Picture, but which may have been rerecorded for inclusion in such soundtrack album.

I.C.  To the extent that advances and security deposits are not required pursuant to the provisions of the applicable agreement to be maintaied in a segregated fund, such sums shall be included in Gross Receipts, but only for the purpose of computing Interest on Negative Cost.  In the event that any sums so included must subsequently be repaid or any interest on such sums must be paid to a third party, such repayment and such interest shall be treated as a Distribution Expense hereunder.  If a segregated fund is required and interest is paid on such fund, which interest is retained by Producer for its sole benefit, then such interest shall be included in Miscellaneous Receipts when such interest is fully vested in Producer.

1
Rider to Exhibit "NP"

I.C.3  The sums excluded as taxes shall be included within Gross Receipts if they are neither paid to the applicable taxing authority within fifteen (15) months of collection nor the subject of a continuing dispute with such taxing authority.

I.C.5  To the extent that special cars, boats or real estate are purchased specifically for use in the Picture, and such cars, boats or real estate are disposed of immediately after completion of principal photography, the net receipts from any such sale shall be included in Miscellaneous Receipts.

I.D.5  Nothwithstanding the provisions of I.D.5, if Producer's agreement with a third party subdistributor provides that Producer shall share in some portion of the sums remaining after deduction of distribution fees and expenses (a so-called "net deal"), then Producer shall only be entitled to the extent that such distribution fee plus the distribution fee charged by such subdistributor does not exceed a total distribution fee of fifty percent (50%) of such subdistributor's gross receipts.

I.D.6  In the event that the election described in paragraph I.B.9(b) is made, the distribution fees described in this paragraph shall be in lieu of any of the other fees described in section I.D.

I.E.1  The costs described in this paragraph paid by a Subdistributor shall only be deducted if Producer has made the election described in paragraph I.B.9(a) above. With regard to the last sentence, the word "discount" shall be deemed to include both discounts and rebates.

I.E.14  Expenses of a Subdistributor shall only be deducted hereunder if Producer has made the election described in I.B.9(a) above with regard to Gross Receipts from such Subdistributor.  To the extent that any distribution expenses are paid to Producer or a party owning or owned by or under joint ownership with Producer, such expenses shall be charged on terms substantially equivalent to the terms which would apply had such items been sold to an unrelated third party.

I.F.1(b)  In no event shall interest described in this paragraph be chargeable on expenditures actually made in the United States.  Interest on all such U.S. expenditures shall be charged in accordance with paragraph I.F.1(a) above.

Exhibit 7, Page 176

I.F.2  In the third line, the word "mid-point" shall replace the word "end."

I.G.3  In addition to the exclusions already described in said paragraph, for purposes of said paragraph, the Negative Cost shall not include costs incurred solely by reason of retroactive union increases which could not have been reasonably foreseen at the time the Budgeted Negative Cost was approved or as a result of third party breach (but only to the extent that such breach is not the result of an action or inaction by Employer and Employee and only if Employee has informed Producer fully and completely of all events leading up to said breach as soon as Employee is aware of the possibility of a serious dispute and if Employee substantially follows all of Producer's instructions with regard to resolving such dispute or potential dispute) or as the result of unusual weather conditions which could not have reasonably been foreseen as of the commencement of principal photography (but only if Employee has taken reasonable steps to provide contingency plans for normal weather conditions at the location where the Picture is to be photographed or items actually reimbursed by insurance or where an insurance company is legally bound so to reimburse).

II.A  If the Picture is licensed for prime time exhibition on a U.S. television network, and if more than Five Hundred Thousand Dollars ($500,000) is received in any three (3) month period after the conclusion of the first three (3) years following the Intitial Release Date, then each time such sum is received during such period a special accounting period shall be declared hereunder ending no more than three (3) months following the receipt of such sums.  The quarterly accounting in the event of a major U.S. theatrical re-release of the Picture shall continue for twelve (12) months rather than six (6) months.  If, after the conclusion of the first three (3) years following the Intitial Release Date of the Picture no statement is required hereunder, such statement shall nonetheless be issued on the written request of Participant; provided, however, that such request may not be made more than once annually.

II.B  Wherever "eighteen (18) months" appears in this paragraph, it will be amended to read "twenty-four (24) months."

II.B.1 and II.B.2  The costs described in subparagraph 1 and the items described in subparagraph 2 shall only include costs and items in arms-length

3
Rider to Exhibit "NP"

transactions with unrelated third parties.  Additionally, the prohibition against Participant making claims with regard to such items shall not be construed so as to prevent Participant from claiming that such costs and items are of a nature that they would not be deductible hereunder even if properly paid.  By way of example, if an advertising charge has been paid in good faith by Producer to an unrelated third party in an arms-length transaction, Participant would have no right to claim that such sum should not have been paid, but Participant would have a right to make a claim (if otherwise justified) that such sum was paid for advertising on a motion picture other than the Picture.

II.D  To the extent that restricted funds are actually used by Producer, such funds shall be included in Gross Receipts.  If, at the time of such use, Producer has restricted funds in such territory derived from more than one (1) source, then Producer shall make a good faith allocation of the funds actually used in accordance with its then current policies on such matters.

IV.C  The phrase starting with the word "it" in the ninth line from the end of this paragraph, and continuing to the end of this sentence, is deleted.

4
Rider to Exhibit "NP"

Exhibit 7, Page 178

# EXHIBIT 8

# EXHIBIT 8

# FORM PA

UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

This certificate, issued under the seal of the Copyright Office in accordance with the provisions of section 410(a) of title 17, United States Code, attests that copyright registration has been made for the work identified below. The information in this certificate has been made a part of the Copyright Office records.

*David Ladd*

**REGISTER OF COPYRIGHTS**
*United States of America*

**PAu   555-142**

PA · PAU

EFFECTIVE DATE OF REGISTRATION

**OCT 28 1983**

Month   Day   Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

## 1

**TITLE OF THIS WORK ▼**

BUCKAROO BANZAI

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**NATURE OF THIS WORK ▼** See instructions

Final Shooting Script   (Revised Third Draft)

## 2

**a**

**NAME OF AUTHOR ▼**
Sherwood Productions, Inc. employer for hire of Earl Mac Rauch

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ United States

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☒ No
Pseudonymous? ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼
Entire work

**NOTE**

**b**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ _____

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼

**c**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ _____

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼

DA 3 306 0204
*338802047*

## 3

**YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
1983 ◀ Year

**DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK** Complete this information ONLY if this work has been published.
Month ▶ _____ Day ▶ _____ Year ▶ _____ ◀ Nation

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Sherwood Productions, Inc.
3910 Overland Avenue
Culver City, California 90230

**TRANSFER** If the claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

See instructions before completing this space

APPLICATION RECEIVED
28 OCT 1983
ONE DEPOSIT RECEIVED
28 OCT 1983
TWO DEPOSITS RECEIVED

REMITTANCE NUMBER AND DATE

DO NOT WRITE HERE OFFICE USE ONLY

---

**MORE ON BACK ▶**   • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.   • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of ___ pages

Exhibit 8, Page 179

FORM PA

EXAMINED BY

CHECKED BY

PAu 555-142

☐ CORRESPONDENCE
   ☐ Yes

☐ DEPOSIT ACCOUNT
☒ FUNDS USED

FOR
COPYRIGHT
OFFICE
USE
ONLY

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼
☐ This is the first published edition of a work previously registered in unpublished form.
☐ This is the first application submitted by this author as copyright claimant.
☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: **Previous Registration Number** ▼          **Year of Registration** ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a & 6b for a derivative work; complete only 6b for a compilation.
a. **Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

b. **Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**6**

See instructions
before completing
this space

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
**Name** ▼                              **Account Number** ▼

Twentieth Century-Fox Film Corporation                    ▮185

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼
⬤ldora Anderson
Twentieth Century-Fox Film Corporation
Box 900
Beverly Hills, California 90213
                    Area Code & Telephone Number ▶  213-203-2966

**7**

Be sure to
give your
daytime phone
◀ number

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one ▼
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of _Sherwood Productions, Inc._
                    Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this is a published work, this date must be the same as or later than the date of publication given in space 3.
Halldora Anderson                                    date ▶  10-24-83

Handwritten signature (X) ▼
⟨signature⟩

**MAIL
CERTIFI-
CATE TO**

Name ▼
Lyman S. Gronemeyer, Esq.
Twentieth Century-Fox Film Corporation
Number/Street/Apartment Number ▼

**Certificate
will be
mailed
window
envelope**

Box 900
City/State/ZIP ▼
Beverly Hills, California 90213

Have you:
● Completed all necessary
  spaces?
● Signed your application in space
  8?
● Enclosed check or money order
  for $10 payable to Register of
  Copyrights?
● Enclosed your deposit material
  with the application and fee?
MAIL TO: Register of Copyrights,
Library of Congress, Washington,
D.C. 20559

**9**

* 17 U.S.C. § 506(e) Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

☆ U.S. GOVERNMENT PRINTING OFFICE 1981 355-306

Nov. 1981-700,000

# EXHIBIT 9

# EXHIBIT 9

# CERTIFICATE OF COPYRIGHT REGISTRATION



OFFICIAL SEAL

This certificate, issued under the seal of the Copyright Office in accordance with the provisions of section 410(a) of title 17, United States Code, attests that copyright registration has been made for the work identified below. The information in this certificate has been made a part of the Copyright Office records.



**REGISTER OF COPYRIGHTS**
*United States of America*

## FORM PA
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

**224-582**

PA    PAU

EFFECTIVE DATE OF REGISTRATION

SEPT   19   84
Month   Day   Year

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1**

TITLE OF THIS WORK ▼

THE ADVENTURES OF BUCKAROO BANZAI ACROSS THE 8TH DIMENSION

PREVIOUS OR ALTERNATIVE TITLES ▼

NATURE OF THIS WORK ▼ See instructions

Motion Picture

---

**2**

**NOTE**
Under the law the "author" of a "work made for hire" is generally the employer not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for

**a** NAME OF AUTHOR ▼
Sherwood Productions, Inc.

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ United States
Domiciled in ▶ _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes  ☒ No
Pseudonymous?  ☐ Yes  ☒ No
If the answer to either of these questions is "Yes," see detailed instructions

NATURE OF AUTHORSHIP  Briefly describe nature of the material created by this author in which copyright is claimed. ▼
Entire work see #6

**b** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions

NATURE OF AUTHORSHIP  Briefly describe nature of the material created by this author in which copyright is claimed. ▼

NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions

NATURE OF AUTHORSHIP  Briefly describe nature of the material created by this author in which copyright is claimed. ▼

---

YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED  This information must be given in all cases.
1984  ◀ Year

DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information  Month ▶ July  Day ▶ 23  Year ▶ 1984
ONLY if this work has been published.
United States  ◀ Nation

---

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2.▼

Sherwood Productions, Inc.
3910 Overland Avenue
Culver City, California 90230

See instructions before completing this space.

APPLICATION RECEIVED
19 SEP 1984
ONE DEPOSIT RECEIVED
19 SEP 1984
TWO DEPOSITS RECEIVED

REMITTANCE NUMBER AND DATE

DO NOT WRITE HERE
OFFICE USE ONLY

TRANSFER If the claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright.▼

---

MORE ON BACK ▶  • Complete all applicable spaces (numbers 5-9) on the reverse side of this page
• See detailed instructions  • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of ___ pages

```
P.A          ●          224-582
```

| EXAMINED BY | | FORM PA |
| CHECKED BY | | |
| CORRESPONDENCE ☐ Yes | | FOR COPYRIGHT OFFICE USE ONLY |
| ☑ DEPOSIT ACCOUNT FUNDS USED | | |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼
☐ This is the first published edition of a work previously registered in unpublished form.
☐ This is the first application submitted by this author as copyright claimant.
☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: **Previous Registration Number ▼**     **Year of Registration ▼**

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a & 6b for a derivative work; complete only 6b for a compilation.
a. Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

Final Shooting Script entitled BUCKAROO BANZAI

b. Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

Motion Picture Version

**6**

See instructions before completing this space

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼     Account Number ▼

Twentieth Century Fox Film Corporation     ▌1185

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼
Halldora Anderson
Twentieth Century Fox Film Corporation
Box 900
Beverly Hills, California     90213
Area Code & Telephone Number ▶   213-203-2966

Be sure to give your daytime phone number

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one ▼
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of  Sherwood Productions, Inc.
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

**8**

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this is a published work, this date must be the same as or later than the date of publication given in space 3.
Halldora Anderson                                       date ▶  8-6-84

Handwritten signature (X) ▼
*Halldora Anderson*

**MAIL CERTIFI-CATE TO**     Name ▼     Lyman S. Gronemeyer, Esq.
                                              Twentieth Century Fox Film Corporation
Certificate will be mailed in window envelope
Number/Street/Apartment Number ▼     Box 900
City/State/ZIP ▼     Beverly Hills, California 90213

**9**

Have you:
• Completed all necessary spaces?
• Signed your application in space 8?
• Enclosed check or money order for $10 payable to Register of Copyrights?
• Enclosed your deposit material with the application and fee?
MAIL TO: Register of Copyrights, Library of Congress, Washington, D.C. 20559

* 17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

☆ U.S. GOVERNMENT PRINTING OFFICE: 1982-361-278/60     Sept. 1982—175,000

# EXHIBIT 10

# EXHIBIT 10

**From:** Mark Lichtman [mailto:marklichtman@gmail.com]
**Sent:** Tuesday, August 16, 2011 9:18 AM
**To:** Roma Khanna
**Subject:** Re: Buckaroo Banzai

Thank you will show it to everyone and get back to you Mark

On Mon, Aug 15, 2011 at 7:15 PM, Roma Khanna <RKhanna@mgm.com> wrote:

Hello Mark,


It was nice to meet you via telephone last week.


Following up from our discussion, attached you will find a copy of the 1998 limited-term assignment of development rights to PolyGram Television for Buckaroo Banzai, showing the reversion of rights.


Things look fairly clear from the paper we have on our end, but please let me know if you have any documents you'd like us to look over that state otherwise.  Happy to review.



All the best,

Roma




Roma Khanna

President, Television Group and Digital

MGM Studios Inc.

10250 Constellation Blvd.,

Los Angeles, California

USA  90067-6241


Phone:   310.449.3850

Fax:       310.449.3851

Email:    RKhanna@mgm.com


MGM HAS A NEW HOME . . .

Effective on **August 22, 2011**, the headquarters of
Metro-Goldwyn-Mayer will be located at:

**245 N. Beverly Drive**
**Beverly Hills, CA 90210-5317**

Please note that our phone numbers will remain the same,
including the main number, (310) 449-3000.

Notice: MGM Tower Phones will be unavailable between Thursday, 5pm – Friday, 5pm PDT (August 18-19).

# EXHIBIT 11

# EXHIBIT 11



Keller
Sloan
Roman
Holland
**LLP**
Attorneys

September 13, 2016

<u>VIA EMAIL AND U.S. MAIL</u>

Robert H. Rotstein
Mitchell Silberberg & Knupp LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683

      Re:    <u>W.D. Richter & Earl Mac Rauch – Buckaroo Banzai</u>

Dear Mr. Rotstein:

Thank you for your letter of August 18, 2016. Unfortunately, you misconstrue the rights which my clients own with respect to the world of Buckaroo Banzai. We are not claiming the limited rights which MGM might own with respect to the single motion picture, *Buckaroo Banzai Across the 8th Dimension*, although as is discussed below, there are certainly serious questions even as to the chain of title with respect to that picture and MGM's rights associated with it. What my clients own are the overall rights to the world of Buckaroo Banzai, and all of the characters, themes and ideas associated with that world. My clients' rights are based on a series of facts of which I suspect that you, and perhaps even the current MGM administration, are unaware. Therefore I will attempt to educate you and MGM regarding those facts, the creation of the world of Buckaroo Banzai by Mr. Rauch, and his embodiments of that world prior to 1981, all of which give rise to these rights.

As you do know, on April 9, 1981, MGM entered into an agreement with Johnny B. Good, Inc. simply to lend the services of Earl Mac Rauch to write a screenplay based on a single episode from "The Adventures of Buckaroo Banzai." Long before that agreement, Mr. Rauch created the character Buckaroo Banzai, the world in which he lives and in which his adventures take place, and a series of written embodiments of episodes involving these characters.

In late summer of 1973, Mr. Rauch pitched to Susan and W.D. Richter—principals of Harry Bailly Productions, Inc.— an original story idea for a series of interlocking, but stand-alone, episodic adventures featuring a multi-talented country-western singer and jet-car driver then named "Buckaroo Bandy." On September 27, 1973, Harry Bailly Productions entered into a one-year option agreement with Mr. Rauch for a serio comic screenplay entitled "JET CAR" that he was to write based upon a single episode from his own proposed Buckaroo Bandy series.

When Mr. Rauch began to write "JET CAR", he retitled it "THE STRANGE CASE OF MISTER CIGARS: A BUCKAROO BANDY MYSTERY." At this point, he introduced several key elements of what would become the world of Buckaroo Banzai. The proposed

Robert H. Rotstein
Mitchell Silberberg & Knupp LLP
September 13, 2016
Page 2

plot line for this episode was to be Buckaroo's race to defeat Mister Cigars before that villain assassinated dozens of world leaders with exploding cigars at a global conference.

Mr. Rauch immediately began to work on a second Buckaroo episode, what would become a complete 57-page treatment for a proposed screenplay entitled "LEPERS FROM SATURN — A BUCKAROO BANZAI ADVENTURE." In this treatment, Rauch changed Buckaroo's surname from "Bandy" to "Banzai," and continued to introduce elements of his world.

Having finished the treatment for "LEPERS FROM SATURN — A BUCKAROO BANZAI ADVENTURE", Mr. Rauch at once began work on a third original script embodying a different episode that he called "A BUCKAROO BANZAI THRILLER — 'FIND THE JET CAR,' SAID THE PRESIDENT." Here Mr. Rauch introduced more details about his complex fictional world and its heroes, Buckaroo Banzai and the Hong Kong Cavaliers.

Mr. Rauch set aside this episode after completing 67 pages of the screenplay. He then turned his attention to yet another individual episode in his proposed series of BUCKAROO BANZAI adventures, beginning work on a fourth screenplay entitled "SHIELDS AGAINST THE DEVIL — A BUCKAROO BANZAI THRILLER." He completed this 109-page screenplay in 1975.

In "SHIELDS AGAINST THE DEVIL", Mr. Rauch continued to introduce elements and characters. Mr. Rauch changed the name of "The Shields" to "Knights of The Blue Shield" (precursors of "The Blue Blaze Irregulars" who appear in subsequent episodes).

Two major plots are entwined in the episode entitled "SHIELDS AGAINST THE DEVIL," one concerning a gigantic weaponized robot steered by crude gears, levers, and sophisticated computers being operated by villains from a cockpit in its head. This King-Kong-like robot is owned by a vicious cartel that Buckaroo has battled before, "The World Crime League," whose headquarters is a "Fascist Fortress … a super-secret hideout in an unknown Asian land" and whose "sinister members" are "like a criminal United Nations," their "reigning chairman" in this episode "the semi-Oriental villain, HOT FAT FROM SINGAPORE."

This first narrative thread in "SHIELDS AGAINST THE DEVIL" concerns America's race to finish the prototype Jet Car before The World Crime League, who has stolen all its plans, builds one of its own and uses it for evil purposes. The melodrama plays out against a second interwoven plot as Buckaroo figures out that Adolf Hitler did not die in a Berlin bunker, but escaped disguised as a woman and is now possibly hiding in a forbidding Ecuadorian jungle populated by gigantic, hairy humans. In a short prose piece at the conclusion of "SHIELDS AGAINST THE DEVIL," Mr. Rauch laid out plans for his next Buckaroo episode, "FORBIDDEN VALLEY", and set his hero off for Ecuador in the Jet Car, heading toward that mysterious, remote jungle locale in search of Adolf Hitler.

Robert H. Rotstein
Mitchell Silberberg & Knupp LLP
September 13, 2016
Page 3

These five stories—(1) "THE STRANGE CASE OF MISTER CIGARS:  A BUCKAROO BANDY MYSTERY," (2) "LEPERS FROM SATURN — A BUCKAROO BANZAI ADVENTURE," (3) "A BUCKAROO BANZAI THRILLER — 'FIND THE JET CAR,' SAID THE PRESIDENT," (4) "SHIELDS AGAINST THE DEVIL — A BUCKAROO BANZAI THRILLER," and (5) "FORBIDDEN VALLEY"— are all discreet episodes from Mr. Rauch 's serialized story idea and were written by Mr. Rauch between 1973 and 1975.  As such, Mr. Rauch owns the copyrights to each of these individual written works as well as to the overarching world of Buckaroo Banzai.  These copyrights are in full force and effect today.

In 1981, W.D. Richter and the producer Neil Canton formed an independent production company, Atlantic Films, and Mr. Richter provided Mr. Canton with over 200 pages of the Buckaroo Banzai saga — the screenplays and prose that Mr. Rauch wrote between1973 and 1975. Mr. Canton loved the elaborate Buckaroo Banzai story idea, likening the property's concept to the distinct, separate adventures of the Indiana Jones series.

On March 25, 1981, W. D. Richter and Neil Canton sent a bound volume of Buckaroo Banzai material that they called "A Buckaroo Banzai Sampler" to the producer Sydney Beckerman.  The next day, on March 26, 1981, Mr. Canton and Mr. Richter met with Sydney Beckerman, who had by then read the sampler. Mr. Beckerman told Mr. Canton and Mr. Richter that he thought the material might be perfect for David Begelman, then head of MGM.

On March 27, 1981, Messrs. Beckerman, Canton, and Richter met with Mr. Begelman at MGM and pitched him the entirety of Mr. Rauch's "The Adventures of Buckaroo Banzai," leaving with him a copy of "A Buckaroo Banzai Sampler."

Their pitch to Mr. Begelman and MGM was not a typical single-story-idea pitch, but rather a detailed presentation of a larger, wholly original, multi-episode idea: "The Adventures of Buckaroo Banzai." Five episodes of that proposed series, as noted, already existed in written form and were included in "A Buckaroo Banzai Sampler" which was left with Mr. David Begelman for his consideration.

The very next day, Mr. Begelman told Sydney Beckerman that he (and MGM) were not interested in acquiring or developing Mr. Rauch's larger property and only wanted to hire Mr. Rauch to write a screenplay based upon only a single episode from "The Adventures of Buckaroo Banzai." Specifically, Mr. Begelman had chosen from the five episodes in the "Sampler", to make Mr. Rauch an offer to write a screenplay based upon the single episode "LEPERS FROM SATURN — A BUCKAROO BANZAI ADVENTURE."  That offer is memorialized in the April 9, 1981 agreement, and provides for MGM to borrow Mr. Rauch as a writer-for-hire from his personal holding company, Johnny B. Good Inc., to write a screenplay and two revisions based on this single episode (referenced in the Agreement as the "Property ") .

Robert H. Rotstein
Mitchell Silberberg & Knupp LLP
September 13, 2016
Page 4

Critically, Mr. Begelman and MGM passed on the opportunity to option or obtain any rights in Mr. Rauch's larger property, including the other four episodes which he had written to that point or any other rights to the world of BUCKAROO BANZAI. The Agreement itself specifically defines what MGM was contracting to acquire – a screenplay (based on a single episode of BUCKAROO BANZAI) and two revisions – and the rights associated with that screenplay.

The Agreement refers to the tentative title for the screenplay "BUCKAROO BANZAI" because Mr. Begelman deemed the episode's original title, "LEPERS FROM SATURN", in "poor taste." But a comparison of the treatment and Mr. Rauch's screenplay demonstrate that the screenplay is derived from the "LEPERS FROM SATURN" treatment. Furthermore, Thomson & Thomson's September 11, 1998 Copyright Research Report, commissioned by Harry Bailly Productions regarding "THE ADVENTURES OF BUCKAROO BANZAI ACROSS THE 8TH DIMENSION," states that "'Baseline' reports that the motion picture was also known under the title BUCKAROO BANZAI AND THE LEPERS FROM SATURN." Tentatively calling the project BUCKAROO BANZAI does not and did not convey to MGM the rights to Mr. Rauch's other copyrighted works or to the world of BUCKAROO BANZAI.

In 1981, while Mr. Rauch was writing the first draft of his screenplay, MGM purchased United Artists and merged the two companies. On July 13, 1982, while Rauch was doing revisions on his first draft, David Begelman was removed as chief of MGM/UA. The new administration was unenthusiastic about the project and agreed to sign it over to Begelman's new independent company, Sherwood Productions.

"THE ADVENTURES OF BUCKAROO BANZAI ACROSS THE 8TH DIMENSION" went into preproduction late in 1982, with bank credit and independent financing raised domestically and internationally by Mr. Begelman. He also made a domestic distribution and marketing deal with 20th Century Fox and sold off the international distribution rights territory by territory, generating advances against the "$20,000,000" movie that he claimed Sherwood was about to make. In fact, the budget was under $13,000,000, and David Begelman had embarked upon questionable financial manipulations involving a number of unwitting entities like European American Bank and Trust Company, Continental Illinois Bank and Trust Company of Chicago, Time Warner Entertainment Company LP, August Entertainment, Inc., and The Kushner-Locke Company. He mortgaged and assigned many of his company's titles, including "THE ADVENTURES OF BUCKAROO BANZAI ACROSS THE 8TH DIMENSION". These maneuvers eventually resulted in the bankruptcy of both Sherwood Productions and Gladden Entertainment (a company Mr. Begelman formed after the collapse of Sherwood Productions).

The compromised titles in Sherwood's film library became the property of its principle creditor, Credit Lyonnais Bank — Netherlands, before passing through the hands of Polygram Filmed Entertainment, then Seagrams Universal, who sold it back to MGM. So by

Robert H. Rotstein
Mitchell Silberberg & Knupp LLP
September 13, 2016
Page 5

1998, MGM at best was the owner of record of a library that contained a motion picture entitled "THE ADVENTURES OF BUCKAROO BANZAI ACROSS THE 8TH DIMENSION"

However, in 2009, after searching the contradictory copyright and assignment history of the movie, lawyers for Warner Bros. Animation (who at that time wished to partner with MGM on a Buckaroo Banzai animated television show) concluded that there was no way that MGM could establish a clear chain of title that proved the actual extent of its current "ownership" of the motion picture entitled "THE ADVENTURES OF BUCKAROO BANZAI ACROSS THE 8TH DIMENSION". As a result of this title search, Warner Bros. Animation withdrew from the proposed joint project, and MGM never pursued the matter further.

Therefore, MGM's chain of title in and to the motion picture "THE ADVENTURES OF BUCKAROO BANZAI ACROSS THE 8TH DIMENSION is not clear, but it is clear that Mr. Rauch owns copyrights in five documented episodes from the world of Buckaroo Banzai as well as owning the overall rights to the world of Buckaroo Banzai, the characters, plots and themes. It is equally clear that MGM never obtained any rights in those works, other than perhaps the specific rights to the screenplay that Mr. Rauch wrote in 1981 that became the motion picture "THE ADVENTURES OF BUCKAROO BANZAI ACROSS THE 8TH DIMENSION."

Your statute of limitations argument does not apply to my clients' claims in the overarching rights to the world of Buckaroo Banzai and to Mr. Rauch's copyrighted works. No one other than Mr. Rauch has ever claimed ownership in the earlier Buckaroo Banzai works, and a claim that rests on his ownership of those rights therefore is not time-barred.

The facts outlined above confirm that Mr. Rauch owns the copyright in the Buckaroo Banzai world and its characters, themes and elements. Because MGM does not own the copyright to the Buckaroo Banzai character and setting, it cannot develop any project outside of the limited rights in one specific screenplay. If MGM continues forward with any such development without my clients' permission, they will be forced to consider all legal options to protect their rights.

Very truly yours,

Kenneth E. Keller

KEK/all